**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| WILLIAM R. ROGERS, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| GREGORY HACKER, | )  Case No.: 3:20-cv-01116-DWD |
| | ) |
| Defendant. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT HACKER'S**
**MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff's six-count amended complaint attacks several gun safety measures: the Firearm Owners Identification (FOID) Card Act, the Firearm Concealed Carry Act, Section 24-3 of the Illinois Criminal Code, and the 72-hour waiting period for firearm purchases established by the Illinois Criminal Code. Plaintiff contends Section 24-3 prevents him from purchasing from a dealer a firearm of his choice, at a price of his choice. Plaintiff also alleges that because the General Assembly transferred millions of dollars from certain firearm regulation funds to the General Revenue Fund  in years past, the fees charged for FOID Card and concealed carry applications are in excess of the costs of enforcing the Acts, and therefore unconstitutionally tax Second Amendment rights. Plaintiff seeks an injunction against the State's use or transfer of the funds for purposes unrelated to firearm licenses. Defendant Hacker seeks dismissal of all of Plaintiff's claims because: (1) Plaintiff lacks standing; (2) Count II is not ripe; (3) the Eleventh Amendment bars Plaintiff's supplemental state law claim in Count V; (4) Defendant Hacker is an improper party; (5) qualified immunity bars Count I; (6) Section 24-3 is constitutional; and (7) any government delay in processing background checks does not impose a substantial burden on Second Amendment rights.

## BACKGROUND

### I. The FOID Card Act

The FOID Card Act was created "to promote and protect the health, safety and welfare of the public" by "provid[ing] a system of identifying persons who are not qualified to acquire or possess firearms, firearm ammunition, stun guns, and tasers . . . by the establishment of [FOID] Cards, thereby establishing a practical and workable system by which law enforcement authorities will be afforded an opportunity to identify those persons who are prohibited by . . . the Criminal Code . . . from acquiring or possessing firearms and firearm ammunition and who are prohibited . . . from acquiring stun guns and tasers." 430 ILCS 65/1.

Under the FOID Card Act, 430 ILCS 65/1 *et seq*., the Illinois Department of State Police (ISP) acts on applications for, issues, and revokes FOID cards. The State uses the FOID card application process to determine who is eligible to possess a firearm. ISP is to approve or deny applications "within 30 days from the date they are received." 430 ILCS 65/5. A FOID card application (or renewal) must be accompanied by a $10 fee. 430 ILCS 65/5(a). For original applications, the FOID Card Act specifies that $6 of each fee goes to the Wildlife and Fish Fund, $1 to the State Police Services Fund, and $3 to the State Police Firearm Services Fund. 430 ILCS 65/5(a). For renewal applications, the entire $10 fee goes to the State Police Firearm Services Fund. 430 ILCS 65/5(b). Corrected and replacement cards cost $5, which goes to the State Police Firearm Services Fund. 430 ILCS 65/13.2.

The part of the FOID fee disbursed to the Wildlife and Fish Fund is directly related to the possession and use of firearms. The Department of Natural Resources, which maintains the fund, is required to conduct courses, of not less than 10 hours in length, in firearms and hunter safety.

520 ILCS 5/3.2. "Funds for conducting of firearms and hunter safety courses shall be taken from the fee charged for the Firearm Owners Identification Card." *Id.*

The State Police Services Fund receives money from "all fees received by [ISP] under the Civil Administrative Code of Illinois or the Illinois Uniform Conviction Information Act." 20 ILCS 2605/2605-400(b). As such, this fund receives money not just from FOID Card fees, but also from fees for criminal history checks and in providing services to other governmental agencies. *See* 20 ILCS 2605/2605-327 (fees for criminal history checks of medical school matriculants are deposited in the State Police Services Fund); 20 ILCS 2605/2605-330 (fees for criminal history checks of firefighter applicants are deposited in the State Police Services fund); and 20 ILCS 2605/2605-400 (allowing ISP to charge fees for providing, inter alia, dispatch services, radio and radar repair, and training to government agencies, and those fees are to be deposited in the State Police Services Fund). Money deposited in this fund is appropriated to ISP for the agency's expenses, some of which include implementation and enforcement of the FOID Card Act's provisions. *Id.*; *see* 430 ILCS 65/1 *et seq.*

The State Police Firearm Services Fund may be used to finance any of ISP's "lawful purposes, mandates, functions, and duties under the [FOID] Act and the Firearm Concealed Carry Act . . . including the cost of sending notices of expiration of Firearm Owner's Identification Cards [and] the prompt and efficient processing of applications under the Firearm Owners Identification Card Act[.]" 20 ILCS 2605/2605-595(b). This fund also receives fees other than FOID Cards, including "revenue from grants, . . . donations, appropriations, and any other legal source." 20 ILCS 2605/2605-595(a). Surplus funds beyond what is needed to carry out that purpose "shall be used by [ISP] to improve the Law Enforcement Agencies Data System (LEADS) and criminal history background check system." *Id.*

## II.      The Concealed Carry Act

Illinois enacted the Firearm Concealed Carry Act (430 ILCS 66/1 *et. seq.*) in the wake of

*District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), which held that the Second Amendment

guarantees "the right of law-abiding, responsible citizens to use arms in defense of hearth and

home," and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), which held that the right applies

to the states. As a result of these decisions, the Seventh Circuit struck down two Illinois statutes

that generally prohibited carrying firearms in public. *Moore v. Madigan*, 702 F.3d 933, 942 (7th

Cir. 2012). The General Assembly then passed the Firearm Concealed Carry Act, creating a

licensing system that authorizes the concealed carry of loaded firearms in public. *See Berron v. Ill.

Concealed Carry Licensing Review Bd.*, 825 F.3d 843, 845 (7th Cir. 2016).

Concealed carry license applications and renewals require a $150 fee. 430 ILCS 66/60(b).

Of that amount, $120 goes to the State Police Firearm Services Fund, $20 to the Mental Health

Reporting Fund, and $10 to the State Crime Laboratory Fund. 430 ILCS 66/60(c). ISP issues

licenses to applicants who meet the Act's qualifications, provide the documentation required,

submit the fee, and are determined to not pose a danger to themselves or others, or a threat to

public safety. 430 ILCS 66/10(a).

## LEGAL STANDARD

A defendant may move for dismissal of a claim for lack of subject matter jurisdiction. Fed.

R. Civ. P. 12(b)(1). "The district court may properly look beyond the jurisdictional allegations of

the complaint and view whatever evidence has been submitted on the issue to determine whether

in fact subject matter jurisdiction exists." *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995)

(citations omitted).

A Rule 12(b)(6) motion to dismiss challenges the complaint's legal sufficiency. Fed. R.

Civ. P. 12(b)(6); *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 820-21 (7th Cir. 2009). Although the court must accept as true all well-pleaded factual allegations and draws reasonable inferences in favor of the plaintiff, *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011), legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must "state a claim to relief that is plausible on its face." *Id.* at 663 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). An "unadorned, the-defendant-unlawfully-harmed-me accusation" is insufficient. *Iqbal*, 556 U.S. at 678. "A pleading that offers 'labels and conclusions' or a formulaic recitation of the elements of a cause of action will not do." *Id*.

## ARGUMENT

### Dismissal pursuant to Rule 12(b)(1)

### I.     Plaintiff lacks standing to bring his claims.

To satisfy the Supreme Court's three-part test for Article III standing, a plaintiff must show "(1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016). At the pleading stage, a plaintiff must "clearly allege facts demonstrating each element. *Id.* (citing *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). Although Plaintiff briefly alludes to a "proposed Plaintiff class[]", this suggestion "adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they

belong and which they purport to represent.'" *Simon v. Eastern Ky. Welfare Rights Org*., 426 U.S. 26, 40 n.20 (1976) (quoting *Warth v. Seldin*, 422 U.S. 490, 502 (1975)).

To have standing to bring a pre-enforcement challenge, a plaintiff must "demonstrate that the threat of enforcement" of an unconstitutional rule "caused injury that was actual or imminent, not conjectural or hypothetical." *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 802 (7th Cir. 2016) (internal quotations omitted). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotations omitted). A plaintiff must show an intention to engage in a course of proscribed conduct arguably affected with a constitutional interest and a credible threat of prosecution. *Six Star Holdings*, 821 F.3d at 802.

