# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTIRCT OF ILLINOIS

| | |
|---|---|
| WILLIAM R. ROGERS, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )    Case No. 20-CV-1116 |
| | ) |
| GREGORY HACKER, | ) |
| | ) |
| | ) |
|     Defendant. | ) |

## SECOND AMENDED COMPLAINT

Comes now Plaintiff William R. Rogers, by and through their attorney, and for their cause of action, states as follows:

## COUNT I

1. That at all times relevant, Plaintiff William R. Rogers ("Rogers") is a citizen and resident of Illinois, and has no criminal record, other than minor traffic tickets, for which no known statute disqualifies him from firearm ownership.

2. That Plaintiff Rogers has never been institutionalized in a mental institution, either voluntarily or involuntarily, has never been adjudicated as mentally defective or deficient, and no known laws, other than the FOID Card Act, at issue in this case, prohibit Plaintiff from lawfully possessing firearms, and in the case of the FOID Card Act, Plaintiff is only prohibited from possessing a firearm, if he has not been issued a FOID card.

3. That in Illinois, subject to certain narrow and inapplicable exceptions, in order to lawfully possess or acquire a firearm, one must possess a currently valid Illinois State Police

Issued Firearms Owners Identification Card, colloquially called a FOID. Literally millions of FOID cards have been issued and are currently valid in Illinois.

4. That in the absence of a FOID card being issued to the possessor of the firearm, there exists a total ban on the possession of all firearms by residents of Illinois.

5. That Defendant Gregory Hacker ("Hacker") is the Chief of the Illinois State Police Firearms Services Bureau, is responsible for the processing of FOID card applications, the issuance of FOID cards, as well as the licensing and regulation of licensed firearms dealers, under state law, in Illinois, and has been since Plaintiff originally filed for a FOID card.

6. That well over 30 days prior to filing this lawsuit, Plaintiff filed, using the online computer system, for a FOID card, and paid the $10.00 fee, plus a processing fee not authorized by statute.

7. That under the FOID Act, Defendant Hacker shall either approve or deny all applications [for a FOID card] within 30 days from the date they are received. 430 ILCS 65/5. This has been the law since the late 1960s.

8. That while the 30-day time period may be a creature of state law, and Defendant may well be in violation of it, it is not state law that this count is based on, as the Illinois Appellate Court has ruled this 30-day time period unenforceable under state law. Rather, it is the excessive and unreasonable delays, be they allowed under state law, or not, incurred in the processing of the FOID card that is at issue. In sum, while a 30-day time period to process FOID cards, or other similar gun licenses, may or may not be legitimate under the 2nd and 14th Amendment, there is no constitutionally legitimate reason that it should take more than couple of weeks, at most, to issue a FOID card. That while a 10,

or even a 30 day time period to conduct a background check may or may not be reasonable, Defendant Hacker and the State of Illinois have totally abandoned their own time periods, and totally abandoned reason, and forced persons, like Plaintiff, to simply wait, unknown and unknowable periods of time, in many cases six months, in some cases, over a year, to conduct a background check that can literally be accomplished in about 10 minutes, and then, once the FOID card application is approved, the card issued, and the person decides to actually buy a firearm, there is still yet another official 3 day waiting period, that has again morphed into, often, another two week or more waiting period to then actually acquire the gun, after getting the FOID card.

9. That in violation of 430 ILCS 65/5, Defendant did not either approve, or deny Plaintiff's application for a FOID card within the 30 days allotted. Instead, Defendant Hacker waited until he was actually served with summons and process in this case, and then, in accordance with his policy and practice, immediately issued the FOID card, in an effort to moot the case, and discourage litigation by persons seeking FOID cards, by depriving Plaintiff, and people like him, from being able to be reimbursed for their court filing fees and costs of litigation, which is the only reason Plaintiff, and people like him, actually obtained their FOID cards when they did. The lawsuit was the catalyst enabling Plaintiff to obtain the FOID card when he did.

