IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTIRCT OF ILLINOIS

| | |
|---|---|
| WILLIAM R. ROGERS, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | ) Case No. 20-CV-1116 |
| | ) |
| GREGORY HACKER, | ) |
| | ) |
| | ) |
|    Defendant. | ) |

**MOTION FOR SUMMARY JUDGMENT ON COUNTS II, III AND IV OF THE SECOND AMENDED COMPLAINT**

Comes now Plaintiffs, by and through their attorneys, and move this Court for partial summary judgment on the Second Amended Complaint.

**COUNTS ON WHICH SUMMARY JUDGMENT IS BEING MOVED**

Count I   -   Plaintiff is NOT moving for summary judgment

Count II   -   Plaintiff is moving for summary judgment.

Count III   -   Plaintiff is moving for summary judgment.

Count IV   -   Plaintiff is moving for summary judgment.

**EXHIBITS CITED**

| | | |
|---|---|---|
| Deposition of Lt. Jeffrey Yenchko, taken November 22, 2022 | - | Ex. A |
| First Supplemental Response to Plaintiff's Requests for Production, Rogers v. Hacker, Case no. 20-CV-1116, S.D. of IL | - | Ex B. |
| Web Page, U.S. Concealed Carry Association | - | Ex. C |
| Web Page, Wisconsin D.O.J. | - | Ex. D |

| | | |
|---|---|---|
| Arizona Department of Public Safety, Concealed Weapons Permit Application. | - | Ex. E |
| Indiana State Police Web Page | - | Ex. F |
| Kentucky State Police Web Page | - | Ex. G |
| IL SOS, Driver's License Fee Chart | - | Ex H. |
| Illinois 2019 Audit | - | Ex I. |
| Per ISPFSB, Number of CCL Applications received certain years | - | Ex J. |
| IL License fee Chart | - | Ex. K |
| Affidavit of Scott Pulaski, et al | - | Ex. L |
| Illinois FTIP sheet | - | Ex M |
| Antique Brass Pistol Ad | - | Ex N |
| Antique Brass Pistol Ad | - | Ex O |
| ATF FAQ answer | - | Ex P |

## GENERAL UNDISPUTED FACTS

1. Plaintiff William Rogers is a citizen and resident of Illinois, has no criminal record other than minor traffic tickets, for which no known statute disqualifies him from firearm ownership. (Doc. 87, p. 1, Count I, para 1.)

2. Plaintiff William Rogers has no mental health disqualification from firearms ownership. (Doc. 87, pp. 1-2, Count I, para. 2).

3. That, in Illinois, subject to certain narrow and inapplicable exceptions, in order to lawfully posses or acquire a firearm, one must possess a currently valid Illinois State Police issued Firearms Owners Identification Card, colloquially called a FOID. (Doc. 87, p. 2, Count I, para. 3).

**CONCEALED CARRY LICENSE COSTS**

This first of the challenges made in this motion is that of the application costs of an Illinois Concealed Carry license, or CCL. In Illinois, absent certain very narrow exceptions, one must have a license to carry a concealed firearm. The exceptions, quite narrow, are basically carrying while hunting, fishing or trapping, or while on your own land. There are also exceptions for "police.[1]" This license is issued by the Firearms Services Bureau of the Illinois State Police, who also issue FOID cards and regulate at the state level firearms dealers.

The Illinois licensing regime is basically a shall issue regime, meaning that if an applicant is qualified, the license must be issued. Plaintiff takes no issue with the qualifications to obtain a permit, as, while strict, and probably intended to dissuade application, he is capable of complying with them. However, the actual cost of the concealed carry license is excessive and exorbitant, which is the challenge Plaintiff makes[2].

