## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

WILLIAM R. ROGERS,    )
           )
   Plaintiff,    )
           )
v.          )
           )
GREGORY HACKER,    )  Case No.: 3:20-cv-01116-DWD
           )
   Defendant.    )

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## AND MEMORANDUM OF LAW IN SUPPORT

### INTRODUCTION

In his Second Amended Complaint, William Rogers alleges his Second Amendment rights have been violated by Gregory Hacker and Jeffrey Yenchko in four ways.[1] In Count I, Plaintiff alleges that delays in issuing Firearm Owners Identification ("FOID") Cards and concealed carry licenses ("CCLs") and delays in conducting point-of-purchase background checks violate the Second Amendment. Plaintiff brings Count I against Gregory Hacker "personally, and not in his official capacity" and seeks monetary damages only. 2d Am. Compl. at 7. In Counts II through IV, Plaintiff seeks only injunctive relief against Hacker (now Yenchko as Hacker's successor as Chief of the FSB) in his official capacity. 2d Am. Compl at 12, 15, 19. In Count II, Plaintiff alleges CCL fees are an unconstitutional tax. In Count III, Plaintiff alleges that an Illinois statute, 720 ILCS 5/24-3(H), violates the Second Amendment because it prohibits federally licensed firearm dealers from selling firearms composed of zinc alloy or other non-homogenous metals that melt at 800 degrees Fahrenheit or less. And in Count IV, Plaintiff alleges that requiring individuals to wait beyond 72 hours for approval to purchase a firearm violates the Second Amendment.

---

[1] Plaintiff seems to have sued Gregory Hacker both in his individual capacity and in his official capacity as Chief of the Illinois State Police's Firearm Services Bureau. Gregory Hacker has retired from this position, therefore his successor, Jeffrey Yenchko, is automatically substituted for Hacker in his official capacity. Fed. R. Civ. Pro 25(d).

Defendants seek summary judgment on all claims. Plaintiff cannot establish a case or controversy for any of his claims: he did not suffer an injury from any delays in issuing his FOID Card; he has never applied for a CCL, and therefore cannot challenge speculative delays in issuing CCLs or the application fees; and he has never attempted to purchase a firearm and has no desire to do so, therefore he cannot challenge any speculative delays in running a background check or prohibitions on the sale of zinc alloy firearms.

Even if Plaintiff had standing for Counts I–III, these claims fail on the merits.[2] Plaintiff cannot show Hacker's personal involvement in the alleged constitutional violation in Count I. Finally, Counts II and III fail because CCL fees and the prohibition against selling zinc alloy firearms are constitutional.

<u>**UNDISPUTED MATERIAL FACTS**</u>

1.   Plaintiff William Rogers is currently a resident of Illinois and has been an Illinois resident for 42 years. 2d Am. Compl. ¶ 1, Doc. 69; Ex. 1 Rogers Dep. at 9:18–21.

**FOID CARDS**

2.   ISP's FSB is responsible for processing new and renewal FOID Card applications; new and renewal CCL applications; processing firearms transfer inquiries related to the sale of firearms ("FTIP transactions"); and operating the Firearms Dealer Licensing Certification Program. FSB is not responsible for administrative appeals of FOID Card denials, revocations, or failures to issue. Ex. 4 Deposition of Gregory Hacker ("Hacker Dep.") at 9:2–11; 81:7–13.

3.   FSB has a FOID section in which there are approximately 25 analysts whose job it is to process FOID Card applications. Hacker Dep. at 13:3–14:1.

---

[2] The Court cannot go on to consider the merits of Count IV because of the lack of standing. Plaintiff has never attempted to purchase a firearm, and has never suffered any delay in excess of 72 hours to make a purchase. In order to assess any delay claim, the Court would have to speculate as to any possible length of delay and how long is too long. None of those circumstances are presented by Plaintiff.

4.   On January 1, 2020, Gregory Hacker became the Chief of FSB. Hacker Dep. at 3:13–24.

5.   On August 1, 2022, Jeffrey Yenchko became the Interim Chief of ISP's FSB, replacing Gregory Hacker. Ex. 5 Deposition of Jeffrey Yenchko ("Yenchko Dep.") at 4:16–19; 5:6–13.

6.   Processing times for FOID Cards started to increase in 2020 for a variety of reasons, including staff attrition in 2019, a first round of renewal applications following the statutory change in expiration date from 5 years to 10 years, increased applications due to social unrest, and COVID issues. A number of steps were taken to address the increase in processing times, including hiring more staff and creating efficiencies in processing applications. By December 2021, during Hacker's tenure as Chief of FSB, FSB was processing FOID Cards within 30 days as required by state law. Hacker Dep. at 17:13–18:18; 26:10–28:22.

7.   Rogers first submitted an application for a FOID Card on January 14, 2019, but did not pay the application fee until June 11, 2020. Rogers Dep. at 22:15–24:18, 25:22–24; Ex. 2 Declaration of Jeffrey Yenchko ("Yenchko Decl.") ¶¶ 5–7; Ex. 2-A Rogers FOID Card Business File.

8.   Rogers' FOID Card application could not be processed until he submitted the application fee. "Processing" a FOID Card application means that an analyst determines whether there are any grounds to deny the application as set forth by law in 430 ILCS 65/8. Yenchko Decl. ¶ 8.

