**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTIRCT OF ILLINOIS**

| | |
|---|---|
| WILLIAM R. ROGERS, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )    Case No. 20-CV-1116 |
| | ) |
| GREGORY HACKER, | ) |
| | ) |
| | ) |
|     Defendant. | ) |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Comes now Plaintiff, by and through his attorneys, and for his response to Defendant's Motion for Summary Judgment, states as follows:

**INTRODUCTION**

Defendant moves for summary judgment on the following counts, based on the following general arguments.

**Count I**

Claimed lack of case or controversy.

Claimed lack of standing.

**Count II**

Claimed lack of "injury in fact" as Plaintiff has not paid for a concealed carry license he cannot afford.

**Count III**

Plaintiff allegedly cannot show that Section 5/24-3(H) prevented him from possessing a zinc allow handgun, and therefore lacks standing.

**Count IV**

That Plaintiff has not suffered injury as he has not sought undergone a FTIP background check.

Plaintiff will address each of these arguments in order.

## ARGUMENT

**I.      There is a Live Case or Controversy in Count I.**

**A.  Plaintiff Has Standing**

Defendant argues that Plaintiff cannot show that he was injured as a result of the "alleged" delay in issuing his FOID card. The delay was not alleged, it is actual. Furthermore, as anticipated in the original filing, Defendants issued Plaintiff his FOID card, after being served with this case, in order to make the case, at least in part, moot. (Doc. 87, p. 7, para. 17

> "Defendant Hacker … admits that ISP intended to make part of this case moot by processing Plaintiff's FOID card application.".

This is consistent with ISP practice, wherein, after making FOID applicants wait so long for their FOID card, as to prompt them to hire a lawyer and file a lawsuit, Defendants go ahead, issue the card, and then claim the case is moot, and by the way, sovereign immunity bars suit against the state, so no damages can be had. This is a patten and practice of those in Defendant;s office. See Ex. A (Murphy v. Grau opinion), Ex B, (Koshinski mootness order), Ex C. (Mitchell v. Trame Mootness order).

 The Supreme Court in *Bruen* stated,

> "That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications.

Plaintiff will also concede that presumed damages are not permitted in section 1983 cases. *Carey v. Piphus*, 435 U.S. 247 (1978); *Memphis v. Stachura,* 477 U.S. 299 (1986). That, however, does not mean that nominal damages are not permitted.

The Supreme Court weighed in on this issue in *Uzuegbunam v. Preczewski*, 142 S. Ct. — (2021). In an opinion by Justice Thomas, the Court ruled that a section 1983 plaintiff who seeks only nominal damages to vindicate the deprivation of a constitutional right does indeed have standing and therefore avoids mootness under Article III. In this case the plaintiff, a former student, brought section 1983 Free Exercise Clause claims for injunctive relief and nominal damages against public college officials who did not allow him to distribute written religious material or speak on campus.

The officials subsequently abandoned their challenged policies and then argued that the plaintiff's claims were moot.

The Supreme Court agreed with the officials that the plaintiff's injunctive relief claim was moot but, on the other hand, agreed with the plaintiff that his claim for nominal damages conferred standing and thus the claim was not moot. Justice Thomas relied on the common law for the proposition that a plea for compensatory damages is not required for an award of nominal damages. Also, a section 1983 plaintiff seeking only nominal damages satisfies the Article III standing requirement of redressability, even if such an award does not provide full redress. The *Brunett* case cited by Defendant does not even address this point.

Finally, this constitutes relief on the merits. For these reasons, the plaintiff's section 1983 nominal damages claim for his Free Exercise deprivation was not rendered moot, even though his injunctive relief claim was.

Notably, in this case, Plaintiff has amended since the original complaint, which in Count I only sought injunctive relief, the complaint now seeks *damages*, though admittedly damages that are quite small. (See Second Amended Complaint). In fact, what is sought is less than $5,000.00, small claims level.

Defendant argues that Plaintiff has no actual damages, despite pleading he actually incurred costs and fees necessary to obtain his FOID card. Our Supreme Court, in *Malley v. Briggs*, 475 U.S. 335, 344 (1986) citing *Monroe v. Pape*, 365 U. S. 167, 365 U. S. 187 (1961), § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." The wrongful involvement exception, also known as the "tort of another" doctrine or the "third-party litigation exception," is less familiar. As its name suggests, the exception permits recovery of attorney fees that a party is forced to incur due to another's wrongful conduct. The exception finds its roots in section 914(2) of the Restatement (Second) of Torts (1979):

Attorney fees and litigation costs are allowed to be recovered by "[o]ne who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person…." See Section 914(2) of the Restatement (Second) of Torts (1979): holding, "[o]ne who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action."

