IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

WILLIAM R. ROGERS,                      )
                                        )
        Plaintiff,                      )
                                        )
vs.                                     )
                                        )   Case No. 3:20-cv-1116-DWD
GREGORY HACKER, Personally, and         )
JEFFREY YENCHKO, In His Official        )
Capacity as the Chief of the Illinois State )
Policy Firearms Services Bureau,        )
                                        )
        Defendants.[1]                  )

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

Before the Court are Plaintiff's Cross-Motion for Summary Judgment as to Counts II, III, and IV (Doc. 95) and Defendants' Cross-Motion for Summary Judgment as to all Counts (Doc. 101) of the Second Amended Complaint. Also before the Court is Plaintiff's Motion for an Extension of Time (Doc. 105) to file a Response to Defendants' Motion for Summary Judgment (Doc. 107). For the reasons explained below, the Court **GRANTS** Plaintiff's Motion for an Extension of Time, **DENIES** Plaintiff's Cross-Motion for Summary Judgment, and **GRANTS** Defendants' Cross-Motion for Summary Judgment. In doing so, the Court emphasizes, as a result of the specific findings made in relation to Plaintiff's lack of standing, which is discussed in detail below, it does not reach the merits

---

[1] Defendant Hacker was sued personally and in his official capacity as Chief of the ISP Firearms Services Bureau. Defendant Yenchko is his successor. Defendant Yenchko was "automatically substituted as a party" to the claims suing Defendant Hacker in his official capacity. *See* Fed. R. Civ. P. 25(d).

of the constitutional questions implicated by Counts II, III, and IV of the Second Amended Complaint.

## I. Background

On July 7, 2021, Plaintiff filed a Second Amended Complaint (Doc. 69) against Defendant Hacker. In Count I, Plaintiff alleges the Chief of the ISP Firearms Services Bureau, formerly Defendant Hacker and now Defendant Yenchko, is responsible for processing Firearm Owners Identification ("FOID") card applications, the issuance of FOID cards, and the licensing and regulation of firearms dealers in Illinois. (Doc. 69, pg. 2). Before initiating this lawsuit, Plaintiff allegedly applied for a FOID card, paid the associated $10.00 fee, and paid a processing fee that is not authorized by statute. (Doc. 69, pg. 2). According to Plaintiff, under 430 ILCS 65/5, Defendant Hacker was required to approve or deny all FOID card applications within 30 days of their receipt. (Doc. 69, pg. 2). Nevertheless, in violation of the Second and Fourteenth Amendments to the U.S. Constitution, Defendant Hacker failed to "either approve, or deny, Plaintiff's application for a FOID card within any reasonable constitutionally allowed time frame, and [he] would not have done so in less than 115 days, but for this lawsuit." (Doc. 69, pg. 3).

As support, Plaintiff alleges systemic, "excessive[,] and unreasonable delays…in the processing" of FOID cards. (Doc. 69, pgs. 2-4). Plaintiff states Defendant Hacker and the State of Illinois forced Plaintiff and others "to simply wait[] [for] unknown and unknowable periods of time, in many cases six months[] [and] in some cases[] over a year, to conduct a background check." (Doc. 69, pgs. 2-3). Defendant Hacker was allegedly aware of the delay, the fact that it violated Illinois law, and the undue restriction of the

2

Second Amendment, yet he took "no articulable steps to actually redress th[e] problem, despite promises, going back nearly a decade (in the case of Hacker's predecessors) to fix the delay problem." (Doc. 69, pg. 4). Further, Defendant Hacker allegedly engaged in a policy and practice of discouraging and/or mooting cases brought by persons seeking FOID cards. (Doc. 69, pgs. 3-4). Plaintiff notes his FOID card was immediately issued after Defendant Hacker was served in this case. (Doc. 69, pgs. 3-4). Plaintiff seeks "an amount… of money less than $5,000.00, plus attorney fees…and costs of suit, plus such other, further[,] and different relief allowed by law." (Doc. 69, pg. 7).

In Count II, Plaintiff alleges the charges for a Firearm Concealed Carry License ("FCCL"), on their face, "appear to be a mere fee used to process applications." (Doc. 69, pg. 8).[2] As enforced, however, Plaintiff alleges the $150 fee constitutes a tax on constitutionally protected activity, *i.e.*, the right to keep and bear arms under the Second Amendment. (Doc. 69, pg. 8). Plaintiff alleges the FCCL costs more than is reasonably necessary to administer the relevant statute and program, as monies collected from the fees are transferred from the statutorily intended funds to the General Revenue Fund of the State. (Doc. 69, pgs. 9-11). Further, Plaintiff alleges he cannot afford the FCCL fee. (Doc. 69, pg. 8). Therefore, the FCCL fee allegedly prohibits him from exercising the right to keep and bear arms outside of the home. (Doc. 69, pgs. 8, 11-12). Aside from attorney's fees and costs, Plaintiff seeks to enjoin (1) the collection of monies paid by applicants for

---

[2]In Count II, Plaintiff also challenges the cost of a FOID card. However, Plaintiff now states, "for purposes of this motion, he does not challenge the cost of a [FOID] Card…as set forth in Count II." (Doc. 95, pg. 3). Plaintiff indicates, "since the filing of this suit, the General Assembly has amended the statute such that the charge for FOID cards is not classified as a 'tax.' " (Doc. 95, pg. 3). Plaintiff withdraws the FOID card challenge in Count II. (Doc. 95, pg. 3). As a result, the Court does not outline that claim here.

FCCL cards to fund any program that is unrelated to processing and issuing such cards, and (2) the enforcement of the Firearm Concealed Carry Act ("FCCA") (430 ILCS 66/1 *et seq.*) until the charges are limited to processing and administration costs. (Doc. 69, pg. 12).

In Count III, Plaintiff alleges he "is not financially well off[] and does not presently own any handguns, as he cannot afford most handguns on the market." (Doc. 69, pg. 12). However, Plaintiff allegedly discovered certain handguns cost $120.00 and are within his budget. (Doc. 69, pg. 13). Plaintiff alleges such handguns are made of zinc alloy. (Doc. 69, pg. 13). According to Plaintiff, Section 24-3(A)(h) of the Illinois Criminal Code of 2012 (720 ILCS 5/24-3(A)(h)) operates as a total ban on "new, modern[,] and safe" zinc alloy handguns, as dealers and manufacturers will not sell such firearms due to a fear of prosecution or license revocations. (Doc. 69, pg. 13). As such, the cheapest handguns, allegedly common and available elsewhere, were driven from Illinois, forcing Plaintiff to remain unarmed. (Doc. 69, pg. 14). Plaintiff seeks a finding that Section 24-3(A)(h) is unconstitutional, an order of enjoinment, and attorney's fees and costs. (Doc. 69, pg. 15).