### A. Plaintiff lacks standing to challenge FOID Card and concealed carry licensing fees.

Plaintiff lacks standing to pursue his challenge in Count III to the FOID card and concealed carry license application fees for several reasons. Plaintiff raises two theories: first that he is entitled to enjoin future uses or transfers from ISP funds; and second, that the fees impermissibly exceed the costs of firearm related programs, such that he is entitled to an injunction against enforcement of the Acts until the fees are reduced. Under either theory, Plaintiff fails to allege he suffered, or there is a substantial risk he will suffer, an injury in fact. And, Plaintiff states no facts showing improper use of fees traceable to Defendant Hacker's conduct.

As stated above, the fees are deposited into various firearm and safety related funds, including the State Police Firearm Services Fund and the State Police Services Fund. 430 ILCS 66/60; 430 ILCS 65/5. In Count III, Plaintiff alleges "for the time period [of] 2014 through 2019" millions of dollars were transferred from the State Police Firearm Services Fund and the State Police Services Fund to the General Revenue Fund (GRF) to pay for general revenue programs.

(Doc. 33, Count III, ¶ 17.) The money, Plaintiff alleges, came from FOID and concealed carry "license receipts." *Id.* Plaintiff alleges, without support, that the fees charged by ISP for the administration of the FOID and concealed carry programs are "largely comprised of taxes" that are well above what is reasonably necessary to administer the program and in fact, act as a tax on constitutionally protected activity. (Doc. 33, Count III, ¶¶ 10, 12.)

Because Plaintiff did not pay his FOID fee until 2020 and has not yet paid a concealed carry fee, Plaintiff's allegations are based on alleged past harm to individuals other than himself, and are insufficient to establish standing. In *Tobin for Governor v. Illinois State Board of Elections*, plaintiff alleged that because the State Board of Elections committed serious procedural errors in refusing to certify candidates in a previous election, it was likely to make the same procedural errors in the future. 268 F.3d 517, 528 (7th Cir. 2001). The court affirmed dismissal for lack of standing, reasoning that the plaintiff's allegations were abstract, speculative, and subject to several contingencies, such as the decisions of individual candidates, the collection of sufficient signatures, and rulings in a hypothetical future proceeding. *Id*. The court held that mere allegations that a party is likely to be injured in the future in the same way it was allegedly injured in the past are not sufficient. *Id.*

Here, Plaintiff's allegations of past harm are insufficient to demonstrate he has been or will be harmed. Plaintiff alleges, with no factual support, that transfers from ISP funds to the State's GRF are "certain to happen again for the 2020, 2021, and beyond fiscal years." (Doc. 33, Count III, ¶ 17.) Fiscal year ("FY") 2020 ended on June 30, 2020, and FY2021 began July 1, 2020.[1] But Plaintiff's amended complaint was filed on November 24, 2020, and Plaintiff did not allege that

---

[1] *See* www2.illinois.gov/dceo/Media/PressReleases/Pages/PR20200610-1.aspx. The Court may take judicial notice of the fiscal years of the State of Illinois. *See* Fed. R. Evid. 201(b). Also, the press release by the State of Illinois is self-authenticating. *See* Fed. R. Evid. 902(5).

money from "license receipts" had been transferred to the GRF in FY2020, or that the budget for FY2021 contemplated such a transfer. Further, Plaintiff's allegations are subject to numerous contingencies, such as the fluctuating costs to administer firearm programs, action by the Illinois General Assembly, and the presumption those funds will be used in an unauthorized manner.

In fact, the transfer of funds from the State Police Firearm Services Fund and the State Police Services Fund to the GRF *was authorized* by the Illinois General Assembly. *See* 30 ILCS 105/8.50 (FY2015); 30 ILCS 105/8.52 (FY2018). No such transfer under state statute occurred for FY2014, 2016, 2017, 2019, or 2020. The transfers in FY2015 and 2018 were conducted by the State Treasurer and the State Comptroller with oversight from the Directors of the Governor's Office of Management and Budget. *See* 30 ILCS 105/8.50(c); 30 ILCS 105/8.52(c). Plaintiff merely speculates the funds will be misused, based on an alleged past injury to applicants other than himself. As *Tobin* instructs, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy" regarding prospective injunctive relief. 286 F. 3d at 528. Additionally, Plaintiff has failed to allege *he* suffered an injury in fact related to the alleged transfer of funds for either fee. Plaintiff alleges he paid a FOID Card fee in 2020. Plaintiff cannot establish standing solely based on paying this fee because the harm alleged, the unauthorized use of funds, predates his payment. Also, Plaintiff has not paid a concealed carry license fee and therefore lacks standing to dispute how those fees are used in the future, especially when such allegations are speculative in nature. Plaintiff states no concrete facts demonstrating an imminent or even likely misuse of his fee or his anticipated concealed carry fee.

Further, Plaintiff states no facts which plausibly establish that the costs of administering the FOID and concealed carry programs exceed or will exceed the fees charged in 2020 or in the future. Plaintiff's conclusion that the fees are in excess of the costs of administering firearm related

programs is entirely speculative. In fact, the Fourth District Appellate Court of Illinois has previously recognized that "the cost of making a FOID [C]ard is about equal to the application fee." *Guns Save Life v. Raoul*, 2019 IL App (4th) 190334, ¶77-79 (affirming denial of preliminary injunction, and specifically holding the FOID Card fee is for a legitimate purpose connected to the administration of the FOID Card program).

The mere fact that the General Assembly moved money from certain ISP funds to the GRF does not establish that ISP's firearm enforcement costs are less than the fees paid by applicants. Money is fungible; funding for ISP's services come from multiple sources. As stated above, the State Police Services Fund not only receive fees from FOID Card and concealed carry applications, but also receives fees for performing criminal history checks of medical school matriculants (20 ILCS 2605/2605-327) and firefighters (20 ILCS 2605/2605-330); and for performing various services for other governmental entities. 20 ILCS 2605/2605-400. Likewise, the State Police Firearm Services Fund receives its "revenue from grants, pass-through grants, donations, appropriations, and any other legal source." 20 ILCS 2605/2605-595(a). Accordingly, Plaintiff's allegations fail to establish that the moneys swept into the GRF *were* licensing fees, and not other moneys deposited in these funds via other mechanisms. Pouring a glass of water into a stream and then scooping a glass out of the stream does not mean the same water returned to the glass.

Also, Plaintiff's claim of injury rests on his assertion that *other applicants* were injured in the past—based on an assumption that fees substantially exceeded regulatory costs between 2014 and 2019—and that those costs *remain the same today*. This, too, is nothing more than a failed allegation that past harm demonstrates future harm. In sum, Plaintiff offers nothing to support his bare conclusion that fees outpaced costs *at the time of his application or will in the future*. Plaintiff

has thus failed to allege facts showing an actual or imminent injury in fact sufficient to grant him standing on those grounds.

Finally, Plaintiff makes no attempt to connect these allegations to Defendant Hacker's conduct. Plaintiff does not allege that Defendant Hacker is in charge of setting or collecting fees for the administration of the FOID or concealed carry programs, nor does he allege that Defendant Hacker is personally responsible for the transfer of ISP's funds to the GRF. As noted, that action was mandated by the General Assembly. As the alleged Second Amendment violation is not traceable to Defendant Hacker's conduct, Plaintiff fails to demonstrate standing as to Count III.

### B.  Plaintiff lacks standing to challenge Section 24-3 of the Illinois Criminal Code.

Plaintiff also has not alleged he has sustained, nor is in immediate danger of sustaining, an injury-in-fact based on enforcement of Section 24-3 of the Criminal Code of 2012. (*See* Count IV.) Section 24-3 delineates crimes involving the unlawful sale or delivery of firearms, and the specific section Plaintiff takes issue with makes it a crime for someone who holds a license as a dealer, importer, manufacturer, or pawnbroker to sell or deliver a firearm that has a barrel, slide, frame, or receiver made of zinc alloy or any nonhomogeneous metal which will melt or deform at a temperature of less than 800 °F. 720 ILCS 5/24-3(A)(h).

Plaintiff seeks a declaration that Section 24-3(A)(h) is unconstitutional under the Second and Fourteenth Amendments. Specifically, Plaintiff claims he is not financially well off and has discovered certain firearms that retail for around $120, which is within his budget, but these "budget minded" firearms are "generally" made of zinc alloy and "will deform [if] heated to a certain level." (Doc. 33, Count IV, ¶¶ 3–5.) Plaintiff does not allege the firearm he seeks to purchase will deform at a temperature of less than 800 °F, the threshold set by Section 24-3(A)(h). Nor does he allege all firearms he can afford will deform at less than 800 °F. As such, he has not alleged that he is unable to purchase a firearm as a result of Section 24-3(A)(h).