10. That in violation of the Second and Fourteenth Amendments, Defendant Hacker did not either approve, or deny, Plaintiff's application for a FOID card within any reasonable constitutionally allowed time frame, and would not have done so in less than 115 days, but for the lawsuit, by which Plaintiff mitigated his damages.

11. That while, 430 ILCS 65/10, in theory, provides an administrative remedy for failure to timely process a FOID application, in truth and in fact, filing an administrative appeal for untimely FOID processing is a futile act, as the appeals are simply placed into paper folders, and there is no assigned Administrative Law Judge or other hearing officer to actually hear the appeals.  Instead, Defendant simply makes an *ad hoc* review of the appeal, if and when time permits, often resulting in months or years to review an appeal, such that it is no real remedy for Defendant failing to timely process the application.

12. When information is sought on how long administrative appeals take, persons seeking that information are told that no such information is available.  However, from information obtained from public media, it is known that some such administrative appeals are still pending well over two years after having been filed, with no word from anyone as to when a hearing or decision might be rendered.

13. That the delay complaint is systemic, and not unique to Plaintiff, in that, at present, the officially stated FOID processing time is over 116 days, with many applications remaining pending for 10 months, or more, all the time, the applicant may not lawfully possess a firearm.  In many cases, FOID card applications have been pending for over a year.  Similar concealed carry applications are similarly not timely processed.

14. That Defendant is actually aware of the foregoing, and actually aware that it violates state law and actually aware that it is imposing an undue restriction on the Constitutional right to keep and bears arms, yet he continues to act the same way, and has taken no articulatable steps to actually redress this problem, despite promises, going back nearly a decade (in the case of Hacker's predecessors) to fix the delay problem, which only gets worse with time.

15. In fact, the opposite is true. During 2020, Defendant Hacker has personally seen to it that employees and contractors responsible for the issuance of FOID cards, have been told not to come into work for large amounts of time, and to not process said applications. Even as late of July, 2021, said employees have not been allowed to come in and work full time of the processing of such cards, per the instruction of Defendant Hacker, such that as of July 2, 2021, the average processing time for a FOID card is 207 days.

16. That as a proximate cause of the foregoing, Plaintiffs, like Rogers, are left with a Faustian Choice, in that they can wait months, or sometimes literally years, for the licenses, unable to lawfully exercise their constitutional rights, suffering irreparable injury every day, or, they can file a lawsuit, causing their license to be promptly thereafter issued, after paying, over and above the normal costs of FOID and concealed carry licenses, between about $500.00 and several thousand dollars, in court filing, service and attorney fee charges, only to have their case dismissed, as moot, once Defendant, as a result of the lawsuit, immediately issue the licenses.

17. As anticipated when this case was originally filed, immediately upon Defendant Hacker being served in this case, Plaintiff's FOID card was issued and mailed to him, not in the ordinary course, but expressly and with the intent of trying to unilaterally make part of this case moot, in order to avoid adverse precedent and payment of costs and attorney fees.

18. In so doing, Defendant Hacker, and his predecessor, are using the Supreme Court's rejection of the so called "catalyst theory," to further their unlawful scheme to violate the Second and Fourteenth amendments, and to delay, as much as practical, the issuance of FOID and concealed carry licenses, and then insulate their unlawful conduct from actual

consequences through a combination of state law tort immunity, and 11th Amendment Immunity, by making the individual case moot, by issuing the specific license to the specific plaintiff, but continuing to act the same, and not generally timely processing either kind of license.

19. While the Supreme Court in held that *Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598 (2001)

> "Petitioners finally assert that the "catalyst theory" is necessary to prevent defendants from unilaterally mooting an action before judgment in an effort to avoid an award of attorney's fees. They also claim that the rejection of the "catalyst theory" will deter plaintiffs with meritorious but expensive cases from bringing suit. We are skeptical of these assertions, which are entirely speculative and unsupported by any empirical evidence[,]"

that is exactly what Defendant Hacker, and his predecessor, are actually doing (i.e. unilaterally mooting an action before judgment in an effort to avoid an award of attorney fees), but continuing the practice as to other persons not named as the Plaintiff.