"[B]ecause any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in

---

[1] Especially in the pre-Concealed Carry License era in Illinois, the "police" exception has been somewhat abused over the years. At least historically, it was not uncommon for prominent or well connected persons to be deputized as sheriff's or coroner's deputies, or in the case of certain federal officials, deputy U.S. Marshalls, in order to carry firearms when ordinary citizens could not. These persons included lawyers, doctors, and sometimes even federal judges.
[2] Plaintiff, for purposes of this motion, does not challenge the cost of a Firearm Owners Identification Card, under current law, as set forth in Count II, based on discovery in this case, as it is unlikely that this Court would find the present cost of a FOID card exorbitant, in light of its actual processing costs. Furthermore, since the filing of this suit, the General Assembly has amended the statute such that the charge for FOID cards is not classified as a "tax." Thus, to the extent that Count II challenges the cost of a FOID card, said claim is withdrawn. That being said, pursuant to the Illinois Civil Rights Act of 2003, 740 ILCS 23/1, Plaintiff reserves the right to file a fee petition, at the close of this case, as the prevailing party, as this lawsuit caused the General Assembly to change the law.

processing license applications <u>or exorbitant fees</u> deny ordinary citizens their right to public carry." *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. ___ (2022).

Per dictionary.com, "exorbitant" has two meanings. The first, meaning is

"exceeding the bounds of custom, propriety, or reason, especially in amount or extent; highly excessive:"

The second meaning, described as archaic, is "outside the authority of law." Under either meaning, the result is the same.

### MATERIAL UNDISPUTED FACTS ON CONCEALED CARRY

1. A resident concealed carry license in Illinois cost $150.00 to apply. Ex, A, p. 43, line 3.

2. A non-resident concealed carry license in Illinois costs $300.00 to apply. Ex. A, p. 43, line 7.

3. Of the $150 for a resident CCL, $120.00 goes to the Firearms Services Bureau. Ex, A, p. 36, line 22.

4. Of the $150 for a resident CCL, $20.00 goes to the mental health fund. Ex. A, p. 36, line 23.

5. Of the $150 for a resident CCL, $10.00 goes to the crime lab. Ex. A, p. 36, line 24.

6. It is unknown what the $20 to the mental health fund actually does. "What would the $20 to the mental health fund be used to accomplish? That, I do not know." Ex. A, p. 37, lines 8-10.

7. It is unknown what the $10 to the crime lab actually does. "What would the crime lab do with its $10.00, if you know? That I do not know." Ex, A, p. 37, lines 5-7.

8. In Fiscal Year 2022 the average processing cost for a concealed carry license was $67.18. Ex B, p. 6. Ex, A, p. 18, line 21-22.

9.  In Fiscal Year 2021 the average processing cost for a concealed carry license was $43.59. Ex B, p. 7.  Ex, A, p. 18, line 21-22.

10. In Fiscal Year 2020 the average processing cost for a concealed carry license was $75.50. Ex. B, p. 8, Ex. A, p. 18, lines 21-22.

11. In Fiscal Year 2019 the average processing cost for a concealed carry license was $34.82. Ex B, p. 9.  Ex, A, p. 18, line 21-22.

12. That about half of the State in the United States do not require a license or permit to carry a concealed firearm legally.  Ex. C, p. 2.

13. That a concealed carry license in Wisconsin costs $40 for a new license, and $22 to renew.  Ex. D, p. 1.

14. That a concealed carry license in Arizona costs $60.  Ex. E, p. 1.

15. That a concealed carry license in Indiana is free.  Ex. F, p. 2.

16. That a concealed carry license I Kentucky costs a total of $60.00. Ex. G.

17. That an average resident Illinois Hunting license costs $12.50.  Ex. H.

## APPLICABLE LAW

That it is now well settled that the Second Amendment confers an individual right to keep and bear arms for self defense, and that this right is incorporated as to the states.  *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

Though both the U.S. Court of Appeals for the Seventh Circuit, and the Illinois Supreme Court have previously ruled that the right to keep and bear arms extends outside of the home, and that Illinois' prior total ban on carry outside of the home was unconstitutional, less there be any

doubt, in 2022, the U.S. Supreme Court put a nail in that coffin. *New York State Rifle and Pistol Association v. Bruen*, U.S. Supreme Court, 2022[3]. In that case, the Supreme Court made clear that;

> "We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command.""