9.   Rogers' FOID Card was issued on November 12, 2020. Rogers Dep. at 25:1–4.

10. Rogers does not know who at the Illinois State Police determined that Rogers should be issued a FOID Card. Rogers Dep. at 25:7–21.

11. Rogers has only ever submitted one FOID Card application, which resulted in a FOID Card being issued as described above. ISP has never denied Rogers a FOID Card, and has never revoked his FOID Card. Rogers has never filed an administrative appeal with ISP related to his FOID Card

or FOID Card application. Yenchko Decl. ¶¶ 5–6, 9; Ex. 3 Supplemental Plaintiff's Responses to Defendant's Interrogatories ("P's Supp. Rogs"), ¶ 5.

**PLAINTIFF'S GUN OWNERSHIP**

12. In 2019 at the latest, Rogers came to possess a .22 rifle that he inherited after his father's passing in 2012. Rogers Dep. at 9:18–10:10; 26:5-18; 27:5–28:24.

13. The .22 rifle is the only firearm Rogers has ever possessed. Rogers Dep. at 38:8–24; P's Supp. Rogs, ¶¶ 10–11.

14. In 2019 when he came into possession of the .22 rifle, Rogers moved the rifle from the shed into the basement of the house. Rogers Dep. at 31:5–16; 37:15–38:7.

15. Rogers never incurred a cost to store the .22 rifle. Rogers Dep. at 39:18–40:1; 46:19-23.

16. The only injury Rogers incurred as a result of the delay in his FOID Card being issued was the "excessive" time it took to issue the FOID Card. Rogers Dep. at 46:10–23.

17. Rogers has never sought to purchase a firearm because he "[j]ust wasn't interested. Just never did go looking for one." Rogers Dep. at 41:11–15.

**ZINC ALLOY FIREARMS**

18. In Illinois, federally licensed dealers are prohibited from selling handguns that are manufactured with zinc alloy or other non-homogenized metals that melt at less than 800 degrees Fahrenheit. 2d Am. Compl. Count III, ¶ 7 (Doc. 69); 720 ILCS 5/24-3(H).

19. Although Illinois residents cannot purchase a zinc alloy handgun from a federally licensed dealer, they can purchase zinc alloy handguns in person-to-person transactions and they can be received as gifts or via a will. Hacker Dep. at 66:21–67:20; 68:12–70:4.

20. Illinois residents can possess zinc alloy handguns. Ex. 6 Order on Renewed Motion for Summary Judgment, *Wilson v. Kelly*, Madison County Case No. 19-CH-666 ("*Wilson* MSJ Order"), ¶ 13; 2d Am. Compl. ¶ 6.

21. Rogers might have looked into purchasing a .22 Heritage Revolver, which is zinc alloy, but it was too expensive to purchase. Rogers Dep. at 52:7–53:14.

22. If Rogers could afford it, he "might consider" obtaining a handgun for lawful self-defense. Rogers Dep. at 60:15–20.

23. Rogers does not have the financial ability to purchase a firearm costing $100 to $130, and has taken no steps to save to purchase a firearm in that range. Rogers Dep. at 64:7–65:2; 65:8–10.

24. Hi-Point Firearms manufactures a 9mm pistol using zinc alloy, which is available to purchase new for $179.99. The P17 .22 caliber is made of steel and is comparable to the Hi-Point 9mm. The P17 is available to purchase new for $199.00. Oglesby Decl. ¶ 4.

25. Other firearms made of steel include the SCCY CPX-2 9mm, which is available to purchase new for $199.99 and is much better quality than the Hi-Point 9mm, and the Taurus G2C 9mm, which is available to purchase new for $219.99 and is better quality than the Hi-Point 9mm.

26. Plaintiff admits that the cheapest handgun that can be purchased in Illinois (which means it is not manufactured using zinc alloy) costs approximately $199.00. P's Supp. Rogs, ¶ 18.

**CONCEALED CARRY LICENSES**

27. In order to be eligible for a CCL, a person must have a FOID Card. 430 ILCS 66/25(2).

28. As of April 2022, there were approximately 2.6 million currently valid FOID Cards in Illinois, and around 450,000 to 500,000 valid CCLs. In fiscal year 2022, FSB issued 99,427 CCLs and 389,000 FOID Cards. Hacker Dep. at 76:3–9; Ex. 7 FY22 Estimated Expenses.

29. Rogers has never applied for a concealed carry license, and does not even know how much it costs to apply. Rogers Dep. at 47:24–48:1; 51:11–20.

30. Rogers does not believe this lawsuit is about concealed carry licenses because he has not applied for a concealed carry license. Rogers Dep. at 48:2–12.

31. Rogers could save money to apply for a CCL, but has not. Rogers Dep. at 65:3–13.

32. The cost for an Illinois resident to apply for a new CCL is $150, and the license is valid for 5 years. Hacker Dep. at 12–16; Yenchko Dep. at 38:21–24; 430 ILCS 66/60; 430 ILCS 66/10(c).

33. Of the $150 CCL application fee, $120 is deposited into the State Police Firearm Services Fund, $10 is deposited into the State Crime Laboratory Fund, and $20 is deposited in the Mental Health Services Fund. 430 ILCS 66/60(b); Yenchko Dep. at 36:10–24.

34. The State Police Firearms Services Fund was established to pay for the operating expenses of the Firearms Services Bureau, specifically including financing ISP's duties under the FOID Act and Firearm Concealed Carry Act. Hacker Dep. at 22:14–19; 20 ILCS 2605/2605-595(b).