In this case, in order to get his FOID card, Plaintiff had to file suit in order to protect his interest. As noted, this suit did, in fact, result in Plaintiff's stated goal, to obtain his FOID card, and vindicate his Second Amendment rights. Contrary to Defendant's claimed lack of personal

involvement, the evidence shows it existed. Under FRCP 8(b)(6), an allegation in a complaint not denied is admitted (except for damages). In Count I, para. 5, Plaintiff pleads in his Second Amended Complaint, and Defendant Hacker does not deny (and therefore admits):

> 5. That Defendant Gregory Hacker ("Hacker") is the Chief of the Illinois State Police Firearms Services Bureau, is responsible for the processing of FOID card applications, the issuance of FOID cards, as well as the licensing and regulation of licensed firearms dealers, under state law, in Illinois, and has been since Plaintiff originally filed for a FOID card.

The only substantive denial is whether Hacker was in the position when the FOID card was originally applied for, but Hacker clearly was in the position when Defendant claims Plaintiff finally paid for the FOID card. If Hacker is responsible for processing FOID card and issuing same, then he is personally involved, even if that personal involvement involves an utter dereliction of duty.

Defendant Hacker testifies as follows:

```
 2        What today does the Firearms Services
 3   Bureau do?
 4        A.   We are responsible for processing FOID
 5   applications, both new and renewal; CCL
 6   applications, both new and renewal; processing
 7   FTIP transactions, which is firearms transfer
 8   inquiries related to the sale of firearms; the
 9   Firearms Dealer Licensing Certification Program,
10   which is what is the Illinois version of the
11   ATF.
12        Q.   Anything else?
13        A.   No, that's the meat of it.
```

"We" is inclusive of Mr. Hacker.

Furthermore, in Defendant's formal answer, they *admit* that this very lawsuit was the catalyst that enabled Plaintiff to receive his FOID card, when he actually did. (Doc. 87, p. 4, para. 9). This again shows that Hacker had the power to do what needed to be done. But for this lawsuit, it is entirely possible that Plaintiff might still be waiting for his FOID card.

Additionally, Defendant Hacker admits that "the officially stated processing time [during the relevant time] is over 116 days." (Doc. 77, p. 5, para. 13). As stated above, Plaintiff waited at least 152 days. Defendant Hacker is well aware of these delays. (Doc. 77, p. 6, para. 14).

In 2020, "the majority of the analysts within the FOID Section and CCL Sections were sent home." (Hacker Depo, p. 29). In fact, at one point, the analysts at FSB were down to 8 working employees. (Hacker depo, p. 29-30). The rest were sent home. Id. Each analysis can process between 15 and 28 FOID applications a day. (hacker Depo, p. 30). Thus, at most, during this time period, FSB could only process, giving it every benefit of the doubt, a little over 200 applications a day, for the entire state. As noted Supra, Defendant Hacker is responsible for processing the FOID applications, at least during this relevant time period. His actions allowed the processing times to explode exponentially, causing Plaintiff not to timely get his FOID card, and thus be damaged.

The whole thing can probably be summarized by Defendant Yenchko's candid statement in his deposition,

```
Q.    Would it surprise you that over the last
ten or so years, I've been told repeatedly every
time a lawsuit is filed over taking too long,
that by the time my lawsuit comes around, all
problems related to untimely FOID card
processing have been solved?
           MS. BAUTISTA:   Object to form.
Q.    You can answer.
A.    No, that doesn't surprise me.
```

As to the argument that Plaintiff admitted he possessed a rifle during this time without a FOID card, this is a red herring. Whether Plaintiff paid fees to store the rifle, or not, the simple fact is (1) per *Heller*, that one can have a rifle does not permit the State to ban handguns[1], (2) as to the rifle he did have, he was unable to acquire ammunition for it, as it was no longer manufactured. (Doc. 101-1, P. 17, depo page 55 lines 8 through 14). A firearm sans ammunition is a club.

Accordingly, Defendant's Motion for Summary Judgment as to Count I should be denied.

**COUNT II**

Plaintiff challenges the Concealed Carry License charge as excessive. Defendant is correct that Plaintiff has challenged the FOID card under the same grounds, but has withdrawn that claim, as to the FOID card. The Supreme Court in *Bruen*, has stated,

---

[1] "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed."
*District of Columbia v. Heller,* 554 U.S. 570 (2008).

"we do not rule out constitutional challenges to shall-issue regimes where, for example, … exorbitant fees deny ordinary citizens their right to public carry."