In Count IV, Plaintiff alleges, under 20 Ill. Adm. § 1235.90, a licensed firearm dealer may transfer a firearm to a purchaser if the transaction has not been disapproved and the ISP had 72 hours to process the transaction. (Doc. 69, pg. 16). However, the ISP Firearms Services Bureau allegedly issued guidance that is contrary to § 1235.90 and could result in "unlimited delay[s] on the right to keep and bear arms." (Doc. 69, pgs. 16-17). That guidance allegedly provides: "The actual transfer of the firearm cannot take place until there is an approval from the [Firearm Transfer Inquiry Program] system, regardless of when the agreement was reached. If the [Federal Firearm Licensees] receive[] a

transaction number, they cannot complete the transfer until they receive an approval."
(Doc. 69, pg. 16). Plaintiff alleges most licensed dealers will not transfer a firearm to a
FOID card holder, even after 72 hours, without approval from Defendant Yenchko, which
results in an infringement on the right to keep and bear arms. (Doc. 69, pg. 17).

Further, under federal law, Plaintiff alleges a licensed firearms dealer may proceed
with a firearm transfer, after 72 hours, if it has not been disapproved and there was a
background check within 30 days. (Docs. 69, pgs. 17-18). Therefore, Plaintiff suggests
purchasers face a "catch 22," as Illinois law could bar a dealer from transferring a firearm
to a purchaser for more than 30 days at the same time that federal law bars a dealer from
transferring a firearm pursuant to a background check older than 30 days. (Doc. 69, pgs.
17-18). For current FOID card holders, Plaintiff notes that a background check has already
been performed and is reperformed frequently by Defendant Yenchko, such that there is
no reason a transaction, not disapproved within 72 hours, cannot proceed. (Doc. 69, pgs.
18-19). Aside from attorney's fees and costs, Plaintiff seeks the following relief: (1) an
order enjoining Defendant Yenchko from enforcing a ban on the transfer of a firearm
from a licensed firearm dealer, more than 72 hours after a background check, unless
Defendant Yenchko disapproves the transaction before the transfer of the firearm; and
(2) an order holding any waiting period over 72 hours unconstitutional. (Doc. 69, pg. 19).

**A. Plaintiff's Cross-Motion for Summary Judgment as to Counts II, III, and IV**

Plaintiff makes arguments similar to the allegations contained in the Second
Amended Complaint. First, as to Count II, he argues the cost of a FCCL improperly
constitutes an "excessive and exorbitant" tax on a constitutional right. (Doc. 95, pgs. 3, 7,

9). Plaintiff notes the "average processing cost" for a FCCL, which has a fee of $150, was $67.18 in 2022, $43.59 in 2021, $75.50 in 2020, and $34.82 in 2019. (Doc. 95, pgs. 4-5). As such, Plaintiff argues the State of Illinois had a profit of $74.50 to $115.18 on each FCCL application during those years. (Doc. 95, pg. 8). Also, from the FCCL fee, Plaintiff notes $120 is transferred to the ISP Firearms Services Bureau, $20 is transferred to a mental health fund, and $10 is transferred to a crime lab. (Doc. 95, pg. 4). According to Plaintiff, the FCCL regime is inconsistent with that of other States, where a concealed carry license is not required, is free, or costs less than $60. (Doc. 95, pgs. 5, 8). Plaintiff suggests the FCCL scheme, coupled with the scheme for FOID cards, resulted in $15,000,000 being "swept" into general revenue funds. (Doc. 95, pg. 8). Therefore, Plaintiff argues the FCCL fee discourages FCCL applications and funds unrelated programs. (Doc. 95, pg. 8).

Second, as to Count III, Plaintiff argues it is illegal for a federal firearms licensee to sell or give away a handgun with an alloy frame or barrel, including a zinc alloy frame or barrel, under § 24-3(A)(h). (Doc. 95, pg. 13). Since it is against federal law to directly receive a handgun made of zinc alloy from a licensed dealer in another state, without going through a federal firearm licensee in the State of Illinois, Plaintiff argues such a handgun must either be inherited or bought secondhand from a person lacking a license. (Doc. 95, pg. 13). Plaintiff submits, "[a] law abiding citizen should be able to go to a licensed, reputable dealer, pay appropriate taxes, fill out appropriate forms, and be confident they are engaged in a lawful transaction, when exercising their fundamental right[]" to acquire a low cost handgun made with zinc alloy. (Doc. 95, pgs. 13-14). Plaintiff

suggests there is no "historical tradition" of prohibiting poor people from buying low-cost firearms or firearms made of a certain material, such as zinc alloy. (Doc. 95, pg. 14).

Third, as to Count IV, Plaintiff argues there is no precedent for requiring that a firearms purchaser wait over 72 hours, and "potentially forever," to acquire a firearm from a licensed firearm dealer. (Doc. 95, pg. 17). Plaintiff argues a firearm that cannot be obtained in a timely fashion, or at all, cannot be "kept" under the Second Amendment. (Doc. 95, pg. 17). Therefore, if the State of Illinois cannot complete a background check within approximately 72 hours, then an individual, who was already the subject of a background check for purposes of receiving a FOID card, should not have to suffer a violation of his or her rights under the Second Amendment. (Doc. 95, pg. 18).

### B. Defendants' Cross-Motion for Summary Judgment and Plaintiff's Motion for an Extension of Time to File a Response

Initially, Defendants argue Plaintiff lacks standing on all Counts.[3] (Doc. 101, pgs. 2, 8-11). Defendants argue Plaintiff did not suffer any injury from the delay in receiving a FOID card, as he possessed a firearm inherited from his father. (Doc. 101, pgs. 4, 8-9). Likewise, Defendants argue Plaintiff did not suffer any injuries related to a FCCL because he never applied or paid a fee for an FCCL. (Doc. 101, pgs. 2, 4, 9-10). Further, Defendants note Plaintiff never attempted to purchase a firearm, let alone a handgun made of zinc alloy, and he does not desire to do so. (Doc. 101, pgs. 2, 9-11). By extension, Plaintiff has not been subjected to a background check at the point of purchase. (Doc. 101, pg. 11).

---

[3]Defendants present similar standing arguments in their Response to Plaintiff's Cross-Motion for Summary Judgment (Doc. 104). The Court finds it unnecessary to repeat those similar arguments.

Regardless, Defendants submit Plaintiff cannot afford the cheapest zinc alloy handgun, and he has not taken steps to save for a firearm. (Doc. 101, pg. 10). Zinc alloy handguns are arguably comparable in price to similar or better-quality handguns. (Doc. 101, pg. 10).