Furthermore, even if Plaintiff had alleged he could only afford to purchase, from a dealer, firearms that deform at less than 800 °F, he still has not alleged a complete bar to purchasing or possessing these firearms. He admits there is no statute in Illinois prohibiting the possession or use of a firearm made of "zinc alloy or any other metal." (Doc. 33, Count IV, ¶ 6.) By alleging the most common way to acquire a firearm is to buy one from a licensed dealer, Plaintiff tacitly admits this is not the *only* method by which to acquire a firearm. (Doc. 33, Count IV, ¶ 9.) And Plaintiff does not allege facts demonstrating that the *only* firearms he is financially able to purchase from a dealer are firearms covered by Section 24-3.

Plaintiff has not alleged an injury affecting him personally as a result of Section 24-3. An injury-in-fact must be "particularized" such that it affects "the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548. The Court's analysis in *TinleySparks, Inc. v. Vill. of Tinley Park* on this issue is particularly instructive. 181 F. Supp. 3d 548, 556-57 (N.D. Ill. 2015). In *TinleySparks*, unsuccessful political candidates and their organization alleged, among other claims, that unnamed volunteers were prohibited from circulating a term limit referendum petition. *Id.* at 557. The court held that allegations concerning unnamed individuals did not demonstrate injury to the *plaintiffs* in a personal way. *Id.* The court concluded that the plaintiffs could not sue to vindicate the rights of others, and held that the plaintiffs failed to establish standing as to that claim. *Id.*

Like the plaintiffs in *TinleySparks*, here Plaintiff attempts to vindicate third-party rights, as he has not alleged he is in the business of selling or delivering firearms such that Section 24-3(A)(h) would impact him in any particularized way. Despite this, Plaintiff claims his Second Amendment rights have been violated because he is unable to "lawfully purchase, at a properly licensed dealer, a handgun of his choice, that she [sic] can actually afford, forcing Plaintiff to

remain unarmed." (Doc. 33, Count IV, ¶ 11.) But there is no constitutional right to purchase a firearm from a specific dealer of choice. *See Teixeria v. County of Alameda*, 873 F.3d 670, 687 (concluding the Second Amendment does not confer a freestanding right to sell firearms).

Further, Plaintiff lacks standing because any alleged injury is not fairly traceable to *Defendant Hacker's* actions.[2] To demonstrate standing, "there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (alterations in original) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976). Plaintiff alleges Hacker is "responsible for the processing of FOID card applications and the issuance of FOID cards." (Doc. 33, Count V, ¶ 5.) Plaintiff does not allege that Hacker is at all responsible for the enforcement of criminal statutes, such as Section 24-3 of the Criminal Code. Further, Plaintiff fails to demonstrate that Hacker sets the price of firearms. Plaintiff's alleged injury is instead traceable to the "independent action of . . . third party" dealers, who have set prices for firearms allegedly in excess of Plaintiff's budget.

Plaintiff also fails to allege facts demonstrating that a favorable judicial decision would redress his alleged inability to purchase a firearm at Plaintiff's price point. Whether any particular dealer would choose to carry the firearms Plaintiff desires, or price them to fit Plaintiff's budget, is entirely speculative. The court has no jurisdiction to order it to be so.

Because Plaintiff has not suffered an injury-in-fact fairly traceable to the challenged conduct of Defendant, and because Plaintiff's alleged injury is unlikely to be redressed by a favorable judicial decision, Plaintiff lacks standing as to Count IV.

---

[2] For the same reasons, this claim should be dismissed for lack of personal involvement, as discussed below.

## II.     Count II of Plaintiff's amended complaint is not ripe.

In Count II, Plaintiff seeks to enjoin Defendant Hacker from failing to process his *anticipated* concealed carry license application within 60 days of receipt of the application. (Doc. 33, Count II, Request for Relief.) Yet, Plaintiff concedes he has not yet applied for a concealed carry license, and presupposes "he will be forced to wait months beyond any reasonable processing time for the concealed carry license to be actually issued." (Doc. 33, Count II, ¶ 23.) This claim is not ripe for adjudication and, as a result, this Court lacks subject-matter jurisdiction over Count II.

The ripeness doctrine arises out of the constitution's case-or controversy requirement, as claims premised on uncertain or contingent events present justiciability problems. *Wis. Right of Life State Political Comm. v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011). "The doctrine's underlying objective is to avoid premature adjudication and judicial entanglement in abstract disagreements. *Church of Our Lord & Savior Jesus Christ v. City of Markham*, 913 F.3d 670, 666 (7th Cir. 2019). A case is not ripe unless there is a threat of significant and immediate impact on the plaintiff. *Alger v. City of Chicago*, 748 F. Supp. 617, 622 (N.D. Ill. 1990). An alleged injury must be "both real and immediate, not conjectural or hypothetical." *Id.* (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983)).

Here, Plaintiff cannot allege any injury, let alone a concrete injury, because he has not even applied for a concealed carry license. Count II is therefore premised on an uncertain event and should be barred by the ripeness doctrine. Mere anticipation an event *may* occur, such as Plaintiff's claim that he will be forced to wait months to be issued a concealed carry license for which he has not applied (nor been approved), falls squarely outside of the Court's jurisdiction, as it is not ripe.

## III.     The Eleventh Amendment bars Count V.

Because Count V raises issues of state law, it is barred by the Eleventh Amendment. Plaintiff seeks a declaration that he may, without violating the Illinois waiting period law, acquire

a firearm from a licensed firearm dealer 72 hours after submission, as long as the transaction has not been denied or disapproved. (Doc. 33, Count V, Request for Relief.)

The Eleventh Amendment confirms that "the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984). The Eleventh Amendment "guarantees that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Bd. of Regents of Univ. of Wis. Sys. v. Phx. Int'l Software, Inc.,* 653 F.3d 448, 457 (7th Cir. 2011). A state may "claim immunity from suit in federal court and may be dismissed from a litigation," *Kroll v. Bd. of Trustees of Univ. of Illinois*, 934 F.2d 904, 907 (7th Cir. 1991), absent voluntary waiver or valid congressional override. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). This proscription to suits against the State applies equally to State agencies or State officials acting in their official capacities. *See Pennhurst*, 465 U.S. at 104, 106; *Indiana Prot. & Advocacy Servs. v. Indiana Family & Soc. Servs. Admin*., 603 F.3d 365, 370 (7th Cir. 2010).

> Although there are exceptions to Eleventh Amendment immunity, none apply here:

> There are three principal types of exceptions to the Eleventh Amendment's bar. First, a state may waive immunity by consenting to suit in federal court. Second, Congress may abrogate the state's immunity through a valid exercise of its powers under recognized constitutional authority, such as by later constitutional amendments. Third, under *Ex parte Young*, 209 U.S. 123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908), a plaintiff may file "suit[] against state officials seeking prospective equitable relief for ongoing violations of federal law . . . .

*Indiana Prot. & Advocacy Servs.*, 603 F.3d at 370. The State has not consented to suit in this matter, nor has Congress abrogated its immunity. The Supreme Court considers two factors "in order to determine whether Congress has abrogated the States' sovereign immunity: first, whether Congress has unequivocally expressed its intent to abrogate the immunity; and second, whether Congress has acted pursuant to a valid exercise of power . . . ." *Seminole Tribe of Florida v.*

*Florida*, 517 U.S. 44, 55 (1996) (internal quotations and citations omitted). Congress has taken no such affirmative action to abrogate the State's sovereign immunity as to the 72-hour waiting period, the FOID Card Act, or any other state law that may affect this suit.

While *Ex Parte Young* allows federal suits to proceed against state officials for ongoing violations of federal law, there is no such exception for violations of state law. In *Pennhurst*, the Supreme Court stated "a federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when—as here—the relief sought and ordered has an impact directly on the State itself." 465 U.S. at 117. The Supreme Court explained "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law" and reasoned that this "conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Id.* at 106. The Eleventh Amendment bar applies even when the offending state law claims are asserted in the same suit as federal law claims over which the court has original jurisdiction. *Id.* at 119–21. The Seventh Circuit and district courts routinely apply this doctrine to dismiss state law claims against Illinois officials, *e.g.*, *Sorrentino v. Godinez*, 777 F.3d 410, 415 (7th Cir. 2015) (dismissing an inmate's breach of contract claim pursuant to *Pennhurst*); *Sterigenics U.S., LLC v. Kim*, 385 F. Supp. 3d 600, 607–10 (N.D. Ill. 2019) (dismissing plaintiff's claim which alleged that the IEPA overstepped its authority under the Illinois' Environmental Protection Act).