20. That under the Second and Fourteenth Amendments, Plaintiff has a right to keep and bear arms, at least, in his home, for private self-defense, including the right to do so in a reasonably timely manner, and without excess cost or resort to the courts to obtain reasonably timely permission.  It is unconstitutional to require a person seeking to lawfully possess or acquire arms to either wait hundreds of days, or more, to obtain the necessary license, or pay hundreds or thousands of dollars in court filing and attorney fees, in order to actually get a license, and no reasonable person would think otherwise.

21. That as a proximate cause of the foregoing, Plaintiff has been damaged in an amount of between $486.00 and $5,000.00, in that, in order to actually obtain his FOID card, without waiting additional months or years, Plaintiff was forced to:

    (A) Hire an attorney; and

    (B) File a lawsuit, and

    (C) Pay a filing fee and related court costs, and

    (D) Pay an attorney,

all in and effort to obtain a FOID card, allowing him to exercise his Second Amendment rights.

22. Furthermore, even aside from the out of pocket costs incurred in hiring an attorney and filing a lawsuit, without which Plaintiff likely would still not have his FOID card, Plaintiff was injured, in an amount to be determined at trial, in that for months, Plaintiff was unable to lawfully possess or acquire a firearm, and thus was unable to lawfully practice shooting, in order to gain skills sufficient to pass a concealed carry class, thus enabling him to apply for a concealed carry license during this time.

WHEREFORE, Plaintiff humbly requests that this Honorable Court enter judgment in Plaintiff's favor, and against Defendant Gregory Hacker, personally, and not in his official capacity, of an amount of money less than $5,000.00, plus attorney fees pursuant to 42 U.S.C. 1988, and costs of suit, plus such other, further and different relief allowed by law.

### COUNT II

1 – 5.   Plaintiff adopts and incorporates paragraphs 1 through 5 of Count I.

6. That per statute, of the funds paid for a FOID card "$6 of each fee derived from the issuance of Firearm Owner's Identification Cards, or renewals thereof, shall be deposited in

the Wildlife and Fish Fund in the State Treasury; $1 of the fee shall be deposited in the State Police Services Fund and $3 of the fee shall be deposited in the State Police Firearm Services Fund." 430 ILCS 65/5

7. Of the funds paid for a CCL, for a resident, "$120 shall be apportioned to the State Police Firearm Services Fund, $20 shall be apportioned to the Mental Health Reporting Fund, and $10 shall be apportioned to the State Crime Laboratory Fund."

8. That Plaintiff has paid, in 2020, the $10 for a FOID card, and intends, once he has saved sufficient money to pay the fee, to apply for a FCCL, currently costing $150.00. However, Plaintiff, who is presently not employed, and who is forced to care for an aging and sick parent that requires a significant amount of care, does not have $150.00 in disposable income, much less the ability to pay said $150.00.00, which he would immediately, and without delay, pay, in order to apply for a concealed carry license, if her were able to afford to do so.  Plaintiff also intends to renew his existing FOID and planned FCCL, as is necessary.

9. On its face, the charges for a FOID and a FCCL appear to be a mere fee used to process applications.  However, this is a farce.

10. As actually enforced, the charges are not a mere fee, but on closer examination clearly become a tax on constitutionally protected activity, that being the acquisition, possession and bearing of arms and ammunition.

11. While Plaintiff can afford to, and has in fact, actually paid the $10.00 FOID fee, he cannot afford to pay the $150.00 concealed carry fee, and thus, the fee, or tax, serves to presently and actually prohibit Plaintiff from even being able to apply for a license, much less exercising his right to carry a firearm outside of the home.