*Bruen*.

The Supreme Court also, expressly, stated;

> "because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry."

Id.

In this case, in the wake of *Moore v. Madigan* , 702 F.3d 933 (7th Cir. 2012), the State of Illinois passed what is basically the current form of Illinois Concealed Carry, becoming the very last state in the Union to provide for, at least theoretically, some ability to carry outside of the

---

[3] As noted by at least one commenter, twenty minutes after the Supreme Court released the *Bruen* opinion, one could almost feel the hurricane force winds of red flags being placed on existing Second Amendment caselaw, especially those previously rejecting claims. Post *Bruen*, it is doubtful that many reported cases previously rejecting Second Amendment claims remain good law.

home[4]. Of course the state, of its purposes, did not exactly go quietly into that good night, it kicked, it screamed, and it made the process expressive and difficult.

As noted by the Illinois Supreme Court case of *Crocker v Finley*, 99 Ill.2d 444, 452 (1984)

> "…charges imposed [] are fees if assessed to defray the expenses []. On the other hand, a charge having no relation to the services rendered, assessed to provide general revenue rather than compensation, is a tax. (*Cook County v. Fairbank* (1906), 222 Ill. 578, 582-87; see also 1 T.M. Cooley, Taxation sec. 33 (C.A. Nicols 4th ed. 1924); 84 C.J.S. Taxation sec. 1.b, at 34-35 (1954).)

This is consistent with the U.S. Supreme Court in *Murdock v. Pennsylvania*, 319 U.S. 105 (1943), that held that a state can recoup certain costs, it cannot *tax* a constitutional right. In other words, the state cannot make a profit off of the licensing regime.

## ARGUMENT

As noted by the Supreme Court over 200 years ago, the power to tax is the power to destroy." *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316 (1819). What good is a right to keep and bear arms, one might ask, if in order to exercise it, one must pay taxes designed to deter the exercise of the right. Fortunately, it is settled that a state cannot tax a right guaranteed by the Constitution. *Murdock v. Pennsylvania*, 319 U.S. 105 (1943).

In this case we know the charge for an Illinois Concealed Carry License is exorbitant, and thus constitutes a tax, for any of at least three reasons of record.

---

[44] While some other states, such as Hawaii, may well have had a permitting statute on the books, in actual practice, it was no better than Illinois total ban, as in real life, it did not actually issue permits to actually carry.

First the sworn facts from the State and its own employees.  Per the State's own figures, verified by the Chief of the Firearms Services Bureau, the state of Illinois, depending on the year<u>, has made a net profit of between $115.18 and $74.50, on average, each and every Illinois Concealed Carry license application</u>.  Ex A, .  For non-residents, add another $150.00 to the profit margin.

We also know that for several years, until caught and exposed publicly, over $15,000,000.00 (fifteen million dollars) was "swept" out of the funds generated by FOID and Concealed Carry cards, and placed into general revenue.  (Ex I).  As noted in exhibit I, page 2, Illinois law prohibits such sweeps from affecting operations of the swept agency.  Thus, we know that from 2015 through 2019, even using Concealed Carry funds to cover for FOID funds, there was still an average profit of 3 million dollars per year swept from the State police, available due to the exorbitant nature of the Concealed Carry costs. Taking the numbers from the State Police FSB website (Ex. J), results in calculations showing significant profit each year on Concealed Carry Applications, literally sufficient to allow the sweeping of millions of dollars into general revenue, allegedly without affecting operations related to issuance of the Concealed Carry Licenses (or a violation of state law, assuming there was an effect).  Alone, this is enough to show exorbitance.  But there is more.