35. The Mental Health Services Fund is controlled by the Department of Human Services ("DHS"). In regards to FOID Cards and CCLs, DHS is responsible for reporting to ISP anyone who has been involuntarily or voluntarily admitted to a mental health facility in the state. Hacker Dep. at 21:7–22:13.

36. Funds deposited in the State Crime Laboratory Fund "shall be used by state crime laboratories as designated by the Director of the Illinois State Police." 730 ILCS 5/5-9-1.4(h).

37. According to FSB, the approximate cost of processing a CCL application in fiscal year 2022 was $67.18, and the cost of processing each FOID Card application was $25.75. However, that does not include costs to DHS for reporting those admitted to mental health facilities, services performed by ISP's crime labs, or $1 million in grants for firearm enforcement efforts, compliance

checks, and instructor audits. It also does not include review boards that are required by recent legislation. Hacker Dep. at 71:24–73:1; Yenchko Dep. at 18:13–24; 20:12–16; FY22 Estimated Expenses; https://isp.illinois.gov/Media/CompletePressRelease/769 (last visited Dec. 12, 2022).[3]

38. ISP's State Crime Laboratories are responsible for providing scientific analysis of physical evidence, including testing on firearms used in the commission of a crime. Ex. 8 Declaration of Brian Mayland ("Mayland Decl.") ¶ 2.

39. ISP's Crime Laboratories analyze ammunition to determine if it was fired from a specific weapon, enter test shots into the ATF's National Integrated Ballistic Information Network, restore obliterated serial numbers to allow for tracking of a firearm, and conduct tests to determine the distance at which a firearm was fired, which may be used by an investigating agency to determine the circumstances of a shooting incident. Mayland Decl. ¶¶ 3–7.

**BACKGROUND CHECKS**

40. Federal law establishes the minimum standard that must be met before a firearm is transferred. When a person is seeking to purchase a firearm from a federally licensed dealer, the dealer conducts an FTIP transaction to determine whether the firearm can be sold to that individual and FSB runs the transaction through the Federal Bureau of Investigations' National Instant Background Check System ("NICS"). If there is an automated approval from NICS with no additional hits, the transaction is approved by FSB. If there is a hit or a potential hit, an FSB analyst must review the background check. Yenchko Decl. at ¶ 10.

41. Because Rogers has never attempted to purchase a firearm, he has never had an FTIP-related background check run. Rogers Dep. at 48:17–24.

42. Most background checks are completed within 72 hours. Yenchko Dep. at 31:24–32:6.

---

[3] District courts are permitted to take judicial notice of matters of public record. Fed. R. Civ. Pro. 201(b).

## ARGUMENT

### I.   THERE IS NO CASE OR CONTROVERSY

There is no actual case or controversy as to Plaintiff's claims. Article III "limits federal courts to resolving concrete disputes between adverse parties." *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021) (dismissing union's claims for lack of standing and ripeness). "Article III prevents federal courts from answering legal questions, however important, before those questions have ripened into actual controversies between someone who has experienced (or imminently faces) an injury and another whose action or inaction caused (or risks causing) that injury." *Id*. (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

#### A.  Plaintiff Lacks Standing

To establish standing, a plaintiff must show "(1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018). "With respect to the injury in fact requirement, the plaintiff must establish that he has sustained or is immediately in danger of sustaining some direct injury." *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 527–28 (7th Cir. 2001). "Abstract injury is not enough." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983).

Plaintiff cannot show he was injured as a result of the alleged delay in issuing his FOID Card (Count I). The Court previously dismissed this claim, and there is no reason for a different result now. In his First Amended Complaint, as in his Second Amended Complaint, Plaintiff alleged that he did not receive his FOID Card within the 30 days required by Illinois state law. Order on Motion to Dismiss ("MTD Order") Doc. 68 at 4; 2d Am. Compl. Doc. 69 Count I ¶ 9. In his First Amended Complaint, Plaintiff alleged that he filed a lawsuit and was issued his FOID

Card, but that he had to pay a filing fee and incur attorney's fees as a result, in addition to the delay in being able to exercise his right to bear arms. MTD Order Doc. 68 at 4. While this Court found that ownership of certain firearms is a legally protected interest, it also found that dismissal of Count I was required because Plaintiff did not "adequately allege injury other than to say that there was a delay which prevented him from purchasing a firearm." MTD Order Doc. 68 at 5.

In his Second Amended Complaint, Plaintiff again alleges that he was injured by having to hire an attorney, file a lawsuit, pay a filing fee, pay an attorney, and that he was unable to possess a firearm to practice shooting. Doc. 69 Count I at ¶¶ 21–22. But the burdens of bringing a lawsuit cannot be the sole basis for standing. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998) ("Reimbursement of the costs of litigation cannot alone support standing."); *Brunett v. Convergent Outsourcing, Inc.*, 982 F.3d 1067, 1069 (7th Cir. 2020) (hiring a lawyer is not a concrete injury sufficient to establish standing); *Gunn v. Thrasher, Buschmann & Voelkel, P.C.*, 982 F.3d 1069, 1072 (7th Cir. 2020) (the very fact of filing a lawsuit is insufficient to establish an injury because if it did "the need to have a concrete injury that could be cured by a favorable judicial decision would be abolished.").