It is undisputed that a FOID card, for a resident, costs $150.00, $300.00 for a non-resident.  This is in addition to training requirements, which are not challenged here.

This $150 or $300 fee, as the case may be, has *nothing* to do with the actual processing costs of a Concealed Carry License.  Those actual processing costs, per Defendant's own figures, are or were ($67.18 for FY2022), ($42.59 for FY2021) and ($32.59 for FY 2019).  See Exhibit D.

In other words, Defendant is making about an $80 a person *profit* on each resident concealed carry card, and about a $230 per person profit on non-residents.

Plaintiff concedes he has not paid the $150.00 charge.  In fact, Plaintiff stipulates to same.  The record shows that, other than Social Security Retirement, Plaintiff has no source of income.  (Rogers Depo., Doc. 101-1, page 17, depo page 54, lines 2 – 7).

The sole argument apparently made by Defendant is that as Plaintiff has not paid the $150.00, he lacks standing to challenge the $150 fee he cannot afford.

Taken to its extreme, if the State impost a ONE MILLION dollar fee to apply for a concealed carry license, only a very rich person, who could afford to pay ONE MILLION dollars, would have standing to challenge such an outrageous fee.  The average Illinoisan is simply out of luck, as they don't have an extra million dollars in the bank.  Fortunately, the U.S. Supreme Court does not requirement payment of fees, that are unlikely to be recovered, to have standing. *Grosjean v. American Press Co.*, Inc., 297 U.S. 233 (1936).  It goes without question that should Plaintiff fork over the $150.00, and then that should Plaintiff sue the state for a refund, they will claim sovereign immunity, voluntary payment doctrine and a whole host of

obstacles to getting Plaintiff his money back, Unless the State is willing to concede that Plaintiff may sue it for dollar damages to get a refund, highly unlikely, the $150.00 fee, if paid, is highly unlikely to be recovered.

Standing is shown by demonstrating (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, and (3) likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S.Ct. 2130, 119 L.Ed.2d 351. Pp. 1546-1547. In this case, there is an injury in fact, Plaintiff cannot lawfully carry a firearm outside of him home, as he lacks a license he cannot afford. This problem is fairly traceable to the facts that Plaintiff lacks a spare $150.00, but even if he did not lack a spare $150.00, the problem is fairly traceable to Defendant charging about double what it costs to process the application, per Defendant's own figures. This problem can be rendered by striking, or reducing the $150.00 fee to an affordable rate, such as the actual processing costs. This Court can enjoin excessive costs, which would be a favorable judicial decision. The Constitution general bars taxing constitutional rights. *Murdock v. Pennsylvania*, 319 U.S. 105 (1943).

Thus, it is suggested, Plaintiff has standing, and the motion of Defendant should be denied as to Count II.

## II  ZINC HANDGUN BANS ARE UNCONSTITITONAL

The simple fact of the matter is that zinc handgun bans are unconstitutional under the Second and Fourteenth Amendments.

The Second Amendment guarantees the right to keep and bear arms for self defense. U.S. Const. amend. II. That right is so fundamental that to regulate conduct covered by the Second Amendment's plain text, the government must show more than that the regulation promotes an important interest like reducing accidental discharges or solving crime. *New York State Rifle &*

*Pistol Association, Inc., v. Bruen*, 142 S. Ct. 2111, 2126 (2022). Rather, to be constitutional, regulations of Second Amendment rights must be "consistent with this Nation's historical tradition of firearm regulation." Id.

The first step under *Bruen*, therefore, is to determine whether the law at issue 'infringe[s]' on 'the right of the people to keep and bear Arms.'" *United States v. Kelly*, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022).  Pistols are arms, per *Heller*.  Pistols made of zinc are still pistols.  Plaintiff is an ordinary U.S. citizen with no known disqualifications.  Thus, *Bruen's* fist test is met.

The Constitution presumptively protects Plaintiffs' proposed conduct. Tehe burden now shifts to the government. Since the provisions implicate conduct protected by the Second Amendment, they are presumptively unconstitutional unless the government can meet its burden to "demonstrat[e] that [the relevant UHA provisions are] consistent with the Nation's historical tradition of firearm regulation." Bruen, 142 S. Ct. at 2130.

To carry its burden, the government must provide "historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation." Id. at 2131–32 (cleaned up); see id. at 2127–28 (reiterating Heller's statement that "the public understanding of a legal text in the period after its enactment or ratification" was "a critical tool of constitutional interpretation"). The government need only "identify a well-established and representative historical analogue, not a historical twin." Id. at 2133. In other words, "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." Id.