Absent standing, Defendants argue Plaintiff cannot challenge the FCCL application fee, the delays in receiving a FOID card or FCCL, the bar on the sale of zinc alloy handguns, or the delays in receiving background checks at the point of purchase. (Doc. 101, pgs. 2, 8-10). Defendants argue, "to assess any delay claim, the Court would have to speculate as to any possible length of delay and how long is too long." (Doc. 101, pg. 2 n. 2). Defendants also note that nothing has changed since the dismissal of related Counts of the First Amended Complaint for lack of standing. (Docs. 68; 101, pgs. 8-10).

Further, on the merits of Count I, Defendants argue there is no evidence that Defendant Hacker personally delayed the processing of FOID card applications, including that of Plaintiff. (Doc. 101, pgs. 12-13). Also, they submit Defendant Hacker addressed the delays in processing FOID card applications by hiring more staff and increasing efficiency, which resulted compliance by December 2021. (Doc. 101, pg. 13).

A slight detour to address procedural decorum is worthwhile here. The Court must consider Plaintiff's 1-page Motion for an Extension of Time (Doc. 105) to file such a Response. That Motion was filed 39 days out-of-time. (Docs. 101 & 105). Three days later, Plaintiff proceeded to file the Response, even though the Court had not yet ruled. As such, the Motion for an Extension of Time essentially operates as a request for the Court to consider the Response in this ruling.

Seemingly unbothered by the lack of timeliness, Plaintiff's attorney, in the Motion for an Extension of Time, merely states "Plaintiff desires to respond…but needs additional time to do so." (Doc. 105). Plaintiff's attorney attempted to bolster his request by explaining that he has been busy. (Doc. 105). Specifically, Plaintiff's attorney "tried two jury trials, wr[ote] an Illinois Supreme Court merits brief, [wrote] multiple Illinois Appellate Court briefs, and has generally had an unusually excessive schedule that has limited his available time." (Doc. 105). The Court does not doubt the veracity of these statements, but it wonders how long it took Plaintiff's attorney to file the 1-page Motion and whether that could have been done before the lapse of the response deadline. Promptness in this regard would have avoided the possibility that the Court would deem the merits of Defendants' Cross-Motion for Summary Judgment admitted as well as the requirement that Plaintiff show excusable neglect under Federal Rule of Civil Procedure 6(b)(1), which, in light of Defendants' arguments (Doc. 106), seems to weigh in favor of denying the Motion for an Extension of Time. *See* L.R. 7.1(c) ("Failure to timely file a response to a motion may, in the Court's discretion, be considered an admission of the merits of the motion."); Fed. R. Civ. P. 6(b)(1)(B) ("When an act may or must be done within a specified time, the court may, for good cause, extend the time…on motion made after the time has expired if the party failed to act because of excusable neglect."); *Miller v. Chicago Transit Authority*, 20 F.4th 1148, 1153 (7th Cir. 2021) (discussing the factors considered when deciding whether neglect was excusable under Rule 6(b)(1)); *see also Harrington v. City of Chicago*, 433 F.3d 542, 548 (7th Cir. 2006) ("[I]t is widely accepted that neglect due to a busy schedule is not excusable.").

Nevertheless, the Court finds it would be helpful to consider the Response when resolving the Cross-Motions for Summary Judgment. For these reasons, the Motion for an Extension of Time is **GRANTED**.

Returning to the Defendants' cross motions, particularly as to standing on Count I, Plaintiff argues he suffered from the delay in the issuance of his FOID card. (Doc. 107, pg. 2). Plaintiff argues that delay abated only after he effected service in this case. (Doc. 107, pg. 2). In Plaintiff's view, Defendants sought to moot the case by finally issuing the FOID card. (Doc. 107, pgs. 2, 4). Further, Plaintiff argues nominal damages can vindicate the deprivation of constitutional rights caused by the aforementioned delay. (Doc. 107, pgs. 2-3). Plaintiff also argues he was without an operable firearm while he waited for a FOID card, as the ammunition for his inherited rifle is no longer manufactured. (Doc. 107, pg. 7).

With respect to standing on Count II, Plaintiff concedes he has not paid a FCCL fee because he has no income other than social security. (Doc. 107, pg. 8). However, Plaintiff still claims an injury, as he cannot lawfully carry a firearm outside of the home without an FCCL that he cannot afford. (Doc. 107, pg. 9). In Plaintiff's view, the "problem is fairly traceable to the fact[] that Plaintiff lacks a spare $150.00, but even if he did not lack a spare $150.00, the problem is fairly traceable to Defendant charging about double what it costs to process the [FCCL] application." (Doc. 107, pg. 9). Plaintiff makes similar arguments with respect to standing on Counts III and IV. (Doc. 107, pgs. 11-12).

In response to Defendants' arguments on the merits of Count I, Plaintiff argues "[i]f Hacker [wa]s responsible for processing FOID card[s] and issuing same, then he

[wa]s personally involved, even if that personal involvement…[was] an utter dereliction of duty." (Doc. 107, pg. 5). Plaintiff points out that the ISP Firearms Services Bureau, institutionally, is responsible for processing FOID card applications. In other words, Plaintiff suggests Defendant Hacker can be personally liable because he was the Chief of the ISP Firearms Services Bureau, which experienced delays in the processing of FOID card applications and staffing issues during the relevant timeframe. (Doc. 107, pg. 6).

## II. Analysis

Under Federal Rule of Civil Procedure 56(a), the Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact," such that the movant is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *accord Driveline Systems, LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019) (quoting *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015); citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Assertions that a fact cannot be or is genuinely disputed must be supported by citations to particular parts of the materials of record. *See* Fed. R. Civ. P. 56(c)(1)(A). Alternatively, the assertions must be supported by a showing that the materials cited do not establish the absence or presence of a genuine dispute or that an adverse party cannot produce evidence to support the fact. *See* Fed. R. Civ. P. 56(c)(1)(B).

If the movant presents evidence showing the absence of a genuine dispute of material fact, then the burden shifts to the nonmovant to provide evidence of specific facts that create a genuine dispute of material fact. *See Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (citing *Hudson Ins. Co. v. City of Chic. Heights*, 48 F.3d 234, 237 (7th Cir. 1995)). A genuine dispute of material fact exists if there is sufficient evidence for the

nonmovant to receive a jury verdict. *See Driveline Systems*, 936 F.3d at 579 (quoting *Aregood v. Givaudan Flavors Corp.*, 904 F.3d 475, 482 (7th Cir. 2018), *reh'g denied* (Oct. 30, 2018)). However, speculation about a material fact, unsupported by evidence, cannot defeat summary judgment. *See Moje v. Fed. Hockey League, LLC*, 377 F. Supp. 3d 907, 920 (N.D. Ill. 2019) (citing *Sbika v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721 (7th Cir. 2018); *Cleveland v. Porca Co.*, 38 F.3d 289, 295 (7th Cir. 1994)). With cross-motions for summary judgment, the Court gives each party the benefit of all reasonable inferences when considering the opposing party's cross-motion. *See Hoosier Env'l Council v. Natural Prairie Indiana Farmland Holdings, LLC*, 564 F. Supp. 3d 683, 697-98 (N.D. Ind. 2021) (citing *Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004)).