The jurisdictional bar proscribed by the Eleventh Amendment applies regardless of the nature of relief sought. *Missouri v. Fiske*, 290 U.S. 18, 27 (1933) ("Expressly applying to suits in equity as well as at law, the Amendment necessarily embraces demands for the enforcement of equitable rights and the prosecution of equitable remedies when these are asserted and prosecuted by an individual against a State"). Thus, state-law claims for declaratory relief are barred. *Watkins*

*v. Blinzinger*, 789 F.2d 474, 483-84 (7th Cir. 1986) (plaintiff's state law claim challenging compensation calculations was barred by the Eleventh Amendment because the state officials did not commit torts or other wrongs against plaintiff independent of their implementation of state law); *Benning v. Bd. of Regents*, 928 F.2d 775, 778 (7th Cir. 1991) (holding plaintiff's claim for declaratory relief in federal court would operate as a work-around *Pennhurst*). A declaratory judgment cannot be used to avoid the Eleventh Amendment when monetary and injunctive relief would be barred. *Council 31 of AFSCME. v. Quinn*, 680 F.3d 875, 884 (7th Cir. 2012). Because "a federal court cannot issue relief against a state under state law," *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 345 (7th Cir. 2020), Count V should be dismissed.

## Dismissal Pursuant to Rule 12(b)(6)

### IV.     Hacker is not a proper party to this lawsuit in his official or individual capacities.

Plaintiff's claims against Defendant Hacker should be dismissed as he is not a proper party to this suit. The proper defendant to a suit is one who bears legal responsibility for the flaws a plaintiff perceives in the system. *See e.g. Bowling v. Pence*, 39 F. Supp. 3d 1025, 1028 (S.D. Ind. 2014) (citing *Hearne v. Bd. of Educ.*, 185 F.3d 770, 777 (7th Cir.1999)) ("[I]t is not the Eleventh Amendment that bars the plaintiffs' action for prospective injunctive relief against the governor; it is their inability to show that he bears any legal responsibility for the flaws they perceive in the system."). Hacker is not responsible for the administration of the FOID Card Act, the collection of FOID Card or concealed carry licensing fees, enforcement of any provision of the Illinois Criminal Code, or implementing the waiting period to obtain a firearm. *See* 20 Ill. Admin. Code 1230.70 (giving ISP's *Director* the authority to approve certain FOID Card applications that were initially denied); 20 Ill. Admin. Code 1232.20(a), (b) (FOID Card applications with the fee are to be submitted to ISP); 20 Ill. Admin. Code 1230.110 (fees for denied applications will not be

refunded); 20 Ill. Admin. Code 1231.140 (concealed carry application fees are collected using the *Illinois State Treasurer's* E-Pay program, and fees charged for criminal history records are collected by a vendor or local law enforcement, and deposited in the State Police Services Fund).

While Plaintiff identifies Hacker as the "Chief of the Illinois State Police Firearms Services Bureau" and states Hacker is "responsible for the processing of FOID card applications and the issuance of FOID cards," as a matter of law, it is the Director of ISP, not Hacker, who ultimately determines whether a FOID card will issue. *See* 430 ILCS 65/2 ("no person may possess any firearm . . . without having in his or his possession a [FOID] Card previously issued by the Department of State Police."). *See*, *Rhein v. Coffman*, 825 F.3d 823, 825 (7th Cir. 2016) (explaining that it is the Director of State Police and not the Chief of the Bureau of Firearm Services who is responsible for deciding whether to restore a FOID Card). Even if some of the challenged actions are delegated to Defendant Hacker, ultimate responsibility lies with the Director of ISP. *See Fiorenzo v. Nolan*, 965 F.2d 348, 352 (7th Cir. 1992) (explaining that the official in question must possess final authority, and not just delegated authority, with regard to the challenged action before liability can attach).

Of particular note, in Count I, Plaintiff requests that Hacker be held *personally responsible* for monetary damages, attorney fees, and costs of suit. (Doc. 33, Count I, Request for Relief.) Yet Plaintiff makes no allegations that Hacker had any personal involvement in regards to Plaintiff's claims. A plaintiff bringing a claim pursuant to § 1983 must produce evidence that the individual defendant "caused or participated in [the] constitutional deprivation." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (quoting *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996)). Plaintiff merely alleges that Hacker is responsible by virtue of his position. This is insufficient to state a claim against Hacker in his individual capacity.

Hacker is not ISP's Director, and is not responsible for enforcing the statutes with which Plaintiff takes issue. As such, Hacker is not a proper defendant in his official capacity. And while Plaintiff claims he is seeking to hold Hacker personally responsible for monetary damages, Plaintiff has not alleged any personal involvement by Hacker in the issuance of the Plaintiff's FOID Card or in regards to any of the other allegations in the amended complaint.

## V.   Defendant Hacker has qualified immunity as to Count I.

Qualified immunity bars Plaintiff's first claim. Although dismissal at the pleading stage based on qualified immunity is not always warranted, it is proper here, where Plaintiff has failed to identify a violation of a clearly established constitutional right. *See Doe v. Vill. of Arlington Heights*, 782 F. 3d 911, 915-16 (7th Cir. 2015) (dismissal at pleading stage based on qualified immunity warranted because alleged constitutional right was not clearly established) (citing *Chasensky v. Walker*, 740 F. 3d 1088, 1095-97 (7th Cir. 2014) (holding that district court erred in denying motion to dismiss based on qualified immunity because plaintiff failed to allege a clearly established right). The Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson v. Callahan*, 555 U.S. 223 (2009) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

Qualified immunity shields state officials from money damages unless a plaintiff pleads sufficient facts to plausibly show the official violated a statutory or constitutional right, and the right was clearly established at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Through qualified immunity, a defendants' conduct may be insulated from liability even if the plaintiff's rights were violated. *See generally Wilson v. Layne*, 526 U.S. 603 (1999). To determine if a defendant is entitled to qualified immunity, the court must ask two questions: (1) "whether the facts alleged show that the state actor violated a constitutional right,"

and (2) "whether that right was clearly established." *Hanes v. Zurick*, 578 F.3d 491, 493 (7th Cir. 2009). The Court has the discretion to decide the case based on the second question without addressing the first. *Dibble v. Quinn*, 793 F. 3d 803, 807 (2015).

To determine whether rights have been clearly established, the United States Supreme Court has suggested the right at issue must be clearly established at the national level by either Supreme Court precedent or, possibly, by a "'robust consensus of cases of persuasive authority' in the Courts of Appeals." *Taylor v. Barkes*, 135 S.Ct. 2042, 2044 (2015) (quoting *City & County of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1779 (2015)). The Supreme Court did, however, "[a]ssum[e] for the sake of argument" that precedent from a circuit court decision could clearly establish a right, despite disagreement among the circuits. *Id*. at 2045; *see also Carroll v. Carmen*, 574 U.S. 13, 17 (2014) (per curiam). Neither an unpublished appellate opinion, nor a district court decision, can clearly establish the law. *Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir. 1995).

The right at issue must be established, "not as a broad general proposition," but rather, in a particularized sense so that the contours of the right are clear to a reasonable official. *Dibble*, 793 F.3d at 808. The right must be defined with relation to the specific facts confronting the defendant. *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013). A right is "clearly established" only if it is defined so clearly and its contours are sufficiently clear that a reasonable official would know that what he is doing violates that right. *Carroll*, 574 U.S. at 16, *Dibble,* 793 F. 3d at 808. "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Carroll*, 574 U.S. at 16 (quoting *Al-Kidd*, 563 U.S. at 740).

Although qualified immunity is an objective standard, the inquiry is still "fact-specific." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). "For qualified immunity to be surrendered, preexisting law must dictate, that is, truly compel . . . the conclusion for every like-situated,

reasonable government agent that what [he] is doing violates federal law *in the circumstances*." *Khuans v. Sch. Dist. 110*, 123 F. 3d 1010, 1019-20 (1997) (alteration in original) (quoting *Lassiter v. Alabama A&M Univ.*, 28 F. 3d 1146, 1150 (11th Cir. 1994)). "[I]t is not the simple existence of analogous case law that defeats the claim of qualified immunity; rather, these decisions must demonstrate that, at the time the defendants acted, it was certain that their conduct violated the law." *Doyle v. Camelot Care Ctrs., Inc.*, 305 F. 3d 603, 620 (7th Cir. 2002).

No decision of the United States Supreme Court, the Seventh Circuit, or any other circuit court has established that a delay in issuing a FOID Card violates the Second Amendment. While the right to bear arms is well-known, this is a general statement that does not make it clear that Defendant would violate Plaintiff's rights by engaging in any of the behavior alleged.