12. That at $150.00, Illinois' concealed carry license is the most expensive state concealed carry license issued in the United States, most being less than a third of that charge.

13. That under the Second Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

14. That whatever the charges related to the issuance of FOID and FCCL could be, as actually used from 2015 through 2020, there are largely comprised of taxes, in that, the charges are well above that reasonably necessary to administer the various relevant statutes and/or programs (i.e FOID and/ or CCL).

15. That by express statute, (430 ILCS 65/5)

> "… every applicant found qualified under Section 8 of this Act by the Department shall be entitled to a Firearm Owner's Identification Card upon the payment of a $10 fee. … $6 of each fee derived from the issuance of Firearm Owner's Identification Cards, or renewals thereof, shall be deposited in the Wildlife and Fish Fund in the State Treasury; $1 of the fee shall be deposited in the State Police Services Fund and $3 of the fee shall be deposited in the State Police Firearm Services Fund."

16. That by express statute, (430 ILCS 66/60)

> "An applicant for a new license or a renewal shall submit $150 with the application, of which $120 shall be apportioned to the State Police Firearm Services Fund, $20 shall be apportioned to the Mental Health Reporting Fund, and $10 shall be apportioned to the State Crime Laboratory Fund."

17. That pursuant to 20 ILCS 2605/2605-595;

> "(a) There is created in the State treasury a special fund known as the State Police Firearm Services Fund. The Fund shall receive revenue under the Firearm Concealed Carry Act and Section 5 of the Firearm Owners Identification Card Act. …"

18. That pursuant to 20 ILCS 2605/2605-595(b) "

> "The Department of State Police may use moneys in the Fund to finance any of its lawful purposes, mandates, functions, and duties under the Firearm Owners Identification Card Act and the Firearm Concealed Carry Act, including the cost of sending notices of expiration of Firearm Owner's Identification Cards, concealed carry licenses, the prompt and efficient processing of applications under the Firearm Owners Identification Card Act and the Firearm Concealed Carry Act, the improved efficiency and reporting of the LEADS and federal NICS law enforcement data systems, and support for investigations required under these Acts and law. Any surplus funds beyond what is needed to comply with the aforementioned purposes shall be used by the Department to improve the Law Enforcement Agencies Data System (LEADS) and criminal history background check system."

19. Contrary to the plaint language of the statute, for the time period 2014 through 2019, a total of $13,210,268 was taken from the State Police Firearm Services Fund, from funds generated by FOID and FCCL license receipts, and transferred to the General Revenue Fund and a total of $15,296,510 was taken from the State Police Services Fund, from funds generated by FOID and FCCL license receipts, and transferred to the General

    Revenue Fund for a total of $28,506,778, or over five million dollars a year. That there is no indication that this was a fluke, an accounting mistake or a onetime event, and appears certain to happen in the future, in that, the State of Illinois Defendants are using the taxes generated by the FOID and FCCL charges to fund general revenues for the State of Illinois, and this is the official policy of the State of Illinois as expressed by its pattern and practice.

20. A state may not impose a charge for the enjoyment of a right protected by the constitution, yet, whether the FOID funds are swept again, or not, with every application, funds are being deposited into, *inter alia*, the state treasury general revenues, and/or some other fund having nothing to do with administration of the FOID of concealed carry laws.

21. That by imposing said taxes, beyond those reasonably necessary to actually fund the FOID and FCCA programs, and instead are being used to fund general revenue programs, which, as a result, infringes upon the right to keep and bear arms, of Plaintiff and the proposed Plaintiff classes, and directly injures Plaintiff, in that, as to the FOID, he has actually paid unconstitutional taxes on his right to keep and bear arms, and as to his proposed concealed carry license, he has been prevented from even applying for same, due to the high costs, imposed as a result of the taxes.

22. That Defendants had no legal right to demand money above the actual cost of processing for the FOID and/or FCCL.

23. That these extra charges, over and above the actual processing costs of the licenses, have resulted in FOID and Concealed Carry Licenses costing more than they should, resulting in a tax on a fundamental constitutional right.