What do other state's charge for similar licenses?  Overlooking that about half of the states require no such license (Ex. C), and no state required a license in 1791, $60.00 seems about average for those who do presently require such a license. (Ex D, E, and G).   Interestingly, to get an Illinois Driver's license, is a fraction of a concealed Carry license.  Ex H (a basic drivers license in Illinois costs $30.00).  Notably, *driving*, as we are often reminded, is a mere privilege, not a right.  Keeping and Bearing arms, is a fundamental right. Thus, whether

compared to other states Concealed Carry Costs, or Illinois' own non-firearms related driver's license, Illinois Concealed Carry not just costs more, but excessively more. Not only that, but a license to actually hunt with a firearm, in Illinois, costs a mere $12.50, for a one year license. (Ex. H). Again, a fraction of the costs of a CCL in Illinois.

When combined, and in light of the history of Illinois, resisting concealed carry and firearms rights, it is clear that the purpose of the charge, as it, is not merely to recoup costs, but to raise prices high, to discourage applicants, and/or fund unrelated matters which should be funded by general revenue. As noted in *Bruen,* the constitutional right to bear arms in public for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U. S., at 780 (plurality opinion). We know of no other constitutional right that an individual may exercise only after demonstrating to government officers some special need. That is not how the First Amendment works when it comes to unpopular speech or the free exercise of religion. It is not how the Sixth Amendment works when it comes to a defendant's right to confront the witnesses against him. And it is not how the Second Amendment works when it comes to public carry for self-defense.

The bottom line is that Defendant is making a substantial profit off of each concealed carry license, which means it is *taxing* a constitutional right, deterring those less well off from being able to lawfully exercise their rights. This cannot stand.

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment on the issue of exorbitance of the costs of concealed carry licenses, and enjoin Defendants from charging, in excess of the actual costs of actually processing the application and actually issuing the licenses, which at this time should not be in excess of $60.00 per person (even at $60.00 per person, this is

above the average cost of issuance over time).  Alternatively, this Court should bar enforcement of the Illinois Concealed Carry Act, unless and until the Illinois Legislature sets an application fee of an amount consistent with the actual processing costs of the application, or for such other, further or different relief allowed by law or equity.

## II.     THE ZINC GUN BAN IS UNCONSTITUTIONAL

Plaintiff's second challenge in this motion is that of the state law prohibition on licensed dealers transferring firearms made in large part of zinc.

Specifically, Plaintiff challenges, and seeks permanent injunction against the enforcement of 720 ILCS 5/24-3, which bans manufacture and/or sale and/or delivery of certain affordable handguns, simply because they incorporate zinc into the final product.  These include dozens or more models, by a variety of both well-established makes, and newer upstarts. (Ex. L).  The common factor of these firearms is that they include quantities of the metal zinc used in their manufacture.

The challenged statute is a holdover relic from the days that Illinois did not understand that the Second Amendment prohibited handgun bans, and candidly, in a bout of classism sought to cut off the supply of low cost firearms that poor people could afford.  At least since 2010, when the Supreme Court issued its decision in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), it knows better, yet has taken no steps to repeal this infringement, which, to be blunt, is squarely aimed at preventing poor people from exercising their right to bear arms, by prohibiting the best and safest, and ultimately, the only reliable, source of firearms, from selling the more reasonably priced firearms.  That being licensed dealers.

**FACTS**

The relevant facts are materially undisputed.

1. That these zinc-based firearms are not dangerous to use, but instead, are generally of good quality, are safe to fire, and will never melt or deform under ordinary or even extreme use.   Ex. L, affidavit of Scott Pulaski, para. 11.

2. In fact, they include such iconic brands as Smith and Wesson, Sig Sauer, Colt and Walther, which any reasonably knowledgeable person familiar with firearms will recognize as the top brands in the world, the equivalent of saying BMW, Cadillac or Rolex. Ex. L, para. 8.

3. That there are at least 26 specific makes of handgun, with hundreds of different models, prohibited by this statute.   Ex. L, para. 8.

4. But for this statute, at least one local licensed firearms vendor would sell these firearms at retail.  The truth is, most licensed firearms dealer would sell them, but for the statute prohibiting same.  Ex. L, para. 7.