Additionally, Plaintiff has admitted that he possessed a firearm during the time that his FOID application was being processed, Undisputed Material Facts ("UMF") ¶ 12. Additionally, even after being issued a FOID Card, Plaintiff has not attempted to purchase a firearm because he "just wasn't interested. Just never did go looking for one." UMF ¶ 13, 17. Plaintiff also claimed in interrogatory responses that he had to pay fees to store his firearm to prevent breaking the law prior to being issued a FOID Card, but that is not true. Plaintiff has *never* paid fees to store his firearm; rather, it has always been stored for free where he lives. UMF ¶ 14. In sum, Plaintiff cannot show that he was injured by the delay in issuing his FOID Card because he possessed a

firearm despite not having a FOID Card, and was not prevented from purchasing a firearm during the delay.

In Count II of the Second Amended Complaint, Plaintiff argues that the CCL fee of $150 is an unconstitutional tax.[4] The Court previously dismissed this claim for lack of standing because Plaintiff did not contend he had paid the fee for a concealed carry permit, and therefore could not show that he had an "injury in fact." MTD Order Doc. 68 at 7–8. That remains the case now, as Plaintiff still has not paid the CCL application fee. UMF ¶ 29–31.

In Count III, Plaintiff argues that his Second Amendment rights are violated by the state law prohibiting licensed firearms dealers from selling zinc alloy handguns. Doc. 69 Count III ¶ 7. The truth is, Plaintiff has not purchased a firearm because he "just wasn't interested. Just never did go looking for one." UMF ¶ 17. And he has taken no steps to save to purchase a firearm *of any type*, much less a zinc alloy handgun. UMF ¶ 24. Even if Plaintiff could not afford firearms other than those comprised of zinc alloy, Doc. 69 Count III ¶¶ 4–5, 11, Plaintiff cannot show any injured caused by Section 5/24-3(H). As an initial matter, it is not illegal to *possess* a zinc alloy handgun, which can be procured in a person-to-person purchase, as a gift, or through a will. UMF ¶¶ 19–20. And even if the Court entered a declaration that 720 ILCS 5/24-3(H) is unconstitutional, Plaintiff still could not purchase a handgun because he cannot afford the cheapest zinc alloy handgun. UMF ¶¶ 21, 23–24. Furthermore, zinc alloy handguns are comparable in price to similar or better quality firearms made with steel, the former costing $179.99 and the latter ranging in price from $199.00 to $219.00. UMF ¶¶ 25–27. Plaintiff cannot show that Section 5/24-3(H) prevented him from possessing a zinc alloy handgun, and therefore lacks standing.

---

[4] Plaintiff also alleged that FOID Card fees were an unconstitutional tax. Doc. 69 Count II ¶¶ 9–10. However, Plaintiff has withdrawn that claim. P's Supp. Rogs at ¶ 13.

Likewise, Plaintiff has not shown he has suffered an injury as to Count IV, which alleges that delays in FTIP-related background checks beyond 72 hours violate the Second Amendment. Doc. 69 Count IV ¶¶ 16, 20–21. Plaintiff has never sought to purchase a firearm because he "[j]ust wasn't interested. Just never went looking for one," and therefore has never had a background check performed, much less delayed. UMF ¶¶ 17, 41. There is no "injury in fact" for events that never occurred.

**B. Count IV is Not Ripe**

"One aspect of the case-or-controversy requirement is ripeness." *Amling v. Harrow Industries, LLC*, 943 F. 3d 373, 377 (7th Cir. 2019). "Ripeness and other justiciability requirements bar a federal court from deciding a question that depends on so many future events that a judicial opinion would be 'adivse about remote contingencies.'" *Id*. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotations omitted).

In Count IV, Plaintiff seeks an advisory opinion from the Court because he "just wasn't interested" in purchasing a firearm, has never sought to purchase a firearm, and therefore has never had a point-of-purchase background check run. UMF ¶¶ 17, 41. While Plaintiff *anticipates* there being a delay with a background check if he has one, that may not be the case. In fact, it is undisputed that most background checks are completed within 72 hours. UMF ¶ 42. The Court previously dismissed Plaintiff's claim challenging delays in issuing CCLs as not ripe because Plaintiff had not applied for a CCL and processing the license may or may not be delayed. Doc. 68 at 6–7. That same reasoning applies to Count IV—if Plaintiff ever seeks to purchase a firearm, his background check may or not be delayed. As such, there is currently no "case or controversy" for this claim.

## II.    NO PERSONAL INVOLVEMENT BY DEFENDANT HACKER

Plaintiff has no evidence that Gregory Hacker was personally involved in the delay in issuing his FOID Card, or any delays in issuing CCLs or conducting background checks (2d Am. Compl. Count I, ¶¶ 8, 10, 13), therefore Hacker is entitled to summary judgment. Individual liability for a claim brought pursuant to 42 U.S.C. § 1983 requires personal involvement in the alleged constitutional deprivation, meaning the plaintiff must show a causal connection between the sued official and the alleged misconduct. *Carmody v. Bd. of Trs. of the Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018) (citations and quotations omitted). "Section 1983 'does not allow actions against individuals merely for their supervisory role of others." *Doe v. Purdue Univ.*, 928 F.3d 652, 664 (7th Cir. 2019) (quoting *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000)). For a supervisor to be subject to liability, the plaintiff must show not just that the supervisor knew about the conduct, but also that he facilitated it, condoned it, or turned a blind eye to it for fear of what he might see. *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017).