"The core question is whether the challenged law and proffered analogue are 'relevantly similar.'" *United States v. Rahimi,* 2023 WL 2317796, at *6 (5th Cir. Mar. 2, 2023)

(citing Bruen, 142 S. Ct. at 2132).

Defendant literally cites no historical analogue, simply suggesting that Plaintiff cannot show injury as he can actually own and possess zinc firearms. He simply cannot buy one new at a dealer, and does not really want one anyway. The facts bely they argument.

As a dealership license is generally required to sell handguns commercially (See 18 U.S.C. 922), it is unclear just *who* Plaintiff would buy such a zinc handgun from. Federal law prohibits him from purchasing pistols in another state and bringing them to Illinois, except through an Illinois based FFL, who cannot transfer the gun to Plaintiff.

Soon to die relatives and generous benefactors who happen to have these guns are speculative at best, as the question arises, if Illinois residents cannot buy these firearms, how did the soon to die relatives and generous benefactors obtain them? The final suggestion almost sounds like Defendant is suggesting that Plaintiff buy a gun off on an illegal gun runner without an FFL.

While Plaintiff did plead more facts that required, as this case was filed prior to *Bruen,* trying to get through the now rejected interest balancing test, the simple matter is that the zinc gun Ban fails to *Bruen* test, and Defendant offers no historical analogue to sustain it. Zinc guns today are like brass guns in antiquity, a little easier to make and a little cheaper, but brass guns were never banned.

As to Plaintiff's interest, he himself refutes that argument, to wit, Plaintiff Rogers makes clear that any reluctance he has is a matter of *cost*. (Doc. 101-1, p. 19, Depo page 61)("your hesitation is simply a matter of cost?  A.  It is a matter of cost"). Also, Plaintiff is interested in *legal self defense*, not collecting firearms. (Doc. 101-1, p. 19, depo page 66)("His question was about legal self-defense.  I want's just going out to buy one just to have one."). In fact, Plaintiff

denies he even said what Defendant quotes him as saying (See Doc 101-1, p. 19, depo page 66 lines 13-16), which is a strong indication he did not understand what counsel was asking him then. In fact, when asked, "[a]ssuming that the Heritage is a or the low cost zinc .22, is that the type of firearm you are interested in" A. That is the one I would be looking at that I would be interested in". Doc. 101-1, p. 20, depo page 67.

Bottom line is, without committing a federal felony (18 U.S.C. 922(b)(3)), an Illinois resident cannot buy a handgun in Missouri, or any other non-Illinois state, without going through an Illinois based dealer, who cannot transfer the gun to Plaintiff, if it is zinc based. Thus, 720 ILCS 5/24-3(H) is unconstitutional, under *Bruen*, The fact that the Heritage .22 is perhaps the single most popular pistol sold in the United States today, only reinforces this. See Ex. E.

Finally, that *other* guns might be on the market does not, as noted in *Heller*, permit the State to ban an entire class of arms. Thus, the entire argument that there are low cost steel guns is irrelevant.

Defendant's Summary Judgment motion on this point must be denied.

**COUNT IV Is Ripe**

Granted, Plaintiff has not had a FTIP transaction, as he only recently obtained a FOID card (and had to sue to get it), and is still suing to be able to buy the handgun of his choice. As his financial reality limits his budget, it is logical he would not have multiple FTIP transactions.

Defendant argues that having to wait more than 72 hours for an FTIP transaction may not occur at all. By the same token, the sun may not rise in the morning, but there is a high degree of confidence that it actually will. The same is true of FTIP transactions violating the 72 hour rule.

In any event, Plaintiff relies upon and references the arguments made in his Motion for Summary Judgment, on this point.

## CCONCLUSION

WHEREFORE, for the foregoing reasons, this Court should DENY Defendant's Motion for summary judgment.

Dated:  3-27-2023                                                                                   Respectfully Submitted,

William Rogers,

By: S/Thomas G. Maag

Thomas G. Maag
Maag Law Firm, LLC
22 West Lorena Avenue
Wood River, IL  62095

Phone:  618-216-5291
tmaag@maaglaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed, using the CM/ECF system, which will send notification to the following:

Kristina Dawn Echols Dion
Illinois Attorney General's Office - Springfield
500 South Second Street
Springfield, IL 62701
217-782-5819
Fax: 217-524-5091
Email: kdion@atg.state.il.us

Shannon Lynn Fruth
Illinois Attorney General's Office - Springfield
500 South Second Street
Springfield, IL 62701
217-782-2077
Fax: 217-524-5091
Email: sfruth@atg.state.il.us

Dated:  3-27-2023                                                                                             s/Thomas G. Maag