Relevant to the instant Cross-Motions for Summary Judgment, the question of whether a plaintiff has standing under Article III of the U.S. Constitution is jurisdictional in nature. *See Pennell v. Global Trust Mngt, LLC*, 990 F.3d 1041, 1044 (7th Cir. 2021); *accord Wisconsin Right to Life State Pol. Action Committee v. Barland*, 664 F.3d 139, 146 (7th Cir. 2011). A plaintiff must establish standing when filing the lawsuit, and he or she cannot manufacture standing thereafter. *See Pennell*, 990 F.3d at 1044 (quoting *Pollack v. U.S. Dep't of Justice*, 577 F.3d 736, 742 n. 2 (7th Cir. 2009)). The standing issue remains open for review at all stages of the case and must be satisfied for each claim and request for relief. *See id.* (quoting *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994)); *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (citing *David v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008); *Friends of the Earth, Inc. Laidlaw Env'l Servs. (TOC) Inc.*, 528 U.S. 167, 185 (2000)).

Article III limits the judicial power to cases and controversies, for which a plaintiff must have standing. *See U.S. v. Texas*, 599 U.S. ----, 143 S. Ct. 1964, 1969 (2023); *accord TransUnion LLC*, 141 S. Ct. at 2203. This is a "bedrock constitutional requirement" and not " 'merely a troublesome hurdle to be overcome if possible so as to reach the "merits" of a lawsuit…a party desires to have adjudicated.' " *See Texas*, 143 S. Ct. at 1969 (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 476 (1982)). Standing is premised on the separation of powers, as it safeguards the judiciary's limited role by preventing the usurping of the political branches. *See id.* (quoting *Clapper v. Amnesty Int's USA*, 568 U.S. 398, 408 (2013)); *see also TransUnion LLC*, 141 S. Ct. at 2203 ("Under Article III, federal courts do not adjudicate hypothetical or abstract disputes. Federal courts do not possess a roving commission to publicly opine on every legal question. Federal courts do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities. And federal courts do not issue advisory opinions."); *accord Dinerstein v. Google, LLC*, 73 F.4th 502, 519-20 (7th Cir. 2023).

To establish Article III standing, a plaintiff must show a concrete, particularized, and actual or imminent injury, caused by the defendant, that is redressable by the Court. *See Texas*, 143 S. Ct. at 1969 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); *TransUnion LLC*, 141 S. Ct. at 2203; *accord Dinerstein*, 73 F.4th at 511; *Ewing v. MED-1 Solutions, LLC*, 24 F.4th 1146, 1150-51 (7th Cir. 2022). To be concrete, the injury must be real and not abstract, conjectural, or hypothetical. *See TransUnion LLC*, 141 S. Ct. at 2203 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *Summers v. Earth Island Institute*, 555 U.S. 488, 493(2009); *Lujan*,

504 U.S. at 560; *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220-21 (2009));

*Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1151 (7th Cir. 2020). Likewise, to be

particularized, the injury must personally and individually affect the plaintiff, as opposed

to being a generalized grievance of all members of the public. *See Fox*, 980 F.3d at 1152

(quoting *Lujan*, 504 U.S. at 560 n. 1; *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342-44

(2006)). Finally, the imminence requirement measures the likelihood of a plaintiff's

claimed injury, which cannot be speculative. *See Dinerstein*, 73 F.4th at 511-12. A plaintiff

who has not suffered a past harm cannot rest on the allegation that he or she may suffer

some injury at an indefinite time in the future. *See id.* (quoting *Whitmore v. Arkansas*, 495

U.S. 149, 155 (1990); *Lujan*, 504 U.S. at 564 n. 2). The claimed injury "must be '*certainly*

*impending.*'" *See id.* (quoting *Lujan*, 504 U.S. at 564 n. 2) (Emphasis in original.). Also,

even if an imminent risk of future harm provides standing to sue for prospective relief, a

claim for damages must be supported by concrete harm that has actually occurred. *See id.*

at 512, 515 (citing *TransUnion LLC*, 141 S. Ct. at 2210-11); *accord Ewing*, 24 F.4th at 1151-52.

### A. Count I of the Second Amended Complaint

In Count I, Plaintiff alleges Defendant Hacker, as the Chief of the ISP Firearms

Services Bureau, was responsible for processing FOID card applications, issuing FOID

cards, and licensing and regulating firearms dealers under Illinois law. (Doc. 69, pg. 2).

Defendant Hacker allegedly violated the Second and Fourteenth Amendments by failing,

in his personal capacity, to approve or deny Plaintiff's FOID card application within any

constitutionally allowed timeframe. (Doc. 69, pg. 3). He allegedly knew of the delay, the

14

fact that it violated Illinois law, and the undue restriction of the Second Amendment, yet took "no articulable steps to actually redress th[e] problem." (Doc. 69, pg. 4).

Here, Plaintiff submitted a FOID card application on January 14, 2019. (Docs. 101-1, pg. 9; 101-2, pg. 1; 101-3, pg. 2). However, he did not pay the FOID card application fee at that time. (Docs. 101-1, pg. 9; 101-2, pg. 1; 101-3, pg. 2). Instead, the record indicates Plaintiff paid that fee, thereby completing his FOID card application, on June 11, 2020. (Docs. 101-1, pg. 9; 101-2, pg. 2; 101-3, pg. 2). On November 12, 2020, which was 3 weeks after the filing of this lawsuit, Plaintiff received his FOID card. (Doc. 101-1, pgs. 10, 18).

Before January 14, 2019, Plaintiff had never applied for a FOID card. (Doc. 101-1, pg. 10). Plaintiff did so, at that time, because he knew a FOID card was a requirement for owning a firearm in Illinois. (Doc. 101-1, pg. 10). At the time of his deposition, which was held on November 2, 2022, Plaintiff owned one firearm—a .22 caliber rifle that was manufactured in the 1920s. (Docs. 101-1, pg. 10; 101-4, pg. 5). He inherited that rifle from his father, who passed away in 2012. (Doc. 101-1, pgs. 6, 10). However, it was not until 2019 or 2021 that Plaintiff acquired that firearm. (Docs. 101-1, pgs. 10-11, 13; 101-4, pg. 6). Plaintiff stated the firearm was inherited, "so the dates may not be exact." (Doc. 101-1, pg. 13).