In fact, the Seventh Circuit expressly found that it was not clearly established how the Second Amendment would apply in regards to a delay in returning a seized firearm. *Rhein,* 825 F.3d at 825. In *Rhein*, plaintiff alleged that the Chief of Illinois' Bureau of Firearms Services violated his Second Amendment rights by delaying for more than a year the return of his firearm after summary revocation of his FOID Card. *Id*. The district court determined that the defendant was entitled to qualified immunity because "courts have yet to determine how quickly governmental bodies must act when the right to keep firearms is at stake." *Id*. The Seventh Circuit ultimately determined it did not need to address whether qualified immunity applied because the Firearms Services Bureau Chief was not a proper defendant as only the ISP Director could determine whether to restore a FOID Card. *Id.* However, the Seventh Circuit did note that the United States Supreme Court observed in *Heller* and *McDonald* that many details of how the Second Amendment applies needed to be worked out. *Id*. at 826.

Here, to the extent that the Court considers Plaintiff's claim in Count I, qualified immunity

bars this claim as the law in this area is far from clearly established.

### VI.    Section 24-3(A)(h) of the Criminal Code of 2012 is not unconstitutional.

The Court should dismiss Count IV because Section 24-3 is presumptively lawful and Plaintiffs has not shown that it violates any established Second Amendment rights.

At the outset, Plaintiff does not specify whether he intends a facial or as-applied challenge to Section 24-3(A)(h). An as-applied challenge "is one that charges an act as unconstitutional as applied to [the challenger's] specific activities even though it may be capable of valid application to others." *United States v. Tollefson*, 367 F. Supp. 3d 865, 872 (E.D. Wis. 2019). On the other hand, a facial challenge is "'the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.'" *Discount Inn, Inc. v. City of Chicago*, 72 F. Supp. 3d 930, 935 (N.D. Ill. 2014) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). That the Act might operate unconstitutionally under some set of circumstances is insufficient to render it invalid in its entirety. *Salerno*, 481 U.S. at 745. Plaintiff's request that this Court declare Section 24-3(A)(h) unconstitutional and permanently enjoin its enforcement implies a facial challenge. Yet the inclusion of his particular circumstances and the manner in which ISP allegedly enforces the provision suggests an as-applied challenge. Nevertheless, under either theory, Counts IV fails.

When considering the constitutionality of a statute, courts begin with a presumption that the statute is constitutional. *See e.g*. *U.S. v. Morrison*, 529 U.S. 598, 607 (2000). When a statute's constitutionality is in doubt, the court has an obligation to interpret the statute to avoid a constitutional problem. *Johnson v. U.S*., 576 U.S. 591, 631 (2015). The rule is that every reasonable construction must be resorted to save the statute from unconstitutionality. *Id.* at 632. Plaintiff fails to overcome the statute's presumption of validity.

When reviewing a Second Amendment claim, the Seventh Circuit undertakes a two-step analysis, beginning "with the threshold question of whether the restricted activity is protected by the Second Amendment." *Horsely v. Trame*, 808 F.3d 1126, 1129 (7th Cir. 2015) (internal quotation marks and alterations omitted). "If the challenged law regulates activity that falls outside the scope of the Second Amendment at the historically relevant time, then the regulated activity is not protected, and the analysis stops there." *Id.* "If the historical evidence is inconclusive or suggests that the regulated activity is not categorically unprotected—then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011).

Here, Section 24-3(A)(h) merely regulates the sale and manufacture by commercial dealers of a narrow class of firearms based on safety considerations. As a result, the statute should be considered "presumptively lawful" under the Second Amendment. *See Heller*, 554 U.S. at 626–27 & n.26 ("Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms."). Plaintiff's claim must fail on that ground alone. Even if this Court proceeds to the second step of the analysis, the provision passes constitutional muster because the statute is substantially related to the government's important interest in reducing gun violence and protecting its citizens.

### A. Section 24-3(A)(h) of the Criminal Code of 2012 is presumptively lawful.

Plaintiff's claim fails at step one of the analysis because the regulated activity does not fall within the scope of the Second Amendment. Here, the "regulated activity" is the manufacture, sale, or delivery of certain firearms. The subjects of the text of the provision—manufacturers and sellers—have no independent rights under the Second Amendment, and thus the activity regulated

by the plain text of the statute falls outside the scope of the Amendment. *See Teixeria* 873 F.3d at 687, *see also Ezell*, 651 F.3d at 699 (providing that the Second Amendment's "central component is the right to *possess* firearms for protection.") (emphasis added).

Prospective firearm purchasers like Plaintiff are not the subject of the statute, but to the extent prospective firearm purchasers should be considered, the prohibition on the commercial sale of a narrow class of firearms does not impose "anything more than a marginal, incremental or even appreciable restraint on one's Second Amendment rights." *Kwong v. Bloomberg*, 723 F.3d 160, 167 (2d Cir. 2013) (licensing fee of over \$100 per year not prohibitively expensive) (internal quotation marks omitted); *Guns Save Life, Inc. v. Ali,* 2020 IL App (1st) 181846, ¶ 59 (holding that county ordinance did not impermissibly burden the right to bear arms). Firearm purchasers may still obtain and possess other firearms for self-defense. And though Plaintiff asserts the law reduces the number of firearms within his budget, "a law does not substantially burden a constitutional right simply because it makes the right more expensive or more difficult to exercise." *Kwong*, 723 F.3d 160, 168 (2d Cir. 2013).

The United States Supreme Court and other federal courts have found that regulation of commercial sale and manufacture of classes of firearms are presumptively lawful and fall outside the scope of the Second Amendment's core protections. The right to bear arms "is not unlimited," and *Heller* recognized that "longstanding regulatory measures" are tradition-based "exceptions" to the scope of the Second Amendment due to their "historical justifications." *Heller*, 554 U.S. at 635. The Court confirmed that "conditions and qualifications on the commercial sale of arms" are "presumptively lawful" under the Second Amendment. *Id.* at 626–27, n.26. In *McDonald*, the Court clarified that "[w]e made it clear in *Heller* that our holding did not cast doubt on such

longstanding regulatory measures as . . . laws imposing conditions and qualifications on the commercial sale of arms. We repeat those assurances here." 561 U.S. at 786.

The presumptive validity of regulatory burdens on the sale of firearms is not surprising, as the right at stake is that of *possession*. *Ezell*, 651 F.3d at 704 ("central component" of the Second Amendment is "the right to *possess* firearms") (emphasis added). For example, in *Teixeira v. County of Alameda*, the Ninth Circuit, sitting *en banc*, considered a local zoning ordinance that effectively rendered it impossible for the plaintiff, who was a firearms dealer, to operate his store. *Teixeira*, 873 F.3d at 674–76. The court conducted a comprehensive examination of the text and history of the Second Amendment. *Id.* at 683–90. The Second Amendment's core right, the Ninth Circuit concluded, is about *possession* of firearms, not commerce in firearms. *Id.* at 676–77. Accordingly, the court held that "the Second Amendment does not independently protect a proprietor's right to sell firearms." *Id.* at 690. A number of federal courts have also determined or assumed that there is "no Second Amendment right to be a firearm manufacturer" for the same reason. *Olympic Arms v. Magaw*, 91 F. Supp. 2d 1061, 1071 (E.D. Mich. 2000), *aff'd Olympic Arms, et al. v. Buckles*, 301 F.3d 384 (6th Cir. 2002); *see also United States v. King*, 532 F.2d 505, 510 (5th Cir. 1976); *Gilbert Equip. Co. v. Higgins*, 709 F. Supp. 1071, 1080–81 (S.D. Ala. 1989).

Plaintiff, as a potential firearm purchaser, is not the subject of Section 24-3(A)(h) and his rights are not implicated by its enforcement. Those who could be prosecuted under the statute have no constitutional "right to sell" or "right to manufacture" a firearm that is implicated by the plain language of the statute. Furthermore, any implied right to *acquire* firearms that might be read into the Second Amendment, *see*, *e.g.*, *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928 (N.D. Ill. 2014) (ban on virtually all firearm sales and transfers within City of Chicago swept too broadly, impermissibly burdening the individual right to keep and bear arms),

remains unburdened by the challenged provision. Indeed, Section 24-3(A)(h) is similar to other firearm regulations which courts have upheld because they leave individuals with alternatives for acquiring firearms for self-defense. *See*, *e.g.*, *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1251–58 (D.C. Cir. 2011) (upholding gun registration, and assault weapon and large capacity magazine regulations where individuals could still possess other firearms for self-defense).