24. That as a result of this tax, Plaintiff cannot afford to file, at this time, for a concealed carry license, but would do so, if he could apply for same, at the licenses actual cost to issue, and thus, has been actually damaged in that his right to carry a firearm outside of him home has been infringed.

25. That as a result of these excess fees, for FOID cards, which in reality are taxes on the right to keep and bear arms, Plaintiff has been actually damaged in that he has paid more in order to legally exercise his right to keep and bear arm, than the mere cost of issuing the FOID.

Wherefore, Plaintiff and the Plaintiff class Humbly request that this Honorable Court enter judgment in Plaintiffs and (1) enjoin Defendants from collecting or using any funds paid by applicants for FOID cards and/or FCCL, to fund any program or operation unrelated to the actual processing and issuance of FOID cards and/or FCCL, (2) enjoining Defendants from enforcing the FOID Act and/or the FCCA, until such time as the charges collected under said acts are limited to actual processing and administration costs of the FOID and FCCA, plus costs and attorney fees, pursuant to 42 U.S.C. 1988, and such other, further and different relief as is allowed by law.

## COUNT III

1. Plaintiff adopts paragraph 1 of Count I.

2. That Plaintiff has a constitutional right, under the Second and Fourteenth Amendments, to possess a handgun, at least, inside his home, for self-defense. *District of Columbia v. Heller*, 554 US 570 - Supreme Court 2008.

3. Plaintiff who is not financially well off, and does not presently own any handguns, as he cannot afford most handguns on the market.

4. That he has, however, discovered that certain handguns retail for around $120.00, which would be within her budget for a new handgun.

5. However, these "budget minded" handguns are generally made of a zinc alloy and will deform is heated to a certain level, not possible to attain by normal, or even abusive use of the firearm.

6. That there is no law applicable in Illinois that prohibits mere possession or use of a handgun made out of zinc alloy or any other metal, nor does it prohibit the purchase and sale of handguns by non federally licensed persons, however, the statute acts as a total ban on new, modern and safe zinc alloy firearm, as no legitimate firearms dealer or manufacturer will sell such a firearm to a FOID card holder, upon fear of prosecution, and Defendant Hacker using it as a reason to revoke the dealer's state permission to sell firearms.

7. 720 ILCS 5/24-3(H), prohibits a person,

   "While holding any license as a dealer, importer, manufacturer or pawnbroker under the federal Gun Control Act of 1968, manufactures, sells or delivers to any unlicensed person a handgun having a barrel, slide, frame or receiver which is a die casting of zinc alloy or any other nonhomogeneous metal which will melt or deform at a temperature of less than 800 degrees Fahrenheit."

8. It is generally unlawful for a person who does not hold any license as a dealer, importer, manufacturer or pawnbroker under the federal Gun Control Act of 1968, to manufacture, sell or deliver to any unlicensed person a handgun.  Thus, the most common way to acquire a lawful handgun is to buy one from a licensed dealer.

9. That while the statute has been on the books for several years, recently, the Illinois State Police has been notifying dealers, distributors and manufactures who make and sell such products that they are not allowed in Illinois, and thus, they have disappeared from dealer shelves, and thus, the lowest cost handguns have been driven from the market in Illinois, by Defendants, and are no longer available for purchase by Plaintiff, but would be so available, but for this statute.

10. That the statute itself has nothing to do with consumer safety, or any legitimate governmental function, but rather, was simply designed to keep affordable handguns off the market in Illinois, based on the incorrect belief that there was no constitutional right to keep and bear handguns.

11. As a proximate cause of the foregoing, Plaintiff has been unable to lawfully purchase, at a properly licensed dealer, a handgun of his choice, that she can actually afford, forcing Plaintiff to remain unarmed, when in the absence of the statute, Plaintiff would be able to purchase her choice of affordable new lawful handguns.