5. That these firearms are clearly in common use by law abiding citizens throughout the United States.   Ex. L, paras. 4, 6.

6. In fact, one of the firearms, the Heritage Rough Rider .22, had over 186,500 examples made in the year 2018.  Ex. L, page 5.  This literally works out to the majority of .22 revolvers made in the United States in 2018, or 1/3 of all revolver kinds made in the United States. Ex. L, pages 4-5.

7. Also notable, a .22 revolver, like the Heritage, is exactly the same kind of gun that Dick Heller had to go to the Supreme Court in order to register with Washington D.C.

See https://www.gun-tests.com/handguns/finally-dick-heller-registers-revolver-in-d-c/

There exists no revolutionary era equivalent to a zinc handgun ban. There exists no Reconstruction era equivalent to a zinc handgun ban. Rather, in candor, the opposite is true. Zinc, used in alloys, has long been used in firearm construction. For instance, brass is an alloy of zinc. https://en.wikipedia.org/wiki/Brass Brass starts to deform at less than 800 Degrees, and is a non-homogeneous metal. Thus, the zinc ban likely bans sale of firearm with brass barrels. Notably, brass barrels in handguns, even in cannon, were common at the time of the Revolution. See inter alia Ex. N, Ex. O. Leading reference guides for historical American firearms, such as Flayderman's Guide to Antique American Firearms, 8th Ed., by Norm Flayderman, are replete with page after page of brass framed handguns and brass barreled pistols, in common use, from pre-Revolutionary War times, through well after the Civil War. Revolutionary War figures like Gen. George Washington, Thomas Jefferson and the Marquis de Lafayette, were known to own brass barrel pistols. Ex. N, p. 2.

## ARGUMENT

A Heritage .22 revolver is probably the most popular handgun sold in the United States today. Ex. L. It is certainly the most popular revolver, by far. This is clearly a popular kind of firearm, in very common use in the United States for lawful purposes. Ex. L. As noted in *Heller,* "under any of the standards of scrutiny the Court has applied to enumerated constitutional rights, in the place where the importance of the lawful defense of self, family, and property is most acute—would fail constitutional muster."

Under federal law, existing since at least 1968, in order to sell firearms for profit, one must have a valid federal firearms License. See 18 U.S.C. 922 generally. These are commonly

called FFLs.  It is presumed that this Court would not be inclined to declare the federal Gun Control Act, and its FFL requirement unconstitutional, as, for the most part at least, while portions of the federal Act may well be unconstitutional, most of it is probably is not, and none of it is challenged herein.

      Under Illinois law, it is illegal for an FFL to sell, or even to give away for free, a pistol, with an alloy frame or barrel, including a zinc alloy.  Under federal law, again not challenged at this point, it is illegal to receive directly a handgun, even from a licensed dealer, in another state, without going through an in state FFL.  Thus, in order to acquire such a firearm in Illinois, you essentially have to inherit it, or buy it second hand from a person lacking a license to sell it on the increasingly regulated non-FFL market (though it is unclear where the gun would come from in order to sell it second hand, as guns do not simply grow wild in the forest like elderberry).

      As it is generally illegal for a non-FFL to manufacture or sell commercially any kind of firearm, the fact that this statute applies to FFLs simply means that the only legitimate source of these kinds of firearms, other than incidental guns generally owned by people before the ban, can be made or sold in Illinois.  Certainly, Plaintiff, and others, can go to an underworld, unlicensed seller, and buy a firearm of this type, if available, and possibly illegally.  But the Second Amendment does not require citizens to deal with smugglers, scofflaws, the underground or black marker sellers, in order to exercise their rights.  A law abiding citizen should be able to go to a licensed, reputable dealer, pay appropriate taxes, fill out appropriate forms, and be confident they are engaged in a lawful transaction, when exercising their fundamental rights.