ISP's FSB is responsible for processing FOID Card and CCL applications, and processing firearms transfer inquiries related to the sale of firearms. UMF ¶ 2. Hacker was Chief of the FSB beginning January 1, 2020, until July 31, 2022. *Id*. ¶¶ 4–5. On January 14, 2019, before Hacker was Chief of the FSB, Rogers submitted his FOID Card application but did not pay the fee until June 11, 2020, and his application could not be processed until payment was received. *Id*. ¶¶ 7–8. Any "delay" before Plaintiff paid the application fee, is solely attributable to Plaintiff.

Additionally, Plaintiff cannot show that Hacker was personally involved in the delay in processing his application after June 11, 2020. Plaintiff has no evidence that Hacker was personally involved in processing his FOID Card application, or even that Hacker was personally responsible for processing *any* FOID Card applications, as that job is assigned to analysts working in the FOID

section of FSB. UMF ¶ 3. Furthermore, Plaintiff cannot show that Hacker was specifically aware of the delays in processing Plaintiff's application. UMF ¶ 10. Plaintiff also has no evidence that Hacker personally took steps to ensure that all FOID Card applications are purposefully delayed. In fact, the undisputed evidence shows that Hacker took steps to address processing delays, including hiring more staff and creating efficiencies in processing applications, which by December 2021 resulted in FOID Card processing times at or under 30 days (in compliance with state law). UMF ¶ 6. This evidence shows that Hacker was not involved in a "scheme" to "delay as much as practical [ ] the issuance of FOID . . . licenses . . . ." 2d Am. Compl. Doc. 69 at 5–6. And as stated above, Plaintiff has not applied for a CCL or sought to purchase a firearm (which could have triggered an FTIP-related background check) so Hacker could not have had any personal involvement in non-existent delays related to events that never took place.

Plaintiff cannot show any causal connection between Hacker and the alleged deprivations in Count I. As such, Hacker is entitled to summary judgment.

## III.   CCL FEES ARE CONSTITUTIONAL

In *N.Y. State Rifle & Pistol Ass'n v. Bruen*, the United States Supreme Court made clear that fee-based "shall-issue" licensing regimes, including Illinois' Concealed Carry Act, 430 ILCS 66/1, *et seq.*, are presumptively constitutional—unless put towards "abusive ends" that deny the right to bear arms, such as by imposing "exorbitant fees." 142 S. Ct. 2111, 2130, 2138 n.9 (2022). Plaintiff cannot establish that the CCL application fee of $150 is being put towards abusive ends that essentially denies the right to bear arms, or that the fee is exorbitant.

Plaintiff has presented no evidence showing that paying $150 for a five-year license (a yearly cost of $30) is exorbitant. Based on the sheer number of CCLs that have been issued, Plaintiff cannot show that the fee for a new CCL essentially results in a denial of the right to bear

arms. In April 2022, approximately 500,000 CCLs were valid in Illinois, and of those nearly 100,000 were issued in FY2022. UMF ¶ 28. Plaintiff cannot even show that the fee has prevented *him* from applying for a CCL. Although Plaintiff alleged that he cannot afford to apply for a CCL, 2d Am. Compl. Doc. 69 Count II ¶ 11, the undisputed facts do not bear that out. In sworn interrogatory responses, Plaintiff claimed he could afford to pay $130 to purchase a firearm, P's Supp. Rogs ¶ 18, which is just slightly less than the $150 CCL fee. Furthermore, Plaintiff admitted he could save the money necessary to apply for a CCL, but has taken no steps to do so. UMF ¶ 31.

Court opinions also support that a $150 fee for a five year license is not exorbitant. In *Antonyuk v. Hochul*, the plaintiffs sought an injunction against New York's Concealed Carry Improvement Act, which set forth requirements to obtain a concealed carry permit, including, inter alia, a list of current and past social media accounts, a list of family members, and 18 hours of in-person training. 1:22-CV-0986, 2022 U.S. Dist. Lexis 201944, *5–6 (NYND Nov. 7, 2022). Regarding the live training, the plaintiffs alleged there was an associated cost of "hundreds of dollars." *Id* at *23. Of particular relevance herein, the court issued a preliminary injunction against the requirement to list family, finding this was an example of an "exorbitant" requirement that the *Bruen* Court warned against. *Id.* at *146. However, the court denied the preliminary injunction as to the live training requirement and fees associated with that requirement, which the plaintiffs presented evidence could be as high as $700 to $1,000. *Id*. at *162. While the court recognized that the plaintiffs might ultimately be able to demonstrate that this cost is "exorbitant," there was not sufficient reason to issue a preliminary injunction when the cost was considered in terms of costs borne by militia members in terms of training and practice. *Id*. at *162–63.