Before that time, the firearm was stored in a gun safe contained within a shed on Plaintiff's mother's property. (Doc. 101-1, pgs. 10-11). Thereafter, the firearm was stored in Plaintiff's home. (Doc. 101-1, pg. 11). He has never had to pay to store the firearm. (Doc. 101-1, pgs. 11, 13, 15). Plaintiff stated the firearm is fireable, and he did not recall stating otherwise in discovery. (Docs. 101-1, pgs. 10-11; 101-4, pg. 5). Regardless, Plaintiff

indicated the ammunition for the firearm is no longer manufactured. (Docs. 101-1, pgs. 13, 17; 101-4, pg. 5). Plaintiff has not attempted to purchase a firearm, stating he "[j]ust wasn't interested" and "[j]ust never did go looking for one." (Doc. 101-1, pgs. 14-15). However, Plaintiff looked into a .22 caliber Heritage made of zinc, but "[i]t was found to be too expensive." (Doc. 101-1, pgs. 16-17). When asked if he desired to buy a handgun for self-defense, Plaintiff stated, "[a]t this point I could not afford it" but, if he could afford it, he "might consider doing that." (Doc. 101-1, pg. 18). Plaintiff could "probably" save "$100 or $130, give or take, for a handgun for self-defense." (Doc. 101-1, pgs. 17, 19-20).

When asked how his rights were violated, Plaintiff stated it was an issue of delay, as "there is no way it should take that long to [get a FOID card]. If I can't get a FOID card, I can't legally own a gun." (Doc. 101-1, pgs. 14-15). Plaintiff continued, "it takes forever and a day…. The only way you hear back from anybody is through a lawsuit. That should not be…. You have 30 days. That should be plenty of time." (Doc. 101-1, pgs. 14-15).

Now, when dismissing Count I of the First Amended Complaint due to lack of standing, the Court found as follows:

> From the pleadings, it is clear that Rogers adequately pleads the existence of [a] legally protected interest. Rogers does not, however, adequately allege injury other than to say that there was a delay which prevented him from purchasing a firearm. It is conceivable that delay, in and of itself, may result in or even bring about injury, but Rogers does not set forth in his complaint the nature of the injury he suffered as a result of any delay.

*Rogers*, No. 20-cv-1116, 2021 WL 2711745, *3.

Since that time, the Supreme Court decided *New York State Rifle & Pistol Association, Inc. v. Bruen*, in which the Supreme Court stated:

To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes, under which "a general desire for self-defense is sufficient to obtain a [permit]." [Citation]. Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent "law-abiding, responsible citizens" from exercising their Second Amendment right to public carry. [Citation]. Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens." [Citation]. And they likewise appear to contain only "narrow, objective, and definite standards" guiding licensing officials, [citation], rather than requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion," [citation]—features that typify proper-cause standards like New York's. *That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.*

*See* 142 S. Ct. 2111, 2138 n. 9 (2022) (Emphasis added.).

While the above passage refers to the "right to public carry," the Court believes the Supreme Court's reasoning as to the "lengthy wait times" may well apply to the processing of FOID card applications. *See id.* Here, even though Illinois law states that the ISP "shall either approve or deny all applications within 30 days from the date they are received," the "lengthy wait time[]" in this case stemmed from at least June 11, 2020, to November 12, 2020, which was 3 weeks after the filing of this lawsuit. *See* 430 ILCS 65/5; (Docs. 101-1, pg. 9-10, 18; 101-2, pg. 2; 101-3, pg. 2).[4] During that time, Plaintiff was barred from "acquir[ing] or possess[ing] any firearm [or ammunition], stun gun, or taser within this State," even though he was otherwise qualified to do so. *See* 430 ILCS 65/2. The

---

[4]The Court notes Defendants have not argued this case was mooted by the issuance of Plaintiff's FOID card. However, the Court cast doubt on such a claim when resolving the Motion to Dismiss the First Amended Complaint. *See Rogers v. Hacker*, No. 20-cv-1116, 2021 WL 2711745, *2 n. 1 (S.D. Ill. July 1, 2021).

record indicates Plaintiff engaged in the FOID card process because he possessed a .22 caliber rifle that may or may not have been fireable. Regardless, though, the indeterminate but "lengthy" delay, alleged by Plaintiff, was attributable to a State-imposed prerequisite to broader Second Amendment activity, such as the right to acquire or possess other firearms or ammunitions. *See Marszalek v. Kelly*, No. 20-cv-4270, 2021 WL 2350913, *1, 7 (N.D. Ill. June 9, 2021) (stating, in case of ISP's months-long delay in granting FOID cards, "[c]learly, at some point, agency dithering would violate the Second Amendment," as Illinois residents would otherwise have no constitutional redress if the FOID application process lengthened to years). In this context, the Court finds it is inconsequential that Plaintiff did not save for or attempt to purchase another firearm, as any attempted purchase would have been futile without a FOID card. As such, for purposes of standing, Plaintiff has shown a concrete injury, namely, a denial of the right to acquire and possess a firearm for lawful purposes under the Second and Fourteenth Amendments. *See TransUnion LLC*, 141 S. Ct. at 2203; *Fox*, 980 F.3d at 1151-52; *see also District of Columbia v. Heller*, 554 U.S. 570, 592 (2008) ("Putting all of these [Second Amendment] textual elements together, we find that they guarantee the individual right to possess and carry weapons in case of confrontation."); *Bruen*, 42 S. Ct. at 2126, 2135 (stating the aforementioned principle and also holding "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct).

Again, Plaintiff alleges Defendant Hacker, as the Chief of the ISP Firearms Services Bureau, was responsible for the processing of FOID card applications, the issuance of

FOID cards, and the licensing and regulation of firearms dealers under Illinois law. (Doc. 69, pg. 2). Defendant Hacker allegedly failed, in his personal capacity, to timely approve or deny Plaintiff's FOID card application. (Doc. 69, pg. 3). Further, as Plaintiff suggests, nominal damages satisfy the redressability requirement of standing if the asserted claim is based on a completed violation of a legal right by the defendant. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801-02 (2021); *accord Brumit v. City of Granite City, Illinois*, 72 F.4th 735, 737 (7th Cir. 2023). It is true, though, that a plaintiff must still "establish the other elements of standing." *See Uzuegbunam*, 141 S. Ct. at 802 n* (citing *Planck v. Anderson*, 5 T.R. 37, 41, 101 Eng. Rep. 21, 33 (K.B. 1792)); *see also Brumit*, 72 F.4th at 737 ("Plaintiffs' potential problem is that their complaint did not allege a 'completed' violation of their rights…, so [they] have failed to identify a concrete injury that could be redressed by nominal damages."). As discussed above, Plaintiff established the other elements of standing for the instant claim Accordingly, the Court proceeds to the merits of Count I.