To the extent Section 24(A)(h) could be read as applying to Plaintiff, it does not impair his ability to acquire a firearm, even if enforced as alleged. Plaintiff alleges he is only unable to afford "most", but not *all*, firearms on the market. (Doc. 33, Count IV, ¶ 3.) As stated above, Plaintiff admits there are firearms within his budget that are not prohibited by Section 24-3(A)(h), therefore his baseless conclusion that the Criminal Code causes him to remain unarmed, (Doc. 33, Count IV, ¶¶ 4, 12.), should be disregarded. *See Riley v. Vilsack*, 665 F. Supp. 2d 994, 1002 (W.D. Wis. 2009) (providing that under federal pleading standards a complaint must be plausible and the court may not accept conclusory allegations as true).

Because Plaintiff does not allege facts showing he is prevented from acquiring and keeping a firearm due to Section 24-3(A)(h), his claim must fail. And because the statute may be enforced without infringing Plaintiff's rights on an as-applied basis, his facial claim fails as well. *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 475 (7th Cir. 2012) (providing that facial and as-applied challenges can overlap conceptually, but where the claim and relief that would follow reach beyond the particular standards of the plaintiff, plaintiff must satisfy the standards for a facial challenge to the extent of that reach) (citing *Doe v. Reed*, 561 U.S.186, 194 (2010)).

Further, no court has recognized a right to acquire "a handgun of [an individual's] choice." (Doc 33, Count IV, ¶ 11.) The Second Amendment does not provide a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626.

The manner in which a Second Amendment right is to be exercised—specifically, the selection of particular arms—is not part of the right to bear arms. *See e.g. Pena v. Lindley*, 2015 WL 854684, at *12 (E.D. Cal. Feb. 26, 2015), *aff'd*, 898 F.3d 969 (9th Cir. 2018).[3] In *Pena*, several plaintiffs challenged California's Unsafe Handgun Act (UHA), a penal statute similar to the statute here, which prohibits the manufacture, sale, gifting, or lending of any firearm which does not meet certain requirements. *Pena*, 2015 WL 854684, at *1. The UHA was ratified to reduce crime by eliminating the sale of cheap firearms. *Id.* at *2; *see also; Fiscal v. City & Cnty. of San Francisco*, 158 Cal. App. 4th 895, 912 (2008). Unlike Section 24-3, the UHA is very restrictive, completely banning certain inexpensive firearms, and only permitting certain firearms that are tested by the California Department of Justice *and* listed in a state roster to be purchased. *Id.* at *2. The plaintiffs in *Pena* challenged the UHA's constitutionality, each citing a particular firearm that they wanted to purchase but could not because it was not on the roster. *Id.* at *5. For example, one plaintiff sought to purchase a Glock 21SF with an ambidextrous magazine release; one plaintiff sought to purchase an un-rostered revolver; and one plaintiff sought to purchase a handgun in an un-rostered *color*. *Id*. at *5. The district court held the UHA "does not amount to a prohibition of an entire class of arms requiring per se invalidation." *Id.* at *12. The court further found the plaintiffs' "insistence upon . . . particular handguns" fell "outside the scope of the right to bear arms." *Id.* at *13. The UHA was a presumptively lawful regulatory measure "and, as such falls outside of the historical scope of the Second Amendment." *Id.* at *13.

Here, Section 24-3(A)(h) is presumptively lawful as the statute merely regulates the sale of firearms and does not implicate the core protections of the Second Amendment. The purpose of Section 24-3(A)(h) is discussed in more detail below in Section VI(B)(ii). Individuals regulated

---

[3] The Ninth Circuit upheld the District Court's ruling that the UHA was constitutional, but declined to evaluate the first prong of the two-prong Second Amendment analysis. *See Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018).

by the challenged provision—manufactures, dealers, pawnbrokers, and others—do not have independent constitutional rights to manufacture or sell firearms, so the Second Amendment is not offended. The constitutional right to keep and bear arms remains intact and is not implicated by the enforcement of the challenged provision. Finally, the Second Amendment does not extend to a right to purchase the firearm of one's choice, even if one prefers a firearm that melts or deforms at heats less than 800 °F. Accordingly, Count IV should be dismissed because Section 24-3(A)(h) does not restrict activity protected by the Second Amendment.

### B. If Section 24-3(A)(h) impacts Plaintiff's Second Amendment right, the regulatory burdens it imposes are constitutional.

Even if this Court were to conclude that further scrutiny under the Second Amendment is warranted, Section 24-3(A)(h) passes constitutional muster such that it should be upheld.

#### i. The least rigorous form of intermediate scrutiny should apply to this case because the challenged provision does not severely burden the core of the Second Amendment right.

If a court deems that a challenged law is within the scope of the Second Amendment, it then performs a means-ends analysis. *Horsley v. Trame*, 808 F.3d 1126, 1131 (7th Cir. 2015). The level of scrutiny for laws protected by the Second Amendment is determined on a case-by-case basis, but it is always higher than rational basis of review. *See Friedman v. City of Highland Park*, 784 F.3d 406, 410 (7th Cir. 2015). The degree of heightened scrutiny applied depends "on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." *Horsley*, 808 F.3d at 1131 (internal quotation marks omitted).

At this step, courts "evaluate the regulatory means the government has chosen and the public-benefits end it seeks to achieve." *Id.* (internal quotation marks omitted). "Laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified." *Id.* (internal

quotation marks omitted). Additionally, as the Supreme Court has stated, longstanding regulations on possession and carriage including "prohibitions on the possession of firearms by felons and the mentally ill" are "presumptively lawful." *Heller*, 554 U.S. at 626–27 & n.26. Where a regulation does not severely burden the Second Amendment, the government must show that the challenged provision is substantially related to an important government objective. *See e.g. United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010).

On its face, the Section 24-3(A)(h) does not restrict any person's *possession* or *acquisition* of firearms and, as a result, should be afforded the least rigorous form of intermediate scrutiny. The statute regulates a narrow class of individuals, firearm manufacturers and sellers, who do not have independent rights under the Second Amendment, as explained above. This type of regulation is as far as possible from the Second Amendment's core right of armed self-defense.

Even if ISP's alleged enforcement of the statute has limited the availability of zinc alloy firearms, the Court must conclude such a restriction merely "infringes" rather than "curtails" the ability to keep and bear arms for self-defense, such that less exacting review is required. *See Culp v. Madigan*, 840 F.3d 400, 407 (7th Cir. 2016) (explaining that when a law infringes on the right to bear arms for self-defense, the law must be "substantially related to an important government interest," and a law that "curtails the fundamental right of law-abiding citizens to carry a weapon for self-defense must pass more exacting scrutiny"). Illinois citizens, including Plaintiff, have "open ample alternative channels," *Heller*, 670 F.3d at 1262, to obtain firearms: citizens can purchase myriad non-zinc alloy firearms, at myriad price points, from myriad firearm dealers.

The Ninth Circuit's reasoning in *Pena* for applying intermediate, rather than strict, scrutiny, is persuasive on this point. As stated above, *Pena* concerned a challenge to California's Unsafe Handgun Act that made all firearms that had not been specifically determined to be safe as unsafe.

898 F.3d 969, 973-74 (9th Cir. 2018). Moving forward, the statute limited the commercial sale of certain handgun models, however, grandfathered in hundreds of models that did not meet the new requirements. *Id.* at 977. Importantly, the statute did not restrict *possession* of handguns in the home or elsewhere and exempted the sale of off-roster existing handguns and out-of-state sales. *Id.* In affirming summary judgment in favor of California, the Ninth Circuit assumed, without deciding, that the UHA burdened conduct protected by the Second Amendment, but found that intermediate (rather than strict) scrutiny was appropriate for the next step of the analysis. *Id*.

Specifically, the Ninth Circuit weighed the severity of the burden presented by the UHA, which regulated the manner of use, but not possession, of firearms, and thus the challenged law affected Second Amendment rights less severely. *Id*. at 978. The court rejected the same argument being made here, explaining that being unable to purchase a subset of firearms does not significantly burden the right to self-defense in the home, even though an individual cannot purchase the exact firearm he would prefer. *Id*. Likewise here, Section 24-3(A)(h) does not effect a substantial burden on the Second Amendment because it merely regulates the sale of certain firearms by licensed dealers and does not prohibit the possession of these firearms. As such, intermediate scrutiny is the correct level of review.