12. That the handguns at issue in this case are common and available throughout the United States, and constitute arms in common use at this time.  In fact, the overwhelming majority of the .22 caliber revolvers produced or sold in the United States, are banned from sale in Illinois, under this Statute, as they contain zinc.

13. That as a result of the foregoing, Plaintiff's rights under the Second and Fourteenth Amendments have been violated.

14. Plaintiff brings this action under 42 U.S.C. 1983, for violation of her civil rights.

WHEREFORE, Plaintiff humbly requests that this Honorable Court declare and hold 720 ILCS 5/24-3(H) unconstitutional, and permanently enjoin its enforcement, plus an award of costs and attorney fees, pursuant to 42 U.S.C. 1988.

## COUNT IV

1. That at all times relevant, Plaintiff William R. Rogers ("Rogers") is a citizen and resident of Illinois, and has no criminal record, other than minor traffic tickets, for which no known statute disqualifies him from firearm ownership.
2. That Plaintiff Rogers has never been institutionalized in a mental institution, either voluntarily or involuntarily, has never been adjudicated as mentally defective or deficient, and no known laws, other than the FOID Card Act, at issue in this case, prohibit Plaintiff from lawfully possessing firearms, and in the case of the FOID Card Act, Plaintiff is only prohibited from possessing a firearm, if he has not been issued a FOID card.
3. That in Illinois, subject to certain narrow and inapplicable exceptions, in order to lawfully possess or acquire a firearm, one must possess a currently valid Illinois State Police Issued Firearms Owners Identification Card, colloquially called a FOID.  Literally millions of FOID cards have been issued and are currently valid in Illinois.
4. That in the absence of a FOID card being issued to the possessor of the firearm, there exists a total ban on the possession of all firearms by residents of Illinois.

5. That Defendant Gregory Hacker ("Hacker") is the Chief of the Illinois State Police Firearms Services Bureau, and is responsible for the processing of FOID card applications and the issuance of FOID cards.

6. That under Illinois law, there exists a 72-hour waiting period in order to purchase any firearm.

7. Under the Illinois Administrative Code,

> "Section 1235.90 Response Procedures
>
> The Department shall provide, during the initial dealer inquiry, an approval, denial, or conditional denial of the transfer. The time period for the Department to respond shall begin at the time the inquiry is received. When the Department provides a conditional denial, the dealer shall not transfer the firearm until an approval is provided by the Department or the length of time prescribed in Section 24-3 of the Criminal Code of 1961 [720 ILCS 5/24.3] has been exceeded."

8. Thus, under a plain language reading of Section 1235.90, a licensed dealer may transfer a firearm to a purchaser, like Plaintiff Rogers, as long as the transaction (a) has not been disapproved, and (b) the Department has had at least 72 hours to process the transaction.

9. That contrary to its own administrative code, Defendant Hacker has issued official guidance, in the form of official FAQs, which state, in relevant part,

> "The actual transfer of the firearm cannot take place until there is an approval from the FTIP system, regardless of when the agreement was reached. If the FFL receives a transaction number, they cannot complete the transfer until they receive an approval."

10. That the official state regulation and the FAQ are irreconcilably in conflict with each other. However, Plaintiff does not ask this Court to resolve this *state law* conflict, but rather to resolve this under federal law.

11. That many, or most, licensed dealers will not actually transfer a firearm, including to Plaintiff, even with a valid FOID card, after 72 hours, unless there is express approval from Defendant Hacker, for fear or prosecution and arrest, resulting in Plaintiff's rights being delayed again. However, under *federal law*, specifically the Gun Control Act of 1968, as amended, a federally licensed firearms dealer may proceed with a transfer, as long as it has not been expressly disapproved, after 72 hours.

12. That under the Second and Fourteenth Amendments, Plaintiff has a right to keep and bear arms, at least, in his home, for private self-defense, including the right to do so in a reasonably timely manner.