      Plaintiff has a Second and Fourteenth Amendment right to keep and bear arms in the home for private self defense, and this right includes handguns.  *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010).  "The Second Amendment

protects similarly intangible and unquantifiable interests. *Heller* held that the Amendment's central component is the right to possess firearms for protection. 554 U.S. at 592-95, 128 S.Ct. 2783. Infringements of this right cannot be compensated by damages." *Ezell v. City of Chicago*, 651 F. 3d 684, 700 - Court of Appeals, 7th Circuit 2011.  In other words, injunctive relief is appropriate.  "The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use[.]  *Ezell* at 704.  Of note to this case, is the right to *acquire* firearms.  It does no good to be able to *possess* a firearm that the law says you cannot buy.  Illinois goes so far now as to even ban home-made firearms.  See Illinois Public Act 102-0889.  Here, that is the exact scenario.  Nothing prohibits *possession* or use of the firearm, just don't try to buy one, or your federally and state licensed gun dealer will lose his license and go to jail, making it very hard to find a willing licensed gun dealer to sell you that gun; which of course means you cannot buy such a gun.

     Applying the *Bruen* test, a prohibition of purchase of ordinary, but low cost, pistols, violates the plain language of the Second Amendment.  Under *Bruen*, step one demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.  In this case, there simply is no such historical tradition of prohibiting low cost firearms from poor people, or prohibiting firearms based on what they are made of, or prohibiting zinc or brass barreled or framed firearms.  None.  As such, the regulation falls.

     That there is no adequate remedy at law for this violation.  The statute either falls or stands on its legality, which it lacks.  The only remedy is to remove the prohibition and allow the

sales. There is no genuine issue of material fact in dispute there, and each Party Defendant has some link in the prohibition chain that must be enjoined.

## CONCLUSION

WHEREFORE, Plaintiff Humbly moves this Honorable Court for an Order (1) declaring 720 ILCS 5/24-3 unconstitutional, (2) enjoining Defendants, either directly, or in concert with any others from enforcing 720 ILCS 5/24-3 in any way, awarding Plaintiffs costs and attorney fees pursuant to 42 U.S.C. 1988, and/or for such other, further and different relief as allowed by law.

**FTIP PROCESSING TIMES**

The third challenged issue is the uncertain and sometimes unlimited waiting period imposed on Plaintiff and others in Illinois.

"[B]ecause any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. ___ (2022).

As noted previously in this motion / memo, in Illinois, in order to lawfully possess or acquire firearms or ammunition, one must have a FOID card. In order to purchase a firearm from a licensed dealer, the dealer will, among other things, contact the Illinois State Police Firearms Services Bureau, and request permission to proceed with the transfer. Under the statute and regulation, the background check is supposed to be instant.[5] Much of the time it is not. In

---

[5] Under the Illinois Administrative Code, "Section 1235.90 Response Procedures The Department shall provide, during the initial dealer inquiry, an approval, denial, or conditional denial of the transfer. The time period for the Department to respond shall begin at the time the inquiry is received. When the Department provides a conditional denial, the dealer shall not

fact, the State does not even try to comply with its own law, as they do "not feel bound by it". Ex A, p. 24.  Based on Illinois Court decision (See *Murphy v. Grau*, 2018 Ill. App. 5th 160421 (Ill. App. Ct. 2018), the State probably is not bound to it, under state law.  Under state law and regulations, Defendant is then supposed to provide a response within 72 hours, with no penalty for not doing so..  Under federal law, as long as the transaction is not affirmatively disapproved, the transaction can proceed after 72 hours from running the background check.  For purposes of this case, Plaintiffs do not challenge that the 72 hour wait time, but having to wait *more* than 72 hours is being challenged.  Thus, no federal rule is being challenged, only a state "rule".

As much as it appears from the plain language of the regulation that under Illinois law, per the statute and regulations, Illinois *appears* to have the same 72 hour rule as the federal government. However, Defendant claims it has a different interpretation of this state statute and regulation and insists that no transaction can proceed unless and until affirmatively approved[6]. Ex, A, p. 24-25.  For purposes of this lawsuit, Plaintiff will resume this point later.  Defendant controls dealer licensing, at least at the state level, at thus, it is a foregone conclusion no dealer will deviate from the commands of Defendant, no matter how obviously arbitrary, capricious or

---

transfer the firearm until an approval is provided by the Department or the length of time prescribed in Section 24-3 of the Criminal Code of 1961 [720 ILCS 5/24.3] has been exceeded."