While *Antonyuk* is the only court to consider fees related to concealed carry licenses since *Bruen*, further support for the constitutionality of the CCL fee is present in opinions addressing

the definition of "exorbitant." In order to be "exorbitant," a fee must significantly exceed what is normal. *See State ex rel. Okla. Bar Ass'n v. Moss*, 577 P.2d 1317, 1320–21 (Okla. Sup. Ct. 1978) (the dictionary defines "exorbitant" as excessive, grossly exceeding normal); *Morris v. Savoy*, 576 N.E.2d 765, 772 (Ohio Sup. Ct. 1991) (the dictionary defines "exorbitant" as "Out of all bounds" or "extravagant"). And other courts have found that "exorbitant" is synonymous with "unconscionable" and "shockingly unfair, harsh, or unjust." *Woody v. DOJ*, 494 F.3d 939, 948 (10th Cir. 2007); *United States HHS v. Smitley*, 347 F.3d 109, 116 (4th Cir. 2003). Using these definitions, Plaintiff cannot show that the fee for a new CCL application is exorbitant. The fee is much less than the several hundreds of dollars that the plaintiffs in *Antonyuk* allege it would cost them to be eligible to apply for a concealed carry license in New York.

Plaintiff will likely argue that the CCL application fee is exorbitant because it exceeds the cost of processing a CCL application. Although courts have applied First Amendment fee jurisprudence in Second Amendment cases challenging licensing fees, those courts were using the pre-*Bruen* framework. *See Guns Save Life v. Raoul*, 2019 IL App (4th) 190334 at ¶ 70 ("'the Supreme Court's First Amendment fee jurisprudence provides the appropriate foundation for addressing *** fee claims under the Second Amendment.'") (quoting *Kwong v. Bloomberg*, 723 F.3d 160, 165 (2d Cir. 2013)). Under this doctrine (to the extent it is still relevant post-*Bruen*), licensing fees are constitutional "when they are designed 'to meet the expense incident to the administration of the [licensing statute] and to the maintenance of public order in the matter licensed.'" *Id.* (alterations in original) (quoting *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941)).

To the extent First Amendment fee jurisprudence is applicable to this case, the fee for new CCL applications is constitutional. The current cost to process a CCL application is $67.18. UMF ¶ 37. And in order to be eligible for a CCL, one must have a valid FOID Card (UMF ¶ 27), which

currently costs an additional $25.75 to process. In addition to these processing costs, there are costs to ISP in the form of crime lab analysis of firearms used in the commission of a crime, costs to the DHS for reporting those admitted to mental health facilities, and $1 million in grants for firearm enforcement efforts. UMF ¶¶ 37–39.

As the Appellate Court did in *Guns Save Life* regarding the FOID Card application fee, this Court should reject any argument that the CCL application fee is an unconstitutional tax because it allegedly was not commensurate with the expense of administering the concealed carry licensing program. *Guns Save Life*, 2019 IL App (4th) 190334 at ¶¶ 77–79. Like CCL application fees, which are divided into three funds (the State Police Firearms Services Fund, the Mental Health Services Fund, and the State Crime Laboratory Fund) (UMF ¶ 33), FOID Card application fees were also divided amongst three funds, including the State Police Firearms Services Fund. *Guns Save Life*, 2019 IL App (4th) 190334 at ¶¶ 76–78. With respect to funds deposited in the State Police Firearm Services Fund, the court found that these funds "are expressly designated 'to finance any of [ISP's] lawful purposes, mandates, functions, and duties under the Firearm Owners Identification Card Act and the Firearm Concealed Carry Act, including the cost of *** prompt and efficient processing of application.'" *Id*. at ¶ 77 (second alteration in original) (quoting 20 ILCS 2605/2605-595(b)). Therefore, the court held that "[a]s to the portion of the [FOID Card application] fee deposited into the State Police Firearm Services Fund, the fee is clearly imposed to defray the cost of the licensing program." *Id*.

The court also rejected the plaintiff's argument that it was an unconstitutional tax to deposit a portion of the fee in the Wildlife and Fish Fund because that fund was not incidental to the administration and enforcement of the FOID statute. *Id*. at ¶ 78. The court found that funds deposited in the Wildlife and Fish Fund are required by statute to be used to conduct firearms and

hunter safety courses, which corresponds with the FOID Card Act's purpose of promoting and protecting the health, safety, and welfare of the public and providing a system of identifying those who are not qualified to possess or acquire firearms. *Id.* As such, the court found that "it is reasonable to conclude the fee is for a legitimate purpose . . . ." *Id.*

The same analysis applied in *Guns Save Life* as to FOID Card application fees requires the same result in this case—CCL application fees are constitutional. The bulk of the $150 CCL application fee, $120, is deposited into the State Police Firearm Services fund (UMF ¶ 32), which is designated to finance ISP's lawful purposes and duties, including administration of the Concealed Carry Act. UMF ¶ 34; *Guns Save Life*, 2019 IL App (4th) 190334 at ¶ 77. Therefore this portion of the fee is "clearly imposed to defray the cost of the licensing program." *Guns Save Life*, 2019 IL App (4th) 190334 at ¶ 77.

As with the portion of the FOID Card application fee that was deposited in the Wildlife and Fish Fund, that portion of the CCL fee deposited in State Crime Laboratory Fund ($10) and the Mental Health Services Fund ($20) fulfills the purpose of protecting the health, safety and welfare of the public and providing a system of identifying those who are not qualified to carry a concealed firearm. The Mental Health Services Fund is controlled by DHS, the agency responsible for reporting to ISP anyone who has been involuntarily or voluntarily admitted to a mental health facility in the state. UMF ¶ 35. And funds deposited in the State Crime Laboratory Fund are used by state crime laboratories. UMF ¶ 36. Those labs are responsible for conducting physical analyses related to crimes involving firearms, including analyzing ammunition to determine if it was fired from a specific weapon, entering testing shots into the ATF's National Integrated Ballistic Information Network, restoring obliterated serial numbers to allow for tracking of a firearm, and

conducting tests to determine the distance at which a firearm was fired, which may be used by an investigating agency to determine the circumstances of a shooting incident. UMF ¶¶ 38–39.