To prevail under § 1983 in Count I, Plaintiff must establish that Defendant Hacker is individually liable, *i.e.*, that Defendant Hacker was personally involved in the deprivation of Plaintiff's constitutional rights. *See Johnson v. Rimmer*, 936 F.3d 695, 710-11 (7th Cir. 2019) (citing *Estate of Perry v. Wenzel*, 872 F.3d 439, 459 (7th Cir. 2017); quoting *Colbert v. Chicago*, 851 F.3d 649, 657 (7th Cir. 2017)); *accord Carmody v. Board of Trustees of University of Illinois*, 893 F.3d 397, 401 (7th Cir. 2018)). This requires a causal connection between Defendant Hacker and the misconduct alleged by Plaintiff. *See Carmody*, 893 F.3d at 401 (quoting *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)); *see also Perez v.*

*Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015) ("It is well established that '[f]or constitutional violations under § 1983…a government official is only liable for his or her own misconduct.' "). The doctrine of *respondeat superior* cannot be used to establish that Defendant Hacker, as a supervisor, is liable for a subordinate's violation of Plaintiff's constitutional rights. *See Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997) (citing *Lanigan v. Village of East Hazel Crest, Illinois*, 110 F.3d 467, 477 (7th Cir. 1997)); *see also Horshaw v. Casper*, 910 F.3d 1027, 1029-30 (7th Cir. 2018) ("[S]upervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly."). Indeed, a supervisor who negligently fails to detect and prevent subordinate misconduct is not individually liable. *See Gossmeyer*, 128 F.3d at 495 (citing *Lanigan*, 110 F.3d at 477). Instead, in that context, Defendant Hacker is liable under § 1983 only if he knew about and facilitated, approved, condoned, or turned a blind eye to the misconduct. *See id.* (quoting *Lanigan*, 110 F.3d at 477).

In this case, Defendant Hacker described the work of the ISP Firearms Services Bureau: "We are responsible for processing FOID applications, both new and renewal; [F]CCL applications, both new and renewal; processing FTIP transactions…; the Firearms Dealer Licensing Certification Program, which is…the Illinois version of the ATF." (Doc. 101-5, pg. 9). Defendant Hacker indicated around 25 persons work in the FOID Section of the ISP Firearms Services Bureau. (Doc. 101-5, pg. 13). Those persons work as analysts, who process FOID card applications, or supervisors, who "review…and…do audits of

th[at] work." (Doc. 101-5, pg. 13). Defendant Hacker also indicated staffing is "fairly stable," but it can fluctuate based on life circumstances. (Doc. 101-5, pg. 14).

At the time of his deposition, which was held on April 6, 2022, Defendant Hacker stated there had previously been failures to issue FOID cards within 30 days. (Doc. 101-5, pg. 117). The failures were "relatively frequent" until December 2021, at which time FOID cards were being issued within 30 days. (Doc. 101-5, pg. 18). Defendant Hacker believed the average FOID card application processing time peaked in June or July of 2021, when it was taking 230 or 240 days to issue a FOID card. (Doc. 101-5, pg. 18).

Defendant Hacker opined on the reasons for the delays and outlined his efforts to address them. He described "a reduction of staff," caused by attrition, promotions, and separations, "toward the end of 2019." (Doc. 101-5, pg. 126). Also, in early-2020, the renewal period for FOID cards was changed from 5 years to 10 years. (Doc. 101-5, pgs. 26-27). Finally, Defendant Hacker noted, in March 2020, there was social unrest and "COVID issues," which he believed caused concerns over personal safety to spike and FOID card applications to "dramatically increase." (Doc. 101-5, pg. 27). As a result, Defendant Hacker indicated, "as our head count was dipping, our application income was coming up substantially to the point where there were record levels throughout the entire year." (Doc. 101-5, pg. 27).

When the Governor sent State employees home from work due to COVID-19, the majority of the analysts within the FOID Section were sent home. (Doc. 101-5, pg. 29). However, the ISP Firearms Services Bureau had a continuity of operations plan to maintain essential operations. (Doc. 101-5, pg. 29). Eight of the twenty-five analysts

remained in-office to perform work functions. (Doc. 101-5, pg. 29). Within four or five days of the Governor sending State employees home from work, Defendant Hacker "had a significant number of those analysts operational in their remote environment." (Doc. 101-5, pg. 29). By March 26, 2020, the "entire staff [was] operational in the remote environment." (Doc. 101-5, pg. 29). Employees were issued laptops, multiple monitors, and software that is required to process FOID card applications. (Doc. 101-5, pg. 93).

Further, Defendant Hacker conceded, "[t]he State hiring process is slow at best." (Doc. 101-5, pg. 27). However, the FOID Section eventually had "significant hiring approved." (Doc. 101-5, pgs. 27-28). At that point, it took a period of time to train and implement the new hires. (Doc. 101-5, pg. 28). By the end of 2020 or start of 2021, the new hires were "fully operational analysts" who helped to level out the FOID card applications. (Doc. 101-5, pg. 28). Defendant Hacker indicated application efficiency went up with "several initiatives" that were implemented. (Doc. 101-5, pg. 28). For example, portions of the FOID card application are automated, and "a lot of work" was done to refine and increase the accuracy and effectiveness of those portions of the FOID card application. (Doc. 101-5, pgs. 30-31). In sum, the work "open[ed] up the window for more potential applicants to move through that automated process." (Doc. 101-5, pg. 31). By mid-2021, the FOID card application processing times were "dramatically decrease[d]" and, by the end of 2021, they were "where they should be." (Doc. 101-5, pg. 28). As of the deposition date, the processing time was believed to be 10 days. (Doc. 101-5, pg. 92).

Here, the Court concludes that Plaintiff has failed to point to any evidence in the record to suggest that Defendant Hacker was personally involved in delaying the

issuance of Plaintiff's FOID card, as is necessary for Plaintiff to hold Defendant Hacker individually liable under § 1983. *See Johnson*, 936 F.3d at 710-11; *Carmody*, 893 F.3d at 401; *Perez*, 792 F.3d at 781; *Gossmeyer*, 128 F.3d at 495; *Horshaw*, 910 F.3d at 1029-30. Instead, the relevant evidence of record only generally relates to the operations of the ISP Firearms Services Bureau and Defendant Hacker's oversight responsibilities as its Chief. The evidence of record does not indicate, for example, Defendant Hacker personally processed or directly oversaw Plaintiff's FOID card application. It is, however, evident that Defendant Hacker was aware generally of delays in processing applications because he asserts that he took some steps to rectify the broader issues of delay. (Doc. 101-5, pgs. 27-29). But Plaintiff offers nothing to suggest either expressly or by reasonable inference that Defendant Hacker consciously disregarded the delay or that he facilitated, approved, or condoned the delay that Plaintiff experienced. Again, the record indicates no "causal connection" between Defendant Hacker and the delay Plaintiff personally experienced in obtaining his FOID card. *See Carmody*, 893 F.3d at 401; *Perez*, 792 F.3d at 781. For these reasons, the Court finds Defendant Hacker is entitled to summary judgment on Count I. *See* Fed. R. Civ. P. 56(a), (c)(1); *Driveline Systems, LLC*, 936 F.3d at 579; *Carroll*, 698 F.3d at 564; *Hoosier Env'l Council*, 564 F. Supp. 3d at 697-98.