### ii. Section 24-3(A)(h) is substantially related to the important government interest of public safety.

Section 24-3(A)(h) withstands intermediate scrutiny. It is clear from the legislative history of the statute that Illinois legislators were concerned about the danger so-called "Saturday Night Specials" posed to the citizens of Illinois. *See*, *e.g.*, 78th Ill. Gen. Assem., House Proceedings, June 4, 1973, attached hereto as Exhibit 1.[4] When reviewing the fit between the government's

---

[4] Available at http://ilga.gov/house/transcripts/htrans78/HT060473.pdf. Courts may exercise their discretion to take "judicial notice of a fact that is not subject to reasonable dispute because it . . . can be accurately and readily

stated objective and the regulation at issue, the court may consider "the legislative history of the enactment as well as studies in the record or cited in pertinent case law." *Fyock v. Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015). Legislators specifically noted that the firearms they sought to regulate were more accessible to young people due to their low cost and were responsible for firearm violence in the State.  Ex. 1, at 121. Moreover, in the years leading to and following ratification, there was a national conversation about the safety of "Saturday Night Specials." *See e.g.* Monica Fennell, *Missing the Mark in Maryland: How Poor Drafting and Implementation Vitiated A Model State Gun Control Law*, 13 Hamline J. Pub. L. & Pol'y 37, 66 (1992) (advocating for melting point laws as a way to curb gun violence). Section 24-3(A)(h) was the Illinois legislature's response to concerns about "Saturday Night Specials" and the challenged statute is substantially related to the important government interest of public safety. *See Kanter v. Barr*, 919 F.3d at 442; *United States v. Meza-Rodriguez*, 798 F.3d 664, 673 (7th Cir. 2015).

The 1968 Senate Judiciary Committee's Report on the Omnibus Crime Control and Safe Streets Act of 1968 demonstrated the concern:

> The problem of firearms misuse in crimes of violence in the United States has been adequately documented by the Judiciary Subcommittee to Investigate Juvenile Delinquency, commencing with the subcommittee's hearings record of 1963 and including the hearing records of 1964, 1965, and 1967. . . . Substantial numbers of firearms that are sold via the mail-order route in the United States are foreign imported firearms, either of the military surplus category or the category of inexpensive, small-caliber firearms, which have been termed as 'unsafe' and as 'Saturday night specials'. . . . Our law enforcement officials have testified that from 50 to 80 percent of the crime guns that are confiscated each year are foreign imports of either of the above categories of weapons. Many of these imports are shipped into the United States as parts or disassembled. Many are rebored and rechambered upon reentry into the United States and the barrels are cut down for concealment purposes.

---

determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Official publications are also self-authenticating. Fed. R. Evid. 902(5).

S. Rep. No. 90-1097, at 76–80. As a result of the Committee's findings, Congress passed the Gun Control Act of 1968, which "was designed to ban the importation of Saturday Night Specials because they comprise a distinct category of guns with little or no legitimate value." *Kelley v. R.G. Indus., Inc.*, 304 Md. 124, 153 (1985); *see* 18 U.S.C. § 921, *et seq.*

In 1973, Representative Roman Kosinski noted the firearms at issue were "of no legitimate use to lawmen, or collectors, or target shooters, or farmers, or hunters" but rather they were "widely used because of their low cost in juvenile crime." (Ex. 1, at 120–21 (statement of Rep. Kosinski).) And Representative Robert Mann argued that "Saturday Night Specials" were "used to kill more people easier than any other weapon." *Id.* at 121 (statement of Rep. Mann). According to its proponents, the bill was drafted to "help control crime in the major cities of this state," *id.* at 122 (statement of Rep. Clyde L. Choate), and to "save countless lives . . . across this state," *id.* (statement of Rep. Mann).

Senator Richard J. Daley presented the measure, then known as House Bill 1058, to the Illinois Senate stating, "[T]his bill restricts the future sales of cheap handguns whose pot metal frames melt under 800 degrees." 78th Gen. Assem., Senate Proceedings, June 22, 1973, attached hereto as Exhibit 2, at 127:24–33.[5] He also said the bill "restricts the sale of so-called Saturday-night specials that are used frequently by young teenagers throughout our metropolitan areas." *Id.* The General Assembly's intent was clear: regulating "Saturday Night Specials" would limit the use of firearms by juveniles and criminals which would, in turn, lower crime and save lives.

The 1973 General Assembly's concern about the accessibility of firearms to minors has been justified by current studies which show young people are responsible for significant percentages of violent crimes and gun crimes. *See*, *e.g.*, *Horsley*, 808 F.3d at 1133 (citing a 2014

---

[5] Available at http://ilga.gov/senate/transcripts/strans78/ST062273.pdf.

FBI study finding that 18 to 20 year-olds were responsible for more than 15.8% of all charges issued for murder and non-negligent manslaughter and a Department of Treasury analysis of gun crimes by persons over 18 and under 21, which found that in 1997, 18-, 19-, and 20-year-olds ranked first, second, and third in the number of gun homicides committed in the United States); *NRA v. BATFE*, 700 F.3d 185, 209–10, n.20-21 (5th Cir. 2012) (citing extensive research and data showing that 18 to 20-year-olds account for a disproportionally high percentage of arrests for violent crimes).

The provision was signed into law in August 1973 as an amendment to the Illinois Criminal Code of 1964. P.A. 78-255, § 61 (eff. Oct. 1, 1973). As originally written, the statute prohibited the manufacture and sale of any firearm "having a barrel, slide, frame or receiver which is a die casting of zinc alloy or any other non-homogeneous metal which will melt or deform at a temperature of less than 800 degrees Fahrenheit." *Id.*, amending Ill. Rev. Stat. ch. 38, § 24-3 (Supp. 1972). While Section 24-3(A)(h) does not mention the term "Saturday Night Special," the melting point language in the provision helps to identify firearms which fall within that blanket term.

> Melting-point laws . . . address one of the usual Saturday Night Special characteristics . . . the quality of materials . . . . In specifically banning handguns made of low quality metals, as identified by low melting points, state melting-point laws also indirectly ban some handguns which have the Saturday Night Special characteristics of unreliability as to safety, lack of sporting purpose, and inaccuracy. Melting point is not a measure of these characteristics, but handguns which lack quality materials often also lack adequate safety and accuracy mechanisms . . . .

Fennell, *supra*, at 66. By regulating the sale of firearms that melt at a certain temperature, Illinois created an objective method to identify cheap and potentially dangerous firearms that legislators warned easily fell into the hands of minors.

Even if melting point is not the best way to identify dangerous firearms, the state "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems."

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986). Furthermore, "the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015). For these reasons, even if the Court reaches the second step in the Second Amendment analysis, Section 24-3(A)(h) would survive intermediate scrutiny: there is a reasonable fit between the provision and the important government interest of improving public safety by reducing firearm violence and reducing crime. Accordingly, Plaintiff's Count IV should be dismissed for failure to state a Second Amendment violation.

**V.      Any government delay in processing background checks over the statutory 72-hour period does not impose a substantial burden on Second Amendment rights.**

In Count VI, Plaintiff alleges that if he cannot lawfully acquire a firearm from a licensed dealer after at least 72 hours have passed since the dealer has run the required background check, any additional delay would violate the Second Amendment. (Doc. 33, Count VI, ¶ 17.) Plaintiff alleges that background check delays (allegedly 14 to 30 additional days) are common in Illinois, but that individuals who have a FOID card have already had a background check performed and that these checks are conducted every few weeks. (Doc. 33, Count VI, ¶¶ 18–19, 22.) So long as a FOID card has not been previously revoked, Plaintiff alleges "almost every background check not immediately showing disapproved or invalid comes back valid and approved." *Id.* As a result, Plaintiff claims there is not a legitimate reason that a firearm transaction not actually explicitly disapproved within 72 hours should not proceed. (Doc. 33, Count VI, ¶ 22.) Plaintiff seeks an injunction that would require any disapproval of a firearm transaction to occur within 72 hours of initiating the background check, and that any transaction not disapproved within that timeframe to be allowed. (Doc. 33, Count VI, ¶¶ Request for Relief.) Plaintiff seeks a declaration that any

waiting period that exceeds 72 hours is unconstitutional. *Id.*

> The FOID Card Act provides that, with certain exceptions inapplicable here:

> no person may knowingly transfer, or cause to be transferred, any firearm . . . to any person within this State unless the transferee with whom he deals displays either: (1) a currently valid [FOID] Card . . . ; or (2) a currently valid license to carry a concealed firearm . . . .

430 ILCS 65/3. Prior to any transfer, licensed firearm dealers are required to utilize a dial up system provided by ISP to initiate an inquiry into the recipient of the firearm. *See* 430 ILCS 65/3.1.