13. That at the time that the Second Amendment was ratified, a purchaser of a firearm could literally walk into a retail establishment, such as a general store, and leave with a firearm that same day.

14. Waiting periods are neither longstanding, being 20th Century creations, nor common, with most states not having them.

15. That under the Defendant's interpretation of the State's law, in the absence of approval, delay would operate as a potentially unlimited delay on the right to keep and bear arms, even after waiting more than 30 days to obtain a FOID card.

16. Recent Illinois background check delays from the Defendant have, on many occasions, extended well beyond 14 days, and in some cases, well beyond 30 or more. However, under federal regulations, when buying from a licensed dealer, the background check has

to be from within the last 30 days, or the transaction cannot proceed, meaning, purchasers are caught in a catch 22, in that, state law, as interpreted and enforced by Defendant, bars the dealer from transferring the firearm, even is more than 30 days have elapsed, yet federal law prohibits the dealer from transferring the firearm, without a new background check, if the first background check is over 30 days old .

17. That by virtue of already having a FOID card, Plaintiff, and people like him, had already had a background check performed, which is rerun and rechecked every few weeks by Defendant Hacker, meaning, as a matter of fact, that every FOID card that shows valid in the Defendant's registry, has had an actual background check within a time period of under 30 days.

18. That there is no federal prohibition on a transfer, from a licensed dealer, after 72 hours from the time that said dealer performs said background check, unless said check comes back actually being denied.  That, in most states, the transaction is allowed to proceed after 72 hours from the running of the background check, thus, no federal statues or regulations are challenged herein.

19. That in the case of an invalid FOID card, the background check always immediately comes back, in red, "invalid."  It is rare and unusual to actually get a "disapproved" back, other than instantly, with most dealers never getting a disapproved or invalid back other than instantly.

20. By virtue of the original FOID background check, and the follow on checks every few weeks, as long as the FOID card has not been previously revoked, almost every background check, not immediately showing disapproved or invalid comes back valid and approved, thus, there is no legitimate reason that a transaction, not actually

disapproved, within 72 hours, should not proceed.  The system literally performs the same background checks repeatedly, whether someone tries to buy a gun, or not.

21. That assuming that Illinois law is consistent with the official position of Defendant, then this Court should declare any waiting period, as applied to a FOID card holder in Illinois, beyond 72 hours, unconstitutional, under the Second and Fourteenth Amendments, whether of not the purchasers background check has come back approved, or is still pending.

WHEREFORE That Plaintiff humbly requests that this Honorable Court *enjoin* Defendant Gregory Hacker, in his official capacity, from enforcing any ban or prohibition on the transfer of a firearm, from a licensed firearm dealer, more than 72 hours after the running of the buyers' background check, unless Defendant actually disapproves the transaction prior to the actual transfer of the firearm, and holding any waiting period or time over 72 hours unconstitutional, plus an award of costs and attorney fees, and such other, further and different relief allowed by law or equity, under 41 USC 1983 and 1988.

Dated:  July 7, 2021

Respectfully Submitted,

William Rogers,

By: S/Thomas G. Maag

Thomas G. Maag
Maag Law Firm, LLC
22 West Lorena Avenue
Wood River, IL  62095

Phone:  618-216-5291
tmaag@maaglaw.com

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that the foregoing document was filed, using the CM/ECF system, which will send notification to the following:

Kristina Dawn Echols Dion
Illinois Attorney General's Office - Springfield
500 South Second Street
Springfield, IL 62701
217-782-5819
Fax: 217-524-5091
Email: kdion@atg.state.il.us

Shannon Lynn Fruth
Illinois Attorney General's Office - Springfield
500 South Second Street
Springfield, IL 62701
217-782-2077
Fax: 217-524-5091
Email: sfruth@atg.state.il.us


Dated:  7-7-2021                                                      <u>s/Thomas G. Maag</u>