[6] Plaintiff does not ask this Court to render an opinion on whose interpretation of the Illinois Statute is correct, in light of this court, like all federal courts, being a court of limited subject matter jurisdiction.  Instead, Plaintiff asks this court to assume that Defendant's interpretation is correct, and thus, rule on whether that interpretation is constitutional, something within this Court's subject matter jurisdiction.  Of course, if Defendant were to concede that, under state law, a transaction can proceed after 72 hours from the running of the FTIP, the entire matter would likely be moot.

contrary to law. Thus, Plaintiff will presume that the state statute is correctly interpreted as suggested by Defendant, for purposes of this case.

In addition, a transaction must proceed within 30 days of initiating the background check, or another background check is required. Ex A, page.15, lines 15-23. Thus, a background check taking 30 or more days is *de facto* denied. This is not a conspiracy theory of "what if." This actually happens. See Ex. M. In fact, the ATF will revoke a dealers federal license if they proceed with a firearms transaction that was initiated, even if approved, more than 30 days prior. (Ex P)

On top of this, it is important to remember that the firearm applicant has already waited between 30 and 200+ days to get the FOID card, on top of the FTIP transaction. Still, in other cases, Defendant just never gets around to responding to the FTIP inquiry. Ex. M. Under *federal law* this is not a problem, as the dealer may proceed after 72 hours, and in the very unlikely event that the purchaser is an actual prohibited person, the ATF is quite good at rounding up that problem.

So the question becomes, under *Bruen*, was there a 1791 era equivalent to making a firearms purchaser wait more than 72 hours, and potentially forever, to obtain a firearm from a legitimate firearms store? The answer is no.

The text of the Second Amendment affords no such power to the government, a firearm that cannot be timely obtained, or obtained at all, is of no use, and cannot be kept. Furthermore, no evidence of any such statute or custom exists in the historical record. While difficult to prove a negative, Plaintiff could find no evidence of a historical tradition, which Defendant cannot rebut, a purchaser could not simply walk into a store, and purchase a firearm.

Granted, a means end test, rejected by the Supreme Court in *Bruen*, would probably find social utility in extensive background checks, and truth be told, Plaintiff does not challenge background checks, as long as it is ones that go on indefinitely, with no applicable standards, and with no obvious resolution in some objectively identifiable time period.  If the State, after conducting a background check to issue a FOID cart, cannot complete a background check within 72 hours, or sometime close to that, a citizen should not be punished by being forced to have their rights violated.

In all likelihood, Defendant will probably claim this issue is moot, as they are now in compliance, but as noted in exhibit M, some are still pending months later having his FTIP run.

WHEREFORE, this Court should declare that any state law requirement that a firearms purchaser, with a FOID card, and its prior background check, have to wait more than another 72 hours for another background check, after the second background check is run, before receiving a firearm, is unconstitutional, and that any rule or statute to that effect should be enjoined.

## CONCLUSION

For the forgoing reasons, this Court should grant this motion for partial summary judgment, and at the end of this case, allow Plaintiff to file, pursuant to 42 U.S.C. 1988, an attorney fee and costs petition.

Dated: 12-21-22                                             Respectfully Submitted,
                                                            William R. Rogers,


                                                            By: s/Thomas G. Maag

                                                            Thomas G. Maag #6272640
                                                            Maag Law Firm, LLC
                                                            22 West Lorena Avenue
                                                            Wood River, IL  62095

                                                            tmaag@maaglaw.com
                                                            618-216-5291

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this date, he filed the foregoing document using the CM/ECF system, which will send notification of the filing to all registered users.

Dated:  12-21-22                                            s/Thomas G. Maag