In sum, the CCL fee is not exorbitant. It is also designed to meet the cost of administering the licensing program and maintaining public order related to acquiring, possessing, and carrying firearms. As such, the fee is constitutional and summary judgment should be granted.

## IV.   720 ILCS 5/24-3(H) IS CONSTITUTIONAL

When considering the constitutionality of a statute, courts begin with a presumption that the statute is constitutional. *See, e.g.*, *U.S. v. Morrison*, 529 U.S. 598, 607 (2000). In *Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court struck down New York's "may issue" concealed carry licensure scheme upon concluding that it violated the right to publicly carry firearms under the Second Amendment. 142 S. Ct. at 2122. Relevant here, it also clarified the standard for analyzing Second Amendment claims. *Bruen* "decline[d] to adopt the "'two-step' framework" for analyzing Second Amendment claims that the Illinois courts and most federal courts of appeals had "coalesced around" after the Supreme Court's decisions in *Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010). *Bruen*, 142 S. Ct. at 2125–26.

Instead, courts must analyze Second Amendment claims by applying a "methodology centered on constitutional text and history." *Id*. at 2128–29. Under this approach, courts must first assess whether the "Second Amendment's plain text covers" the regulated conduct. *Id.* 2129–30. At this threshold step, plaintiff bears the burden to show that the Second Amendment's plain text covers his or her proposed conduct, and thus presumptively protects that conduct. *See Bruen*, 142 S. Ct. at 2130 (if "plain text covers an individual's conduct . . . the government *must then* justify its regulation") (emphasis added); *id.* at 2141 n.11 ("*[B]ecause* the Second Amendment's bare text covers petitioners' public carry, *the respondents here shoulder the burden* of demonstrating that

New York's proper-cause requirement is consistent with the Second Amendment's text and historical scope.") (emphasis added). If plaintiff satisfies this burden, then the government must justify its regulation by demonstrating that it is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. To show that a challenged regulation aligns with historical tradition, the government may either identify historical regulations that are "distinctly similar" to the challenged regulation or use "analogic reasoning" to demonstrate that the challenged regulation is analogous to historical regulation. *Id*. at 2131.

In some cases, the historical inquiry will be "fairly straightforward," such as when a challenged law addresses a "general societal problem that has persisted since the 18th century . . . ." *Id.* at 2131. But when the challenged law addresses "unprecedented societal concerns or dramatic technological changes" the historical analysis requires a "more nuanced approach." *Id.* at 2132. When this is the case, the government can justify regulations by "reasoning by analogy," a process that requires the government to show that its regulation is "'relevantly similar'" to a "well-established and representative historical analogue." *Id*. at 2132–33 (emphasis omitted). While *Bruen* did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it did identify "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self defense." *Id*. A modern-day regulation does not need to be a "dead-ringer" for historical precursors or a "historical *twin*" to "pass constitutional muster," rather, modern regulations are consistent with the Second Amendment if it "impose[s] a comparable burden on the right of armed self-defense and [ ] that burden is comparably justified" as its historical predecessors. *Id*. at 2133.

To start, plaintiff has failed to show that Section 24-3(A)(h) is covered by the plain text of the Second Amendment, which addresses ownership and possession of handguns (and not the

commercial sale of firearms): "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The statute at issue in this case, however, regulates only the commercial sale of certain, enumerated firearms:

> A person commits the offense of unlawful sale or delivery of firearms when he or she knowingly does any of the following:
>
> (h) While holding any license as a dealer, importer, manufacturer or pawnbroker under the federal Gun Control Act of 1968, manufactures, sells or delivers to any unlicensed person a handgun having a barrel, slide, frame or received which is a die casting of zinc alloy or any other nonhomogeneous metal which will melt or deform at a temperature of less than 800 degrees Fahrenheit. For purposes of this paragraph, (1) "firearm" is defined as in the Firearm Owners Identification Card Act; and (2) "handgun" is defined as a firearm designed to be held and fired by the use of a single hand, and includes a combination of parts from which such a firearm can be assembled.

720 ILCS 5/24-3(A)(h).

As the Supreme Court has explained, the Second Amendment protects "an individual right to keep and bear arms for self-defense." *Bruen*, 142 S. Ct. at 2125. However, this right "is not unlimited," as "longstanding regulatory measures" are "exceptions" to the Second Amendment. *Heller*, 554 U.S. at 635. Under the Second Amendment, "conditions and qualifications on the commercial sale of arms" are "presumptively lawful." *Id.* at 626–27; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as '. . . laws imposing conditions and qualifications on the commercial sale of arms.' We repeat those assurances here."); *Bruen*, 142 S. Ct. at 2162 (Kavanugh, J., concurring) (reiterating the holding from *McDonald* that a variety of gun regulations remain lawful, including qualifications on the commercial sale of arms). Because Section 24-3(A)(h) only regulates the sale of firearms, it is not covered by the plain text of the Second Amendment.