## B. Counts II, III, and IV of the Second Amended Complaint

Next, the Court finds Plaintiff lacks standing to assert Counts II, III, and IV of the Second Amended Complaint. Usually, it is the injury requirement that is "the main event" for standing issues. *See Fox*, 980 F.3d at 1151. That is largely the case here.

### 1. Count II — The FCCL Fee

As to Count II, and unlike the FOID card application that is at issue in Count I, Plaintiff has never applied for a FCCL. (Doc. 101-1, pgs. 15-16). In fact, at the time of his deposition, it was Plaintiff's understanding that the case was about owning the .22 caliber rifle that he inherited from his father and not about FCCLs. (Doc. 101-1, pg. 15). While Plaintiff argues he is unable to afford the $150 FCCL fee because it costs more than is reasonably necessary, that contention is inconsistent with the evidence of record. (Doc. 69, pgs. 8-11). Plaintiff indicated at his deposition that he can "probably" save "$100 or $130, give or take." (Doc. 101-1, pgs. 17, 19-20). Plaintiff has also shown an ability to pay a $500 filing fee and execute a $300 per hour contract with his attorney. (Doc. 101-1, pgs. 15-16, 19-20). Even if there was no charge for an FCCL or if he could reasonably afford that license, though, Plaintiff indicated he would merely "consider" obtaining a FCCL. (Doc. 101-1, pg. 19). Similarly, Plaintiff has a FOID card but has never attempted to purchase a firearm, including one that could be concealed for carry, because he "[j]ust wasn't interested" and "[j]ust never did go looking for one." (Doc. 101-1, pgs. 14-15). In short, Plaintiff seeks to redress an injury, namely, an exorbitant FCCL fee that allegedly constitutes a tax on constitutionally protected activity, that he has not suffered. (Docs. 69, pg. 8-11; 95, pgs. 4-5, 8). Accordingly, any opinion by the Court on the merits of Count II,

24

where Plaintiff admits he has taken no steps to apply and pay for an FCCL, would be hypothetical, abstract, conjectural, and a mere result of Plaintiff's desire to adjudicate a generalized legal grievance related to FCCLs.[5] *See Texas*, 143 S. Ct. at 1969; *TransUnion LLC*, 141 S. Ct. at 2203; *Fox*, 980 F.3d at 1151-52; *Dinerstein*, 73 F.4th 511-12.

## 2. Count III—Section 24-3(A)(h)

With respect to Count III, Section 24-3(A)(h) provides:

(A) A person commits the offense of unlawful sale or delivery of firearms when he or she knowingly does any of the following:

*** 

    (h) While holding any license as a dealer, importer, manufacturer or pawnbroker under the federal Gun Control Act of 1968, manufactures, sells or delivers to any unlicensed person a handgun having a barrel, slide, frame or receiver which is a die casting of zinc alloy or any other nonhomogeneous metal which will melt or deform at a temperature of less than 800 degrees Fahrenheit. For purposes of this paragraph, (1) "firearm" is defined as in the Firearm Owners Identification Card Act; and (2) "handgun" is defined as a firearm designed to be held and fired by the use of a single hand, and includes a combination of parts from which such a firearm can be assembled.

720 ILCS 5/24-3(A)(h).

In this case, Plaintiff allegedly discovered certain handguns, generally made of zinc alloy, cost approximately $120 and are within his budget. (Doc. 69, pg. 13). However,

---

[5]The Court dismissed Count II of the First Amended Complaint, relating to delays in the receipt of FCCLs, for lack of ripeness. *See Rogers*, No. 20-cv-1116, 2021 WL 2711745, *3. When doing so, the Court reasoned: "Rogers has not yet applied for his [FCCL].... While he alleges that he will apply at some time in the future, he may or may not follow through with that plan." *See id*. Although Plaintiff has abandoned the claim related to delays in the receipt of FCCLs, the Court notes the applicability of its prior reasoning to Count II of the Second Amended Complaint. Similarly, the Court dismissed Count III of the First Amended Complaint, relating to, *inter alia*, the FCCL fee allegations that are now at issue, for lack of standing. *See id*. at *3-4. The Court, in part, reasoned: "And, of course, there is no contention by Rogers that he has paid a fee for a [FCCL]." *See id*. at *4. Obviously, this reasoning also remains applicable.

Section 24-3(A)(h) allegedly operates as a total ban on "new, modern[,] and safe" zinc alloy handguns because dealers and manufacturers will not sell such firearms to FOID card holders due to a fear of prosecution or the revocation of licenses. (Doc. 69, pg. 13). Therefore, according to Plaintiff, he must remain unarmed. (Doc. 69, pg. 14).

As with Count I, Plaintiff's allegations are belied by the evidence. Plaintiff has never attempted to purchase any firearm, let alone a handgun made of zinc alloy, because he "[j]ust wasn't interested" and "[j]ust never did go looking for one." (Doc. 101-1, pgs. 14-15). At most, Plaintiff looked into purchasing a .22 caliber Heritage, made of zinc alloy, but "[i]t was found to be too expensive." (Doc. 101-1, pgs. 16-17). Even if he could afford it, though, Plaintiff merely stated he "might consider" purchasing a .22 caliber Heritage for self-defense. (Doc. 101-1, pg. 18). These facts, which show Plaintiff's mere tepid interest in buying a firearm or a handgun made of zinc alloy, are insufficient to establish he has suffered an injury, in any way caused by Defendants, due to Section 24-3(A)(h). But, even if that were not the case, it is also unclear that an invalidation of Section 24-3(A)(h) would redress Plaintiff's alleged injury, as licensed gun dealers would still not be required to sell handguns made of zinc alloy at all or at a price Plaintiff can afford. *See Texas*, 143 S. Ct. at 1969 (stating an injury must be legally and judicially cognizable, *i.e.*, redressable, meaning it is traditionally capable of resolution by the judiciary).

Moreover, a party only has standing to challenge the constitutionality of a statute to the extent it adversely impacts his or her own rights. *See Wilson v. Estate of Burge*, No. 21-cv-3487, --- F. Supp. 3d ----, 2023 WL 2750946, *63 (N.D. Ill. March 31, 2023) (quoting *County Court of Ulster County, New York v. Allen*, 442 U.S. 140, 154-55 (1979)). Therefore,

26

generally, if there is no constitutional defect in the application of a statute to the plaintiff, then he or she does not have standing to argue its constitutionality as applied to third parties in hypothetical situations. *See id.* (quoting *Allen*, 442 U.S. at 154-55).