In conducting the inquiry, ISP initiates and completes an automated search of its criminal history record information files, those of the Federal Bureau of Investigation, including the National Instant Criminal Background Check System, and files of the Department of Human Services relating to mental health and developmental disabilities to obtain any felony conviction or patient hospitalization information which would disqualify a person from obtaining, or require revocation of, a FOID card. 430 ILCS 65/3.1(b). If receipt of a firearm would not violate Section 24-3, federal law, or the FOID Act, ISP assigns an identification number to the transfer and provides the firearm dealer with the number. 430 ILCS 65/3.1(c). It is unlawful to deliver a firearm to a buyer without observing "*at least*" a 72-hour waiting period. 720 ILCS 5/24-3(A)(g).[6]

### i. Waiting periods and background checks before delivery of a firearm are presumptively lawful and are longstanding.

In support of his constitutional claims, Plaintiff alleges that "at the time the Second Amendment was ratified, a purchaser of a firearm could literally walk into a retail establishment, such as a general store, and leave with a firearm that same day." (Doc. 33, Count VI, ¶ 15.) Additionally, he alleges that waiting periods are neither longstanding nor common. (Doc. 33, Count VI, ¶ 16.) However, such claims are without merit. In a case of first impression concerning a waiting period law, the Ninth Circuit upheld a *ten-day waiting period* between the purchase and

---

[6] The waiting period is subject to some exceptions not at issue here. 720 ILCS 5/24-3(A)(g)(1)-(5).

delivery of a firearm. *Silvester v. Harris*, 843 F. 3d 816 (9th Cir. 2016). In upholding the regulation, the Ninth Circuit specifically rejected the argument that a delay in procuring firearms is not a longstanding circumstance, finding there is no foundation in history for a claimed ability to immediately exercise Second Amendment rights. *Id.* at 827, 831.

Indeed, the FOID Card Act background check requirements comport with longstanding regulatory traditions falling outside the scope of the Second Amendment, as the checks are designed to prohibit "the possession of firearms by felons and the mentally ill," and regulate "the commercial sale of arms." *Heller*, 554 U.S. at 626; *see also Pena*, 898 F.3d at 1009 n.19 (Baybee J., concurring in part and dissenting in part) (finding that background checks and waiting periods regulate who may lawfully possess or purchase a firearm and qualify as restrictions on possession of firearms by felons and the mentally ill). Twenty-two states and the District of Columbia require a background check before purchasing a firearm.[7]

### ii. The State has a significant interest in regulating who may possess a weapon, and background checks survive intermediate scrutiny.

Plaintiff cannot show he is likely to succeed under the second prong of the *Heller* analysis. If this Court reaches the second stage of the analysis under *Heller*, it must inquire as to the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights. *Kanter*, 919 F.3d at 441. The appropriate standard of review depends on "how close the law comes to the core of the Second Amendment rights and the severity of the law's burden on that right." *Id.* at 441 (quoting *Ezell*, 651 F.3d at 703). If the law imposes a severe burden on a Second

---

[7] *See* Cal. Penal Code §§ 28100-28490; Colo. Rev. Stat. § 18-12-112; Conn. Gen. Stat. §§ 29-33(c), 29-361(f), 29-37(e)-(j); Del. Code tit. 11, § 1448B, tit. 24, § 904A; D.C. Code Ann. §§ 7-2502.01-7-2502.04; Haw. Rev. Stat. Ann. §§ 134-2, 134-13; 430 ILCS 65/1-65/15a, 720 ILCS. 5/24-3(k); Iowa Code § 724.17; Md. Code Ann., Pub. Safety § 5-117.1(f); Mass. Gen. Laws ch. 140, §§ 121, 129B, 129C, 131, 131A, 131E; Mich. Comp. Laws §§ 28.422, 28.422a; Neb. Rev. Stat. Ann. §§ 69-2404, 69-2407, 69-2409; Nev. Rev. Stat. §§ 202.2547-202.2548; N.J. Stat. Ann. § 2C:58-3; N.M. Stat. Ann. § 30-7-7.1; N.Y. Gen. Bus. Law. § 898; Or. Rev. Stat. §§ 166.435, 166.436; N.C. Gen. Stat. §§ 14-402-14-404; 18 Pa. Cons. Stat. § 611; R.I. Gen. Laws §§ 11-47-35-11-47-35.2; Rev. Code Wash. § 9.41.113; Va. Code Ann. § 18.2-308.2:2 (effective July 1, 2021); Vt. Stat. Ann. tit. 13, § 4019.

Amendment right, there must be a stronger public interest justification than when the burdens are closer to the margins of a Second Amendment right. *Kanter*, 919 F.3d at 441–42.

Here, the only issue is mere delay past the 72-hour statutory period to complete a background check for the purchase of a firearm, not a complete and total ban on firearm possession as in *Heller*, 554 U.S. 570 (banning possession of handguns in the home), or *Ezell*, 651 F.3d 684 (banning firing range in the City of Chicago). Timing lies on the margins of the Second Amendment. As such, the appropriate standard of review is one akin to intermediate scrutiny. *Silvester*, 843 F. 3d at 827, 831 (10-day wait, even for those who already passed a background check was not unconstitutional). Therefore, the background check process will survive so long as it is substantially related to an important government objective. *Kanter*, 929 F.3d at 448.

As some form of intermediate scrutiny is the appropriate standard of review, Plaintiff is unlikely to succeed on his claim, because background checks are substantially related to the State's significant interest in regulating who can legally possess a firearm. The FOID card system was developed to "promote and protect the health, safety and welfare of the public" and "promote the public interest through "a system of identifying persons who are not qualified to acquire or possess firearms" in the State of Illinois. 430 ILCS 65/1. Protecting public safety is an important government interest. *See Kanter*, 919 F.3d at 448 (evaluating comparable federal law stating that preventing gun violence by keeping firearms from those who misuse them is an important interest); *Meza-Rodriguez*, 798 F. 3d at 673, ("[t]he government has a[] strong interest in preventing people who already have disrespected the law (including . . . felons . . .) from possessing guns.").

Plaintiff takes the extreme position that this Court should enjoin Defendant Hacker from enforcing any ban or prohibition on the transfer of a firearm from a licensed firearm dealer, unless Defendant Hacker has disapproved the transaction within 72 hours, a timeline set by Illinois law,

not the Second Amendment. (Doc. 33, Count VI, Request for Relief.) But taking the time necessary to adequately conduct background checks, rather than blindly adhering to the statutory period, is substantially related to the State's clear and important interest in protecting the public by ensuring that potentially dangerous individuals are not allowed to possess firearms. Therefore, the administrative delay of which Plaintiff complains does not violate the Second Amendment, and Plaintiff's challenge must fail.

**CONCLUSION**

All of Plaintiff's claims should be dismissed because: (1) Plaintiff lacks standing to bring his claims; (2) Count II is not ripe for adjudication; (3) the Eleventh Amendment bars Plaintiff's State supplemental claim; (4) the named Defendant is an improper party; (5) qualified immunity bars Count I; (6) Section 24-3 is constitutional; and (7) any government delay in processing background checks over the statutory 72-hour period does not impose a substantial burden on Second Amendment rights.

For the above and foregoing reasons, Defendant Gregory Hacker respectfully requests this honorable Court dismiss the Plaintiff's amended complaint with prejudice.

February 1, 2021                                    Respectfully submitted,

                                                   GREGORY HACKER,

                                                         Defendant,

Shannon Fruth, #6320635                            KWAME RAOUL, Attorney General
Assistant Attorney General                         State of Illinois,
500 South Second Street
Springfield, Illinois 62701
Phone: (217) 785-4555                              By: /s/ Shannon Fruth
Fax: (217) 524-5091                                      Shannon Fruth, #6320635
E-Mail: sfruth@atg.state.il.us                          Assistant Attorney General
gls@atg.state.il.us

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| WILLIAM R. ROGERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| GREGORY HACKER, | ) |
| | ) |
| Defendant. | ) |

No. 3:20-cv-01116-DWD

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2021, I electronically filed the foregoing *Memorandum of Law in Support of Defendant Hacker's Motion to Dismiss* with the Clerk of the Court using the CM/ECF system, which will send notification of same to the following:

Thomas G. Maag, #6272640
Maag Law Firm, LLC
22 West Lorena Ave
Wood River, IL 62095
tmaag@maaglaw.com

and I hereby certify that on the same date, I mailed by United States Postal Service, the described document to the following non-registered participant:

None

Respectfully submitted,

By: /s/ Shannon Fruth
Shannon Fruth, #6320635
Assistant Attorney General