Furthermore, Plaintiff has not shown that Section 24-3(A)(h) has prevented him from acquiring or possessing a zinc alloy firearm in any way. *First*, there is no evidence that Section 24-3(A)(h) has prevented Plaintiff from acquiring or possessing a zinc alloy handgun. On the contrary, Illinois residents *can possess* zinc alloy handguns. UMF ¶ 20. Even though federally licensed dealers cannot sell zinc alloy handguns, Illinois residents can purchase these handguns in person-to-person transactions and can receive them as gifts or via a will. UMF ¶ 19. Indeed, Section 24-3(A)(h) is similar to other regulations which have been upheld because they leave individuals with alternatives for acquiring firearms for self-defense. *See*, *e.g.*, *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1251–58 (D.C. Cir. 2011) (upholding gun registration, and assault weapon and large capacity magazine regulations where individuals could still possess other firearms for self-defense). *Second*, as explained, the evidence shows that Plaintiff would not purchase a zinc alloy handgun even if he were to prevail in this litigation. Plaintiff has no interest in purchasing a firearm, but rather "might consider" it, and even if he decided to purchase a firearm he could not afford to buy the zinc alloy handguns that are prohibited from being sold by Section 24-3(A)(h). UMF ¶¶ 17, 21–23. Plaintiff does not come close to showing that he has been essentially barred from keeping arms because of Section 24-3(A)(h).

Furthermore, although zinc alloy guns may be budget friendly, so are steel guns. Zinc alloy guns can be purchased new for around $179.99, and comparable steel guns can be purchased for $199.00 to $219.00. UMF ¶¶ 24–26.

In short, unlike the circumstances in *Heller*, *McDonald*, and *Bruen*, the prohibition on selling zinc alloy handguns does not result in a virtual ban on handguns, budget-minded or otherwise. Plaintiff has not met his burden of showing that the regulated conduct, the sale of *zinc alloy* handguns, falls within the plain text of the Second Amendment. The Supreme Court has

recently reaffirmed that the government may regulate the commercial sale of arms, and that is exactly what Section 24-3(A)(h) does. While Plaintiff concludes that the regulation has essentially prevented him from possessing a handgun due to his financial circumstances, he has not presented undisputed evidence to support that conclusory statement and in fact has admitted that he cannot afford to purchase any handgun, regardless of the price.

Even if the Second Amendment covered Section 24-3(A)(h), the prohibition on the sale of zinc alloy handguns is analogous to a robust historical tradition of regulating what weapons one could keep and bear. The historical analysis required by *Bruen* is clearly satisfied here because the Supreme Court has repeatedly recognized that "the right [to keep and bear arms] was not a right to keep and carry *any weapon whatsoever* in any manner whatsoever." *Heller*, 554 U.S. at 626 (emphasis added); *see McDonald*, 561 U.S. at 786 (same). This point was reiterated in *Bruen*. 142 S. Ct. at 2128 (reiterating historical tradition of prohibiting carriage of certain types of weapons); 2159 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns.").

In particular, the *Bruen* Court identified a historical tradition of regulating the carriage of certain firearms based on their physical characteristics—namely, the size of those weapons. The Court noted, "[i]n the early to mid-19th century, some States began enacting laws that proscribed the concealed carry of pistols and other small weapons," while permitting the open carriage of those weapons. *Id.* at 2146. The Court then identified a number of examples of such laws, including: An Act Against Wearing Swords, &c., ch. 9, in Grants, Concessions, and Original Constitutions of the Province of New Jersey 290 (2d ed. 1881) (enacted in 1686); 1813 Ky. Acts § 1, p. 100; 1813 La. Acts p. 172; 1820 Ind. Acts p. 39; Ark. Rev. Stat. § 13, p. 280 (1838); 1837 Ga. Acts §§ 1, 4, p. 90; 1838 Va. Acts ch. 101, § 1, p. 76; 1859 Ohio Laws § 1, p. 56. *Bruen*, 142

S. Ct. at 2147 n.16. Illinois's prohibition on the sale of zinc alloy handguns by federally licensed dealers is analogous to this historical tradition, because it too, regulates certain handguns based on their physical attributes. And like its historical counterparts, which did not amount to a total prohibition on the carriage of small weapons, Illinois's law does not amount to a total prohibition on the sale of many other handguns or even on the possession of zinc alloy handguns.

## CONCLUSION

For the foregoing reasons, there is no genuine dispute as to any material fact, and the Court should enter summary judgment in favor of Defendants and against Plaintiffs on all claims.

January 13, 2023

Respectfully submitted,

GREGORY HACKER and JEFFREY YENCHKO,

Defendants,

Laura K. Bautista, #6289023
Assistant Chief Deputy Attorney General
500 South Second Street
Springfield, Illinois 62701
Phone: (217) 782-5819
Fax: (217) 524-5091
E-Mail: laura.bautista@ilag.gov
gls@ilag.gov

KWAME RAOUL, Attorney General
State of Illinois,

By:   s/Laura K. Bautista
      Laura K. Bautista, #6289023
      Assistant Chief Deputy Attorney General

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

WILLIAM R. ROGERS,                          )
                                            )
      Plaintiff,                       )
v.                                          )
                                            )
GREGORY HACKER,                             )    Case No.: 3:20-cv-01116-DWD
                                            )
      Defendant.                       )

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 13, 2023, I caused a copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification to all counsel of record.

s/Laura K. Bautista             
Laura K. Bautista, #6289023
Assistant Chief Deputy Attorney General