Relevantly, Section 24-3(A)(h) is contained within the Illinois Criminal Code of 2012 and targets those, engaged in the commercial sale of firearms, who "hold[] any license as a dealer, importer, manufacturer or pawnbroker under the federal Gun Control Act of 1968." *See* 720 ILCS 5/24-3(A)(h). As such, Plaintiff is not within the class of individuals against whom Defendants would allegedly act in response to violations of Section 24-3(A)(h). Likewise, Plaintiff is not within the class of individuals for whom there " 'exists a credible threat of prosecution,' " which could establish a pre-enforcement injury. *See File v. Martin*, 33 F.4th 385, 389 (7th Cir. 2022) (quoting *Driehaus*, 573 U.S. at 159); *see also Am. Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012) ("[T]he plaintiff must show 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder.' "); *Int'l Aerobatics Club Chapter 1 v. City of Morris*, No. 13-cv-4272, 2015 WL 13881575, *3 (N.D. Ill. June 23, 2015) ("When this case is viewed as a pre-enforcement challenge, these plaintiffs have standing because *their desired conduct* subjects them to regulation, and potentially to prosecution, by virtue of the very existence of [the]…ordinance and regulations.") (Emphasis added.). As recently noted by our Supreme Court, "the absence of coercive power over the plaintiff makes a difference: [w]hen 'a plaintiff's asserted injury arises from the government's allegedly unlawful regulation…of someone else, much more is needed' to establish standing."

*See Texas*, 143 S. Ct. at 1971 (quoting *Lujan*, 504 U.S. at 562). For all of these reasons, the Court finds it would have to hypothesize or speculate about abstract legal issues that do not personally and individually affect Plaintiff to resolve Count III. *See id.* at 1969; *TransUnion LLC*, 141 S. Ct. at 2203; *Fox*, 980 F.3d at 1151-52; *Dinerstein*, 73 F.4th 511-12.

### 3. Count IV — Transfers of Firearms at the Point of Purchase

With respect to Count IV and the transfer of firearms at the point of purchase, Plaintiff alleges the official guidance of the ISP Firearms Services Bureau could result in "unlimited delay[s] on the right to keep and bear arms" under the Second Amendment. (Doc. 69, pgs. 16-17). However, despite having a FOID card, Plaintiff has never attempted to purchase a firearm because he "[j]ust wasn't interested" and "[j]ust never did go looking for one." (Doc. 101-1, pgs. 14-15). Therefore, by extension, Plaintiff has never awaited the actual transfer of a firearm or had a background check conducted at the point of purchase. (Doc. 101-1, pg. 15). Also, Plaintiff has no definite plans to purchase a firearm. Instead, even if he could afford to purchase a firearm for self-defense, Plaintiff indicates that is merely something he "might consider doing." (Doc. 101-1, pg. 18).

Clearly, Plaintiff has not suffered a concrete injury from the conduct alleged in Count IV. *See TransUnion LLC*, 141 S. Ct. at 2203; *Fox*, 980 F.3d at 1151. He has spent no time, let alone 72 hours or "potentially forever," waiting for the transfer of a firearm at the point of purchase. (Doc. 95, pg. 17). And, of course, the likelihood of a future injury is entirely speculative, as the Court would have to guess about the potential delay Plaintiff would suffer if he attempted to purchase a firearm and the point at which that delay became untenable. *See Dinerstein*, 73 F.4th at 511-12. Therefore, Plaintiff presents nothing

28

more than a generalized grievance, common to all members of the public, rather than an injury affecting him personally and individually. *See Fox*, 980 F.3d at 1151. As discussed in relation to Counts II and III, the Court cannot cast the standing requirement aside in order to reach a hypothetical and abstract legal issue that Plaintiff desires to have adjudicated. *See Texas*, 143 S. Ct. at 1969; *TransUnion LLC*, 141 S. Ct. at 2203.

### 4. Ripeness

Now, the Court notes the close relationship between the doctrines of standing and ripeness. *See Sweeney v. Raoul*, 990 F.3d 555, 559-61 (7th Cir. 2021) ("We can restate many of these same [standing] precepts in terms of ripeness."). Defendants invoke the doctrine of ripeness, along with the doctrine of standing, in relation to Count IV. However, the Court finds the doctrine of ripeness is also applicable to Count II.

The ripeness doctrine, like the standing doctrine, is based on Article III's case-or-controversy requirement. *See Wisconsin Right to Life State Political Action Committee v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011); *accord Church of Our Lord and Savior Jesus Christ v. City of Markham, Illinois*, 913 F.3d 670, 676 (7th Cir. 2019). Also, like standing, the ripeness issue is jurisdictional. *See Barland*, 664 F.3d at 146. Whether a claim is ripe for adjudication depends upon the fitness of the issues for a decision and the hardship of withholding consideration of those issues. *See id*. at 148 (quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983)). Ripeness concerns arise if the claims involve uncertain or contingent events that may not occur as anticipated or at all. *See id*. (citing 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3532 at 365 (3d ed. 2008); *Bauer v. Shepard*,

620 F.3d 704, 708-09 (7th Cir. 2010)); *accord Church of Our Lord and Savior Jesus Christ*, 913 F.3d at 676. The ripeness doctrine seeks to avoid the premature adjudication of and judicial entanglement in abstract disagreements. *See Church of Our Lord and Savior Jesus Christ*, 913 F.3d at 676-77 (citing *Pac. Gas & Elec. Co.*, 461 U.S. at 200-01); *see also Bumpus v. Airline Pilots Ass'n, Int'l*, 606 F. Supp. 3d 845, 852 (N.D. Ill. 2022) ("The dispute must be 'definite and concrete' and 'of sufficient immediacy and reality' to warrant judgment from the court."). For reasons similar to those discussed in the context of standing—namely, that Plaintiff has not attempted to purchase a firearm, awaited a transfer of a firearm or had a background check at the point of purchase, or applied or paid the fee for a FCCL—the Court finds Counts II and IV are also unripe. (Doc. 101-1, pgs. 14-16).

### III. Conclusion

For the foregoing reasons, Plaintiff's Motion for an Extension of Time (Doc. 105) is **GRANTED**, Plaintiff's Cross-Motion for Summary Judgment (Doc. 95) is **DENIED**, and Defendants' Cross-Motion for Summary Judgment (Doc. 101) is **GRANTED**. The Clerk of the Court is **DIRECTED** to enter judgment for Defendants and against Plaintiff.

**SO ORDERED.**

Dated: August 28, 2023

_____
DAVID W. DUGAN
United States District Judge